**CHLOE S. DILLON**
California State Bar No. 273748
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
chloe_dillon@fd.org

Attorneys for Ulises Romeo Lucas-Hernandez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ULISES ROMEO LUCAS-HERNANDEZ,<br><br>Defendant. | CASE NO.:  19MJ24522-LL<br><br>**Memorandum of Points and Authorities in Support of Mr. Lucas's Pretrial Motions** |

## I.    Statement of Facts

On November 30, 2019, Border Patrol Agent Brian Mauler was patrolling a dirt road known as "The 3030 Road," near Boulevard, California. He saw shoeprints near the road, which he followed for about five minutes before finding three people in a deep, sandy wash. The area was about 3.5 miles north of the border in between the United States and Mexico, and 16 miles east of Tecate, California. Agent Mauler questioned the individuals in an unknown language as to their citizenship and legal documents to be present in the United States. He then arrested all three individuals.

Conditions at Border Patrol stations along the U.S./Mexico border have been described as "inhumane and punitive"—arrestees sleep on a concrete floor in very cold temperatures and receive little food or water. *See* Exs. A, B, and C. One station held 900 people even though its maximum capacity was 125; detainees were

1   frequently forced to wear soiled clothing and stand on toilets in order to have

2   enough air to breathe. Ex. D. In the last year, at least seven children have died after

3   being held in such stations. Ex. E. Mr. Lucas suffered through similar conditions.

4       Two days later, on December 2, 2019, Mr. Lucas had his initial appearance

5   and arraignment all while in custody, for a misdemeanor violation of 8 U.S.C.

6   § 1325. He met with counsel in a room in a basement parking garage before the

7   hearing. During this meeting, Mr. Lucas was shackled and in custody. At the initial

8   appearance, Mr. Lucas was also shackled and in custody. At that hearing, the

9   government moved to detain Mr. Lucas on the basis that his undocumented status

10  meant that he had no ties to the community and was thus a flight risk. *See* Dkt. No.

11  5. Mr. Lucas was released on conditions on December 11, 2019. Dkt. Nos. 9, 11.

12      Mr. Lucas has received a total of 63 pages of discovery from the government,

13  as well as certain dispatch recordings and the recording of the post-arrest interview.

14  There is still outstanding discovery to be produced.

15  **II.    Argument**

16      **A.    Motions to Preserve Evidence and Compel Discovery**

17      Mr. Lucas, through counsel, has previously requested Rule 16 and *Brady*

18  discovery directly from the government. Mr. Lucas moves this Court to order the

19  government to preserve and produce all discovery to which he is owed under Rule

20  16 and the Constitution. Rule 16 requires the government to produce evidence that

21  "is material to preparing the defense[.]" FED. R. CRIM. PROC. 16(1)(E)(i). Indeed,

22  this rule carries a "low threshold" of materiality, asking only whether information

23  would help to prepare the defense. *United States v. Hernandez-Meza*, 720 F.3d 760,

24  768 (9th Cir. 2013). This includes material that "simply causes a Defendant to

25  'completely abandon' a planned defense and 'take an entirely different path.'" *Id*.

26  (quoting *United States v. Doe*, 704 F.3d 1134, 1151 (9th Cir. 2013).

27          A defendant needn't spell out his theory of the case in
            order to obtain discovery. Nor is the government entitled
28          to know in advance specifically what the defense is going

1
2
3

to be. The relevant subsection of Rule 16 is written in categorical terms: Upon defendant's request, the government must disclose any documents or other objects within its possession, custody or control that are "material to preparing the defense."

4

*Hernandez-Meza*, 720 F.3d at 768 (quoting FED. R. CRIM. PROC. 16(a)(1)(E)(i).

5
6
7
8
9
10
11
12
13
14
15
16

This rule applies to evidence helpful to preparing a defense at trial, as well as evidence helpful to pre-trial litigation. Specifically, the Ninth Circuit has repeatedly held that evidence helpful and relevant to pre-trial suppression motions is discoverable under Rule 16. *See, e.g.*, *United States v. Soto-Zuniga*, 837 F.3d 992, 1001 (9th Cir. 2016) (holding that statistics pertaining to an alleged immigration checkpoint was discoverable under Rule 16 as it was relevant to a suppression motion); *United States v. Thomas*, 726 F.3d 1086, 1096–97 (9th Cir. 2013) (holding that various records related to a law enforcement dog relied on to search the defendant were discoverable as relevant to a suppression motion); *United States v. Cedano-Arellano*, 332 F.3d 568, 571 (9th Cir. 2003) (holding that evidence related to a dog's training and experience related to a suppression motion was discoverable under Rule 16).

17
18

Mr. Lucas here addresses specifically certain items that he fears the government may not preserve or produce without the Court's order.

19
20
21
22
23
24
25
26
27

First, Mr. Lucas requests discovery on whether the National Guard or U.S. military was involved in his case in any way. The National Guard and the U.S. Marines have been deployed to assist in border enforcement, and their involvement may violate the Posse Comitatus Act. *See United States v. Dreyer*, 804 F.3d 1266, 1272–74 (9th Cir. 2015) (en banc) (explaining that the Posse Comitatus Act forbids military personnel from participating in civilian law enforcement activities). If the National Guard or military was involved in his case, Mr. Lucas will make a specific, follow-up discovery request with the prosecutor or Court if necessary, and likely file a motion to dismiss under the Posse Comitatus Act.

28

Second, Mr. Lucas requests any and all recordings from any surveillance

leading up to and including the arrest. This includes any scope video, infrared recording, dispatch tapes, seismic intrusion device photographs, bodycams, or dashcams, drone recordings, and citizen's reports if any exist.

Third, Mr. Lucas requests the opportunity to view the entire A-file (or, in the alternative, that the Government provide him a full copy of his A-file).

Fourth, Mr. Lucas requests any apprehension reports, or other notes taken contemporaneously with the surveillance or arrest of him.

Finally, Mr. Lucas requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material, and that the AUSA state on the record that he has done so and complied with his obligations under the law to provide this information. *See Kyles v. Whitley*, 514 U.S. 437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991). Such material includes, but is not limited to, any complaints filed (by a member of the public, by another agent, or any other person) against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, and whether or not any disciplinary action was ultimately recommended. Mr. Lucas further requests production of any such information at least one week prior to trial.

Mr. Lucas also specifically requests disclosure and all information in the government's possession that any agent involved in this case was ever a member of the "I'm 10-15" Facebook group or of another social media group publishing white supremacist or bigoted posts. Media reports have recently shed light on a previously clandestine Facebook group for Border Patrol agents. This group included posts mocking immigrants who died and legislators who inspected immigration detention facilities, among other posts using vulgar and demeaning

language and images. *See, e.g.*, A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, PROPUBLICA (July 1, 2019), https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes. Media reports also revealed many law enforcement agents from many agencies who were members of and active in explicitly white supremacist social media groups. *See, e.g.*, Will Carless & Michael Corey, *To Protect and Slur: Inside Hate Groups on Facebook, Police Officers Trade Racist Memes, Conspiracy Theories and Islamophobia*, REVEAL: CENTER FOR INVESTIGATIVE REPORTING (June 14, 2019), https://www.revealnews.org/article/inside-hate-groups-on-facebook-police-officers-trade-racist-memes-conspiracy-theories-and-islamophobia/.

This information is evidence of bias and is thus required to be produced under Rule 16, *Henthorn*, and *Brady*. Mr. Lucas asks the Court to set a deadline for the production of this discovery.

**B.  Motion to Dismiss the Complaint because the government's prosecution of Mr. Lucas violates equal protection.**

Federal law contains three classes of misdemeanors. A Class A misdemeanor is an offense punishable by "one year or less but more than six months." 18 U.S.C. § 3559(a)(6). A Class B misdemeanor is punishable by "six months or less but more than thirty days." 18 U.S.C. § 3559(a)(7). And a Class C misdemeanor is punishable by "thirty days or less but more than five days." 18 U.S.C. § 3559(a)(8). Federal law categorizes Class B and Class C misdemeanors as "petty offenses." 18 U.S.C. § 19. So illegal entry under § 1325, which is a Class B misdemeanor, is considered a "petty offense."

Every year, the Government prosecutes thousands of petty offenses in the Southern District of California through the Central Violations Bureau ("CVB"). According to its website, offenses prosecuted through CVB include violations of "certain federal laws" as well as violations of certain state laws that occur on federal

5                                    19MJ24522-LL

property under the Assimilative Crimes Act at 18 U.S.C. § 13. *See* Ex. F. Offenses that appear in the Code of Federal Regulations that have a maximum sentence of six months or more are also frequently prosecuted through CVB. *See* Ex. G.

But more serious crimes—including some felonies—are also prosecuted in CVB court. These crimes include unlawful possession of a firearm (18 U.S.C. § 922(g)), assault on a federal officer (18 U.S.C. § 111), identity theft (18 U.S.C. § 1028), interstate domestic violence (18 U.S.C. § 2262), theft of government property (18 U.S.C. § 641), and possession of weapons or firearms in a federal facility (18 U.S.C. § 930). *See* Ex. H. In fact, between July 2018 and July 2019— during the same time period that Streamline has been in effect—the Government has charged at least 383 defendants in CVB court with Title 18 and Title 21 offenses that are class B misdemeanors or higher. *See* Ex. H.[1]

Even though these 383 defendants prosecuted in CVB court were charged with equally serious (or more serious) crimes than § 1325, none were held in criminal custody. Rather, at the time of apprehension, everyone was released with a citation. *See* Ex. I. Occasionally, a person may be briefly handcuffed or held for questioning by law enforcement officials for several hours. *See* Ex. I at 1-2. But even in these rare cases, the person is released the same day. *See* Ex. I at 2.

Several weeks later, a defendant in CVB court will receive a notice to appear in the mail instructing him or her to appear at one of the upcoming misdemeanor courts. *See* Ex. I at 2. This court proceeding does not take place in a courtroom and is not presided over by a judge. *See* Ex. I at 2. Rather, it is held in one of the jury rooms of the federal courthouse, where the defendants freely come and go

---

[1] Hundreds of other defendants were charged with offenses that would be a felony under California law and so are punishable as a felony under the Assimiliative Crimes Act. *See* 18 U.S.C. § 13 (stating that a person who "would be punishable" under state law "shall be guilty of a like offense and subject to a like punishment" under the Assimilative Crimes Act).

throughout the morning. *See* Ex. I at 3. Each defendant will meet with his or her defense attorney, after which the defense attorney will attempt to negotiate a disposition with the prosecutor. *See* Ex. I at 2-3. At a later date, the magistrate judge will then review and approves this disposition. See Ex. I at 3.

Nearly all the offenses in CVB court will eventually be dismissed or resolved through a fine or a deferred prosecution agreement. For instance, of the 383 cases charged under Titles 18 and 21 of the United States Code in CVB court last year, 98.6 percent were dismissed and 1.4 percent were resolved through forfeiture of collateral. *See* Ex. H. Not a single one resulted in a conviction.

But the Government does not place individuals accused of § 1325 in CVB court. They are not released into the community on the day of their arrest. They are not allowed to remain out of custody to await the written notice of their charges. They are always shackled when meeting with their attorneys (and sometimes in court). They are not offered any deferred prosecution options. And while 100% of defendants convicted of § 1325 are punished with at least *some* custodial time, none of these 383 CVB defendants last year received *any* jail time.

These disparities do not exist because of the level of severity of the offense. The 383 Title 18 and 21 crimes the Government charged in CVB court last year carried penalties *as* serious or *more* serious than § 1325. Nor do these disparities exist because § 1325 defendants are less likely to show up for court. In the year since Streamline court began on July 9, 2018, Pretrial Services and various magistrate judges in the Southern District of California have reported that 79 of the 299 § 1325 defendants released on bond into the community have failed to appear for court—an in absentia rate of 26.4 percent. But of the 383 CVB defendants charged with federal offenses last year, 134 did not show up for court—an in absentia rate of 35 percent. *See* Ex. H. In other words, § 1325 defendants are nearly 8.6 percent *more* likely to show up for court when released on bond than CVB

defendants.[2]

In sum, by prosecuting § 1325 defendants in "regular court," the Government does not permit them to take advantage of the substantial benefits of CVB court, even though § 1325 defendants are charged with a similar or less serious offense than defendants charged in CVB court and pose less risk of flight. Accordingly, the Government discriminates against § 1325 defendants as compared to other individuals charged with petty offenses in the Southern District of California.

The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. This guarantee of equal protection also extends to the federal government. *See United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."). While the government retains broad discretion to classify individuals where it is reasonable to do so, classifications based on alienage, national origin, and race are "inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971). This is because "[a]liens as a class are a prime example of a discrete and insular minority for whom such heightened judicial solicitude is appropriate." *Id.* at 372 (quotations and citation omitted). To survive strict scrutiny, disparate treatment on the basis of alienage, national origin, or race must be compelling and narrowly

---

[2] Nor are Border Patrol officers precluded from issuing CVB citations—for instance, one citation shows that a person in the pedestrian lane at the San Ysidro port of entry was prosecuted for being a possession of firearm by a prohibited possessor under 18 U.S.C. § 922—an offense carrying a potential *life sentence* depending on the accused's priors. *See* Ex. O. Another person prosecuted in CVB court was apprehended at a port of entry while possessing a full syringe of black tar heroin. *See* Ex. O. So Border Patrol officers can and do issue CVB citations for serious offenses at or near the border.

MEMORANDUM OF POINTS AND AUTHORITIES

tailored to achieve its objective, and there can be no less discriminatory means of achieving the goal. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).

Here, that high standard is not met. Defendants in the Southern District of California who are charged with petty offenses *other than* § 1325 are not held in pre-trial custody, are not subject to shackling, are not limited in their ability to consult counsel, are not prevented from seeking alternative dispositions, and are not punished by incarceration. Meanwhile, Mr. Sanchez and other defendants charged with § 1325 are, by definition, set apart on the basis of their alienage,[3] as well as by their national origin and race. In other words, by making § 1325 defendants the only petty offenders subject to pretrial incarceration and shackling, convictions, and jail sentences, the Government is not simply prosecuting illegal entrants for a crime— it is punishing them more severely than similarly-situated defendants on the basis of their alienage, national origin, and race.

Even if § 1325's *facial* elements did not trigger strict scrutiny, the Supreme Court has held that facially-neutral government action motivated by "invidious racial discrimination" violates equal protection. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). And within the past year, numerous courts have recognized that comments made by President Trump both before and after he took office create a plausible equal protection violation on the basis of discrimination against Mexicans and Central Americans. For example, courts have relied on the following statements to find animus on the basis of race

---

[3] The Government may argue that its charging practices do not discriminate on the basis of alienage but rather on the basis that § 1325 defendants are undocumented, which is not a protected class and thus not subject to strict scrutiny. *See, e.g.*, But this argument fails because a defendant may be convicted under § 1325 even though he has legal status. *See, e.g.*, *United States v. Sanchez*, 258 F. Supp. 2d 650, 662 (S.D. Tex. 2003) (holding that a lawful permanent resident may be convicted of § 1325); *United States v. Figueroa–Corrales,* 845 F.2d 329 (9th Cir. 1988) (unpublished); *Gunaydin v. United States Immigration and Naturalization Serv.,* 742 F.2d 776 (3d Cir. 1984).

and national origin:

- In discussing protections for nationals from Latin America (including El Salvador), the president asked, "'Why are we having all these people from shithole countries come here?'" and expressed a preference for immigrants from countries like Norway, which is overwhelmingly white;[4]

- The president "spoke publicly about the need to protect 'the West' and 'civilization' from forces from 'the South or the East'";[5]

- The president has described Mexicans and Central Americans as "gang members, killers, and rapists"; "'criminals' and 'thugs'"; "'bad hombres'"; and "true animals";[6]

- The president stated that Judge Gonzalo Curiel could not be fair in presiding over a lawsuit because he was "'of Mexican heritage,' 'Hispanic,' and a member of a Latino Lawyers' Association";[7]

- Referring to an article about a recent crime wave on Long Island, the president said "'They come from Central America. They're tougher than any people you've ever    met . . . . They're killing and raping everybody out there'";[8]

- Referring to immigrants, the president stated, "'You know they're bad. They're pouring in from El Salvador, Guatemala, Honduras, Mexico, all over. They're just pouring into our country!'";[9]

---

[4] *Ramos v. Nielson*, 321 F. Supp. 3d 1083, 1099-100 (N.D. Cal. 2018); *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1060-61 (N.D. Cal. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 315 (D. Md. 2018).

[5] *CASA de Maryland*, 355 F. Supp. 3d at 315.

[6] *S.A.*, 363 F. Supp. 3d at 1059; *CASA de Maryland*, 355 F. Supp. 3d at 325; *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 401 (D. Mass. 2018); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 276-77 (E.D.N.Y. 2018).

[7] *CASA de Maryland*, 355 F. Supp. 3d at 315; *S.A.*, 363 F. Supp. 3d at 1059; *Batalla Vidal*, 291 F. Supp. 3d at 276–77.

[8] *S.A.*, 363 F. Supp. 3d at 1059; *Centro Presente*, 332 F. Supp. 3d at 401.

[9] *S.A.*, 363 F. Supp. 3d at 1060.

MEMORANDUM OF POINTS AND AUTHORITIES

- In May 2018 (immediately before the zero-tolerance policy began), the president said of people crossing the Mexican border into the United States: 'You wouldn't believe how bad these people are. These aren't people. These are animals.'"[10]

Citing such statements, one court observed: "One could hardly find more direct evidence of discriminatory intent towards Latino immigrants." *CASA de Maryland*, 355 F. Supp. 3d at 325.

Here, the abrupt decision in April 2018 to begin prosecuting § 1325 misdemeanors in the Southern District of California at record levels almost certainly originated from this hostility. *See* Exs. L, M, N. And even though local prosecutors may have had no intent to discriminate on the basis of race or national origin, "their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decisionmaking process." *Ramos*, 321 F. Supp. 3d at 1123. *See also CASA de Maryland*, 355 F. Supp. 3d at 325 (finding that the president's racial animus against El Salvadorans could be imputed to a subordinate because "[a]n action is not cured of discriminatory taint because it is taken by an unprejudiced decision-maker who is manipulated or controlled by another who is motivated by discriminatory intent"); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (ascribing the president's "anti-Latino animus" to those "involved in the decision-making process"). So even assuming that no local prosecutors were motivated by race or national origin, President Trump's demonstrated animus towards people from Mexico and Central America requires strict scrutiny.[11] And because the

---

[10] *S.A.*, 363 F. Supp. 3d at 1061.

[11] Even if strict scrutiny did not apply, the Ninth Circuit has held that a "dogged animus" against a disfavored group cannot satisfy rational-basis review because "such animus cannot constitute a legitimate state interest." *Arizona Dream Act Coal.*, 855 F.3d at 970. *See also Romer v. Evans*, 517 U.S. 620, 634 (1996) (holding that government action cannot survive rational-basis review

government cannot show that its decision to prosecute Mr. Lucas in regular court, rather than CVB court, satisfies strict scrutiny, the Court should dismiss the charge.

### C. Motion to Dismiss the Complaint because the government's prosecution of Mr. Lucas violated principles of selective prosecution and selective enforcement.

Alternatively, the Court could also adjudicate Mr. Lucas's equal protection challenge through the legal framework of a selective prosecution or selective enforcement claim. *See United States v. Armstrong*, 517 U.S. 456, 464–65 (1996) (grounding selective prosecution claims in "the equal protection component of the Due Process Clause of the Fifth Amendment"). Although § 1325 defendants and CVB defendants are both technically being "prosecuted" for a crime, courts may consider whether the government is relying on impermissible grounds to prosecute similarly-situated defendants in different systems. *See, e.g.*, *United States v. Sellers*, 906 F.3d 848, 853 (9th Cir. 2018) (stating that "the demographics of those prosecuted in state and federal courts for the same crime" may "evince differential treatment of similarly situated individuals").

"To establish a claim of selective prosecution, a defendant must show both discriminatory effect and discriminatory purpose." *Id*. at 852. Courts apply a "rigorous standard" to such claims because "[p]rosecutors occupy a special province of the executive branch and have broad discretion to enforce our nation's laws." *Id*. at 853 (quotations omitted). But a prosecutor's discretion is still "subject to constitutional constraints," including equal protection. *United States v. Batchelder,* 442 U.S. 114, 125 (1979). So prosecutorial decisions may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles,* 368 U.S. 448, 456 (1962). *See also Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (adjudicating a selective

---

where there exists "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected").

prosecution claim on the basis of national origin). Thus, a defendant can succeed on a selective prosecution claim by showing that the administration of a criminal law is "directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law. *Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886).

Here, the government's disparate treatment of § 1325 defendants has a "discriminatory effect." As explained above, the U.S. Attorney's office in the Southern District of California prosecutes people who are of a different alienage, national origin, and race in a separate system than "similarly situated individuals" charged with equivalent crimes. Because of its decision to file criminal complaints in some cases and CVB citations in other cases, one set of defendants is not arrested, does not serve jail time, and rarely ends up with a conviction, while the other does. As explained above, this disparate treatment also has a discriminatory purpose, given President Trump's history of disparaging comments about immigrants and people from Mexico and Central America. *See* Ex. L; Section I.A.[12] So the government's policy of prosecuting everyone *except* § 1325 defendants in CVB court violates equal protection under the doctrine of selective prosecution.

Alternatively, this policy violates equal protection under the doctrine of selective enforcement. To show selective enforcement, a party is generally required to show that law enforcement officers are enforcing an "unconstitutional policy" by "extrapolating from a series of enforcement actions." *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011). *See also Thomas v. County of Los Angeles*, 978 F.2d

---

[12] Arguably, Mr. Lucas need not even show a discriminatory purpose because § 1325, on its face, has an element of alienage, which is a protected class subject to strict scrutiny. *See Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985) ("A showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification.").

504, 509 (9th Cir. 1993) (selective enforcement requires the showing of a "policy, plan, or a pervasive pattern"). But because law enforcement officers do not enjoy the "same presumption of regularity and deference" as prosecutors, a claim of selective enforcement need not satisfy "as rigorous a standard" as a claim of selective prosecution. *Sellers*, 906 F.3d at 853.

Here, there is unquestionably a "policy, plan, or a pervasive pattern" of federal law enforcement officers in the Southern District of California treating petty offenders differently based on their alienage, national origin, and race. Individuals who commit § 1325 are arrested, detained in horrific conditions, offered no alternative disposition, and sentenced to jail time. But individuals who commit any federal petty offense *other* than § 1325 are released, sent a citation, told to show up to "traffic court," usually offered a fine or other alternative disposition, and rarely sentenced to jail. For these reasons, Mr. Lucas's arrest and prosecution violate the doctrines of selective enforcement and selective prosecution.

### D. Motion to Dismiss the Complaint because the government's prosecution of Mr. Lucas violates procedural and substantive due process.

The Due Process Clause of the Fifth Amendment also guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. This Clause protects individuals in two ways. Substantive due process "prevents the government from engaging in conduct that shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quotations and citations omitted). But when government action survives substantive due process scrutiny, it must still be implemented in a fair manner under the doctrine of procedural due process. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). To determine whether governmental action satisfies procedural due process, courts employ a three-factor test that weighs (1) the interest at stake for the individual, (2) the risk of erroneous

deprivation of such interest and the probable value of safeguards, and (3) the costs and administrative burden on the Government. *Id.* at 335.

Streamline court survives neither analysis. First, substantive due process has been violated because it "shocks the conscience" for the Government to blatantly deprive § 1325 defendants of the substantial benefits of CVB court while extending those benefits to defendants charged with similar or *more* serious crimes who have a similar or *greater* risk of flight.

But even if this deprivation survived substantive due process, it could not survive procedural due process under the *Mathews v. Eldridge* factors. First, the interest at stake for the individual is substantial, as defendants charged with § 1325 face a significant loss of liberty, the traumatizing experience of being held in custody in substandard conditions, and an overwhelmingly greater chance of being convicted of an offense. Second, there is no question that charging § 1325 defendants in CVB court would almost entirely alleviate the risk that they would be held in custody, subject to horrendous conditions, and convicted of an offense. Finally, the costs and administrative burden on the Government are minimal, as nothing suggests that absorbing Streamline defendants into CVB proceedings would be problematic, or that there would be a greater than average risk of absconding. And if anything, placing § 1325 defendants in CVB court would greatly *lessen* the burden on the Government to provide housing, food, and transportation during the criminal proceedings. Thus, the Government's discriminatory treatment violates both substantive and procedural due process under the *Mathews v. Eldridge* factors.

**E.  Motion to Dismiss the Complaint because Congress violated the non-delegation doctrine when it enacted 8 U.S.C. § 1325(a)(1).**

Under 8 U.S.C. § 1325(a)(1), Congress has made it a crime for any "alien" to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers[.]" An immigration officer is "any employee . .

. designated by the Attorney General . . . to perform the functions of an immigration officer[.]" 8 U.S.C. § 1101(a)(18). An "immigration officer" includes any "[b]order patrol agent[.]" *See* 8 C.F.R. § 287.5(c)(1)(i). Congress, then, made it a crime for a non-citizen to enter, or attempt to enter, the United States during a time or at a place that any immigration officer, including any Border Patrol agent, has not designated for entry. That means whether a defendant's conduct amounts to a crime depends on what an executive-branch official has designated. Congress, then, has delegated to the executive branch the ability to define a criminal provision's scope.

At issue is whether § 1325(a)(1) violates the non-delegation doctrine. The doctrine prohibits Congress from delegating away its core legislative functions to another branch of government. As explained below, Congress delegated away its core legislative function when it allowed "immigration officers" to determine in their discretion what times and places to designate for entry without providing those officers with any guidance about how they should exercise their discretion. *See* 8 U.S.C. § 1325(a)(1). Congress's delegation in § 1325(a)(1) thus violates the non-delegation doctrine. This Court must therefore dismiss this case.

1.   The non-delegation doctrine prohibits Congress from delegating its core legislative authority, and Congress violates that prohibition if it allows an executive-branch official to decide a statute's scope without providing an "intelligible principle" to guide the official.

The Constitution establishes a tripartite system of government that divides power among the three federal branches. While the branches must work together, no branch can do a task exclusively assigned to another branch. "[D]iffus[ing] power" in three separate, co-equal branches helps to "secure liberty[.]" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The non-delegation doctrine protects the constitutional separation of powers by prohibiting Congress from delegating its core legislative powers to another branch. As Chief Justice Marshall explained, Congress may not "delegate . . . powers which are strictly and exclusively legislative." *Wayman v. Southard*, 10 Wheat. 1, 42–43

(1825). This protects "'the integrity and maintenance of the system of government ordained by the Constitution." *Mistretta v. United States*, 488 U.S. 361 (1989) (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

The core of the "legislative function" that the Constitution prohibits Congress from delegating is a "determination of . . . legislative policy" that results in the "promulgation" of "a defined and binding rule of conduct[.]" *Yakus v. United States*, 321 U.S. 414, 424 (1944). The prohibition against Congress delegating its core legislative function has particular salience in the criminal context. "[D]efining crimes," the Supreme Court has said, is a "legislative function," *United States v. Evans*, 333 U.S. 483, 486 (1948), and Congress cannot delegate away "the inherently legislative task" of determining what conduct "should be punished as crimes," *United States v. Kozminski*, 487 U.S. 931, 949 (1988).

Of course, Congress may "seek[] assistance, within proper limits, from its coordinate Branches." *Touby v. United States*, 500 U.S. 160, 165 (1991). "Thus, Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Id*. That means Congress can permit an executive-branch official to fill in the details of a legislative scheme, as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the authority] is directed to conform." *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928)).

In 1935, the Supreme Court for the first time struck down a statute on non-delegation grounds. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935). First, in *Panama Refining*, the Court struck down a statute authorizing the President to criminalize the interstate transportation of petroleum "produced or withdrawn" in violation of state law. 293 U.S. at 406, 414–19. Next, in *Schechter Poultry*, the Court struck down a statute authorizing the President to create a "code of fair competition" for

the poultry industry. 295 U.S. at 525, 529–34. With these statutes, Congress had failed to lay out a "legislative objective," "[p]rescribe the method of achieving that objective," and lay "down standards to guide" the exercise of executive discretion in achieving that objective. *See Yakus*, 321 U.S. at 423.

Since *Panama Refining* and *Schechter Poultry*, Congress has generally provided an intelligible principle when enacting statutes that include delegated authority. This has avoided non-delegation problems. *See Mistretta*, 488 U.S. at 373 (citing cases). For example, in *Touby*, the Court held that Congress did not violate the non-delegation doctrine in the Controlled Substances Act. 500 U.S. at 165–66. There, the defendant argued that Congress had violated the non-delegation doctrine by allowing executive-branch officials to "schedule a drug temporarily" and then attaching criminal liability to manufacturing that substance. *Id*. 165–66. The Court did not dispute that giving an executive-branch official the ability to define what constituted criminal behavior was a delegation. The Court held, however, that it was a permissible delegation because Congress gave the executive-branch official sufficient guidance. *Id*. at 166. Specifically, Congress, by statute, had allowed the Attorney General to schedule a drug temporarily only "'to avoid an imminent hazard to the public safety.'" *Id*. (quoting 21 U.S.C. § 811(h)(1)). Congress further listed by statute "three factors" for the Attorney General to use to make that determination. *Id*. (citing 21 U.S.C. §§ 811(c)(4)–(6), 811(h)(3)). This detailed guidance meant the statute did not violate the non-delegation doctrine. *Id*.

A case from this past term suggests that the lower federal courts should approach with caution the government's attempt to read narrowly the requirement of an intelligible principle. In *Gundy v. United States*, 139 S. Ct. 2116 (2019), the Court addressed whether Congress violated the non-delegation doctrine in the Sex Offender Registration and Notification Act ("SORNA"). In SORNA, Congress provided that the "Attorney General shall have the authority to specify the applicability" of the Act to those convicted of sex offenses before the Act took

1 effect. 34 U.S.C. § 20913(d). Justice Kavanaugh did not take part in the case.

2     A sharply divided Court upheld the delegation. The four-Justice plurality re-
3 affirmed that Congress "may not transfer to another branch 'powers which are
4 strictly and exclusively legislative.'" 139 S. Ct. at 2123. It held, however, that
5 Congress had not done that in SORNA. Congress had "supplied an intelligible
6 principle" to the Attorney General to guide his "use of discretion." *Id*. The plurality,
7 reviewing SORNA's test and structure, affirmed that Congress meant for
8 "SORNA's registration requirements to apply to pre-Act offenders." *Id*. at 2124.
9 The "Attorney General's role," then, was "limited": he had to "apply SORNA to
10 pre-Act offenders as soon as he thought it feasible to do so." *Id*. at 2125–26. As a
11 result, the plurality affirmed the defendant's conviction.

12     Justice Alito concurred, concluding that he could not "say that the statute
13 lacks a discernable standard" under the Court's case law. *Id*. at 2131. He stated,
14 however, that he might vote differently in the future with a full Court. *Id*.

15     Justice Gorsuch in dissent, joined by Chief Justice Roberts and Justice
16 Thomas, disagreed with the majority about the scope of the delegated authority. *Id*.
17 at 2131–33 (Gorsuch, J., dissenting). More generally, the dissenters believed that
18 the Court should expand the non-delegation doctrine and that the delegation in
19 SORNA failed that stricter standard. *See id*. at 2133–42.

20     *Gundy* suggests, then, that courts should construe the "intelligible principle"
21 narrowly. And that suggests that this Court should approach with caution any
22 government attempt to interpret it broadly.

23         2.   The delegation of legislative authority in 8 U.S.C. § 1325(a)(1)
24            violates the non-delegation doctrine because Congress never
           articulated any intelligible principle to immigration officers to
25            guide how they exercise their discretion to designate times and
           places for entry.

26     As noted above, in 8 U.S.C. § 1325(a)(1), Congress has allowed executive-
27 branch officials—"immigration officers"—the discretion to determine a criminal
28 statute's scope. In this way, the statute is like the portion of the Controlled

Substances Act discussed in *Touby*. That statute, like this one, allowed an executive-branch official to make a decision (there, designate a substance as controlled), that altered a criminal statute's scope. *See* 500 U.S. at 165–67. Whether that delegation is permissible depends on whether Congress provided an "intelligible principle" to the executive-branch official to guide and constrain the exercise of their discretion. *Id*. at 165–66. With the Controlled Substance Act, Congress did. *Id*. at 166. With § 1325(a)(1), Congress did not.

The origin of 8 U.S.C. § 1325(a)(1) can be traced to legislation Congress passed in 1917. *United States v. Aldana*, 878 F.3d 877, 880 (9th Cir. 2017) (discussing § 1325's history). In 1917, Congress provided that non-citizens should "be taken into custody and deported" if they "have entered the United States by water at any time or place other than one designated as a port of entry for aliens by the Commissioner General of Immigration, or at any time not designated by immigration officials[.]" Immigration Act of 1917, Pub L. No. 64-301, § 19, 39 Stat. 784, 889.

A decade later, in 1929, Congress eliminated the distinction between land and water entries and added a criminal penalty to its 1917 prohibition. "No good reason [was] seen for perpetuating the distinction made . . . between entering by water or by land." H.R. Rep. No. 70-2418, at 4 (1929) (cited in *Aldana*, 878 F.3d at 880). Under the revised statute, Congress for the first time made it a misdemeanor for an "alien" to "enter[] the United States at any time or place other than as designated by immigration officials[.]" *Aldana*, 878 F.3d at 880 (quoting Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551, 1551). This is essentially the language Congress adopted in 1952 when it enacted 8 U.S.C. § 1325(a)(1). *See* Immigration and Nationality Act, Pub. L. No. 82-414, § 275, 66 Stat. 163.

Congress, however, has never provide guidance to immigration officials about how they should determine what times and places to designate for entry. This lack of guidance was not an oversight. Congress believed immigration officials,

with help from their bureaucratic supervisors, would decide on an ad hoc basis when and where to designate: "Immigration officials, of course, will designate times and places only as authorized by their superior officers." H.R. Rep. No. 70-2418, at 4 (1929).

Immigration officials have continued to recognize their boundless discretion to designate times and places for entry. They have, however, somewhat formalized how they exercise their discretion to designate places. In 8 C.F.R. § 100.4, immigration officials have designated various physical ports of entry as places for entry. *See Aldana*, 878 F.3d at 881 (discussing this regulation). But "[t]he designation" of places "may be withdrawn whenever, in the judgment of the Commissioner, such action is warranted." 8 C.F.R. § 100.4(a). Thus, executive-branch authorities have reserved the right to undesignate a place for entry for whatever reason the Executive Branch wants. Moreover, immigration officials have never formalized the times designated for entry. That decision appears to be made at the local level. For example, according to the CBP website, the Andrade Port of Entry is open for entry from 6 a.m. to 10 p.m. each day of the week. By contrast, the Otay Mesa Port of Entry is open 6 a.m. to 8 p.m. Monday through Friday and is closed on the weekends. Indeed, the executive branch has threatened to entirely close Ports of Entry on the Southern Land border for political purposes. *See* Nick Miroff, et. al., *Trump Extends Threat of Border Closure, Shifting Ultimatum to U.S. Lawmakers*, WASH. POST (April 3, 2019), https://www.washingtonpost.com/immigration/trump-extends-threat-of-border-closure-this-time-pressuring-us-lawmakers/2019/04/03/988ff5ee-5634-11e9-8ef3-fbd41a2ce4d5_story.html?noredirect=on.

In any event, no matter how immigration officials have used their discretion, the key point is this: Congress never gave "immigration officers" any "guidance" so that it is possible to determine "whether the will of Congress has been obeyed" when those officials designate times and places for entry. *See Yakus*, 321 U.S. at

426. This makes § 1325(a)(1) different from the Controlled Substance Act (upheld in *Touby*) or SORNA (upheld in *Gundy*). It instead makes the statute the same as the statutes at issue in *Panama Refining* and *A.L.A. Schechter Poultry*. As a result, Congress violated the non-delegation doctrine when it enacted § 1325(a)(1).

In short, while the Supreme Court might soon expand the non-delegation doctrine's reach, § 1325(a)(1) violates even the more modest version of the doctrine. Thus, the statute that government has alleged that Mr. Lucas violated is unconstitutional. This Court, then, must dismiss this case.

**F.    Motion to Dismiss the Complaint because Congress violated the Due Process Clause's prohibition on vague laws when it enacted 8 U.S.C. § 1325(a)(1).**

The government violates the Fifth Amendment's Due Process Clause "by taking way someone's life, liberty, or property" based on a "vague" criminal law. *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). First, a statute is impermissibly vague if it "fails to give ordinary people fair notice of conduct it punishes[.]" *Johnson*, 135 S. Ct. at 2556. Second, a statute is impermissibly vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. The vagueness "doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

Here, § 1325(a)(1) flunks these requirements. As explained above, the scheme Congress and executive-branch officials created in § 1325(a)(1) allows an immigration officer, including a Border Patrol agent, to decide what places and times to designate for entry. An immigration officer can decide what to designate for any reason or no reason at all. There are no "standards to govern the actions of" immigration officers. *See Dimaya*, 138 S. Ct. at 1212. It is up to the officer's whim. Thus, the statute, and the implementing regulation, "authorize[] . . . arbitrary and

discriminatory" enforcement. *See Hill*, 530 U.S. at 732. Indeed, because the immigration officer's discretion is unbounded, it is hard to imagine a scheme more amenable to arbitrary enforcement.

In short, § 1325(a)(1) violates the prohibition against vague laws. Thus, the statute that government has alleged that Mr. Lucas violated is unconstitutional. This Court, then, must dismiss this case.

### G. Motion to Dismiss the Complaint because it fails to allege all the elements of the charged offense.

A charging document must include the "essential facts constituting the offense charged[.]" FED. R. CRIM. P. 7(c)(1). That is, a charging document "must set forth each element of the crime that it charges." *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998). A charging document "that tracks the words of the statute violated is generally sufficient" to allege the elements of an offense. *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995). But not always. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007). "[I]mplied, necessary elements, not present in the statutory language, must be included in an indictment." *Jackson*, 72 F.3d at 1380; *accord United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). Thus, in general, if a "statute is silent on *mens rea*," the government must allege the *mens rea* in the charging document. *United States v. Morrison*, 536 F.2d 286, 288 (9th Cir. 1976); *see also Du Bo*, 186 F.3d at 1179. If a charging document fails "to recite an essential element of the charged offense," that is a "'fatal flaw requiring dismissal'" of the charging document. *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005) (applying rule to an indictment); *see also United States v. Hatch*, 919 F.2d 1394, 1398 (9th Cir. 1990) (applying rule to an information); *Hotch v. United States*, 208 F.2d 244, 250 (9th Cir. 1953) (applying rule to a complaint).

Here, the government has charged Mr. Lucas with violating the attempt portion of § 1325(a)(1). Its charging document, however, is deficient because it

fails to contain the implied *mens rea* for the attempt portion of § 1325(a)(1). It fails to allege that Mr. Lucas knew he was an "alien" when he attempted to enter the United States. As a result, this Court must dismiss this case because the charging document fails to allege the elements of the charged offense.

1.    <u>If a defendant believes he is a U.S. citizen, he has not committed an attempted illegal entry.</u>

To commit an attempt offense, the defendant must have the "intent to commit the underlying offense" and commit an "overt act constituting a substantial step towards the commission of the offense." *United States v. Gonzalez-Monterroso*, 745 F.3d 1237, 1243 (9th Cir. 2014) (internal quotation marks omitted). Under the intent element, "a defendant should be treated in accordance with the facts as he supposed them to be," not as they actually are. *United States v. Quijada*, 588 F.2d 1253, 1255 (9th Cir. 1978); *accord United States v. Hinkson*, 585 F.3d 1247, 1265 n.27 (9th Cir. 2009); *United States v. Steward*, 16 F.3d 317, 320 n.4 (9th Cir. 1994). A defendant is guilty of attempt, then, only if, under the facts as he believes them to be, his intended acts would amount to the underlying offense. So if a defendant bought a substance he thought was cocaine, he is guilty of attempting to purchase a controlled substance, even if the substance is actually powdered sugar. *Hinkson*, 585 F.3d at 1265 n.27. Conversely, if under the defendant's understanding of the facts "the result desired or intended it not a crime, the actor will not be guilty of an attempt even [if] he firmly believes that his goal is criminal." Wechsler, Jones & Korn, *The Treatment of Incohate Crimes in the Model Penal Code of the American Law Institution: Attempt, Solicitation, and Conspiracy*, 61 COLUM. L. REV. 571, 579 (1961) [*hereinafter* "Wechsler"].

Applying this logic to § 1325(a)(1) establishes that a defendant commits attempted illegal entry only if he knows that he is an "alien." *See* 8 U.S.C. § 1325(a)(1). If a defendant genuinely (but incorrectly) believes that he is a U.S. citizen, and then enters the United States, the defendant is not an alien who enters

the United States under the "facts as [he] supposed them to be[.]" *See Quijada*, 588 F.2d at 1255. In other words, if he were correct that he was not an "alien," the acts he intended to commit—the "results he desired"—would not constitute the crime of illegal entry under § 1325(a)(1). *See* Wechsler, *supra*, at 579.

Even though knowledge of alienage is an element of an attempted illegal entry, the charging document does not allege that *mens rea*. Thus, the charging document contains a "fatal flaw requiring dismissal[.]" *See Pernillo-Fuentes*, 252 F.3d at 1032 (internal quotation marks omitted).

### 2. If a defendant believes he is a U.S. citizen, he has not committed any offense in § 1325(a), including attempted illegal entry.

As just explained, basic principles of attempt law require that the government prove in an attempted illegal entry case that the defendant knew he was an alien. But, setting that argument aside, anytime the government charges a defendant with committing any offense in § 1325(a), the government must prove that the defendant knew he was an alien.

To determine the particular *mens rea* for an element of a criminal offense, this Court must begin with the "longstanding presumption, traceable to common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). This presumption helps to "separate wrongful from innocent acts." *Id.* at 2197. The presumption applies "even when Congress does not specify any scienter in the statutory text" and "where the most grammatical reading of the statute does not support" a scienter. *Id.* at 2197 (internal quotation marks omitted). Indeed, statutes that require no *mens rea*—that is, strict-liability offenses—"generally are disfavored," and are "limited" to so-called "'public welfare' or 'regulatory' offenses" that "regulate potentially harmful or injurious items." *Staples v. United States*, 511 U.S. 600, 606-07 (1994).

1    Recently, the Supreme Court in *Rehaif* addressed how the presumption of

2    *mens rea* applies to an offense that requires the government to prove that the

3    defendant is an "alien." At issue was a statute that makes it a crime for "felons and

4    aliens who are 'illegally or unlawfully in the United States'" to possess a firearm.

5    139 S. Ct. at 2194 (quoting 18 U.S.C. § 922(g)). The question was: did the

6    defendant need to know "both that he engaged in the relevant conduct (that he

7    possessed a firearm) and also that he fell within the relevant status (that he was a

8    felon, an alien unlawfully in this country, or the like)?" *Id*. The Court answered

9    "yes." The Court determined that there was "no convincing reason to depart from

10   the ordinary presumption in favor of scienter." *Id*. at 2195. The Court noted that but

11   for the defendant's status, his conduct was lawful. *Id*. at 2197. "It is therefore the

12   defendant's *status*, and not his conduct alone, that makes the difference." *Id*.

13   (emphasis in original). Thus, the Court held that the government needed to prove

14   both that the defendant knew that he had engaged in the relevant conduct and that

15   he fell within the relevant status.

16   With respect to § 1325(a), there is "no convincing reason to depart from the

17   ordinary presumption in favor of scienter." See 139 S. Ct. at 2195. Just as in *Rehaif*,

18   "the defendant's *status*, and not his conduct alone, that makes the difference"

19   between criminal and non-criminal conduct. *See Rehaif*, 139 S. Ct. at 2197. A U.S.

20   citizen who just enters or attempts to enter the United States at a non-designated

21   time or place has committed no offense.[13] As a result, to convict a defendant of

22   violating § 1325(a)(1), the government must prove both that the defendant knew

23   that he had "engaged in the relevant conduct" (that he entered or attempted to enter

24

25   _____

26   [13] A U.S. citizen commits a crime only by "intentionally" failing to "enter the
     United States . . . at a border crossing point designated by the Secretary" and then
     not "reporting the arrival" and "present[ing] themselves, and all articles
27   accompanying them[,] for inspection." *See* 19 U.S.C. § 1459(a), (e), (g). Thus, if a
     U.S. citizen enters the United States at a non-designated time or place, no crime has
28   been committed unless the U.S. citizen both intentionally entered outside a border
     crossing and intentionally failed to present promptly for inspection.

the United States) and also that he knew "that he fell within the relevant status" (that he was an alien). *See Rehaif*, 139 S. Ct. at 2194.

In charging Mr. Lucas with violating § 1325(a)(1), the government needed to allege explicitly that Mr. Lucas knew he was an alien, an "implied, necessary element[], not present in the statutory language[.]" *See Jackson*, 72 F.3d at 1380. Thus, the proposed charging document fails to allege all the elements of the charged offense, and this Court must therefore dismiss it. *See Du Bo*, 186 F.3d at 1179–80.

## H.   Motion to Dismiss Because § 1325 Violates the Equal Protection and Due Process Clauses

Mr. Lucas moves the Court to dismiss this case because the statute employs an unconstitutional definition of the term "alien." This Court should dismiss the complaint because § 1325 relies on unconstitutional citizenship laws in its "alienage" element. The term "alien" is defined as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). The Supreme Court held that the statutes that transmit citizenship to children born abroad violate equal protection under the Fifth Amendment's Due Process Clause—they treat children of unwed mothers and unwed fathers differently. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686, 1700–01 (2017). Because these citizenship laws create an unconstitutional exception that favors unwed mothers over unwed fathers, and the offense charged rests on these invalid statutes, the complaint must be dismissed.

## I.   Motion to Suppress Statements

### 1.   The Court should suppress all statements taken at the station because Mr. Lucas invoked his right to counsel.

This Court should suppress all statements obtained from Mr. Lucas at the Border Patrol Station. Mr. Lucas plainly invoked his right to counsel when finally read his rights at the station. Any such statements must be suppressed as they would plainly be obtained in violation of Mr. Lucas's Fifth Amendment rights. Defense counsel does not expect the government to dispute this.

2.   <u>The Court should exclude the field-statement-testimony of Agent Mauler unless the government complies with the evidentiary rules.</u>

    a.   *The government cannot show that Agent Mauler is either a mere language conduit for the introduction of the statements under the hearsay rules.*

The out-of-court statements that the government will want to introduce are being offered for the truth of the matter asserted—specifically, that Mr. Lucas is a citizen of Mexico and not a citizen of the United States. As such, the statements are hearsay. Fed. R. Evid. 802.

The government intends to introduce these statements under a hearsay exception or exclusion, likely Fed. R. Evid. 801(d)(2) (statement of party opponent). As the proponent of the evidence, the government bears the burden to establish that it falls within that hearsay exclusion ground. Whether the statement falls within that exclusionary ground is a legal issue that the Court determines when deciding whether or not to admit the evidence. Fed. R. Evid. 104(a).

The defense was unable to find any cases in which the government introduced statements made in another language without an interpreter present. In all the cases addressing similar circumstances, there was, at a minimum, a purported interpreter (even if that interpreter was an agent of the government). Thus, Mr. Lucas assumes that the government will put forth Agent Mauler as an interpreter.

Ninth Circuit law is that statements made through a purported interpreter constitute hearsay unless the government is able to establish that the interpreter is a mere "language conduit." *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991). In order to be a language conduit, an interpreter must have (1) sufficient capacity, and (2) no motive to misrepresent. *Id*. Whether statements made through an interpreter should be considered statements of the original declarant "require[s] an analysis of the facts on a case-by-case basis." *United States v. Garcia*, 16 F.3d 341, 342 (9th Cir. 1994). Courts consider "the following four factors ...: (1) which party supplied the interpreter, (2) whether the interpreter had any motive to mislead

or distort, (3) the interpreter's qualifications and language skill, and (4) whether actions taken subsequent to the conversation were consistent with the statements as translated." *United States v. Romo-Chavez*, 681 F.3d 955, 959 (9th Cir. 2012).

Here, the government cannot establish that Agent Mauler is a mere language conduit, as the factors all weigh against the government. First, the government provided this 'interpreter,' and moreover, Agent Mauler was primarily acting as a law enforcement officer, not as an interpreter, at the time of these statements. Thus, the first factor tips strongly in favor of Mr. Lucas. *See Romo-Chavez*, 681 F.3d at 959-60. Second, this witness is testifying on behalf of the government, and he does have a motive to support the government's case, even if that is not a specific motive to mislead or distort. He has an interest in construing the statements to support the government's case.

As to the third factor, Agent Mauler is plainly not qualified as an interpreter. *Cf.* Fed. R. Evid. 604 ("An interpreter must be qualified and must give an oath or affirmation to make a true translation.") And taking a class in Spanish at the Border Patrol academy a number of years ago—a course whose purpose is to train individuals to serve as law enforcement officers, not to speak Spanish or serve as interpreters—does not qualify him as such. If Agent Mauler is qualified to serve as a Spanish interpreter, then any individual who took some high school or college Spanish class is qualified. The fact that Agent Mauler uses Spanish in his job daily is irrelevant. First, Agent Mauler is not learning Spanish from the people he arrests. Second, his job as a Border Patrol Agent is not a language immersion environment; Agent Mauler primarily speaks English when he is on the job. *Cf. Romo-Chavez*, 681 F.3d at 960 (officer grew up in El Paso speaking Spanish, studied it in school, spoke it at home with his wife, and conducted interviews in it on a regular basis).

As to the fourth factor, the actions taken subsequent to the conversation were that Mr. Lucas was arrested by Agent Mauler, reflecting his understanding of the conversation. Mr. Lucas took no action in reliance on the conversation. This factor

thus does not indicate that both parties took action in reliance on the conversation and does not tip in the government's favor. *Cf. Nazemian*, 948 F.2d at 528; *Garcia*, 16 F.3d at 344.

Evaluating all the factors, Agent Mauler is not properly considered a mere "language conduit," and as such, the government cannot establish that the statements are Mr. Lucas's through Agent Mauler's interpretation. As such, they are properly excluded because the government has not met its burden as the proponent of the evidence.

### b.    Agent Mauler is not qualified to testify as an expert.

Agent Mauler will not be testifying merely to statements he spoke, heard, and perceived. He will instead be employing specialized knowledge in his testimony, in that, he will be translating those statements into English. As such, Agent Mauler's testimony is more properly considered expert testimony and not lay witness testimony, and the government must qualify Agent Mauler as an expert.

Lay witness testimony may incorporate an opinion, but that opinion may not be based on specialized knowledge. Fed. R. Evid. 701. The Rules specifically state that an opinion based on specialized knowledge is expert opinion, and thus Agent Mauler must meet the definition of an expert under Fed. R. Evid. 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Here, the Court, as the trier of fact, will be using Agent Mauler's specialized knowledge to understand the evidence: specifically, to understand Mr. Lucas's

statement. It will use that specialized knowledge to determine a fact in issue: whether Mr. Lucas is a citizen of another country and not a citizen of the United States. And finally, the government is putting forth Agent Mauler as someone who has expertise, by virtue of his knowledge, experience, training, and education. As such, the government should have to qualify Agent Mauler as an expert under the Federal Rules of Evidence, in order to ensure that Agent Mauler has sufficient knowledge of Spanish and that he has reliably applied that knowledge in this case. Without qualifying Agent Mauler as an expert, any testimony as to any conversation in Spanish with Mr. Lucas should be excluded.

> 3. <u>The Court should suppress the field statements as involuntary.</u>

Finally, the Court must not allow the government to introduce these statements at trial for any purpose (including impeachment) unless the government proves they were voluntary. *See Haynes v. Washington*, 373 U.S. 503, 513–14 (1963); 18 U.S.C. § 3501(a). Section 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Lucas understood the nature of the charges against him and whether he understood his rights. Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, FED. R. CRIM. PROC. 12 obligates courts to make factual findings. *See United States v. Prieto-Villa*, 910 F.2d 601, 606–10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" *id*. at 610 (quoting *Waller v. Georgia*, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence. An evidentiary hearing is required to complete the picture of what occurred through testimony of the agent(s) involved, and Mr. Lucas requests such a hearing under § 3501 at the date of the motion hearing or such other date designated by this Court.

> **J.     Motion for Leave to File Further Motions**

Mr. Lucas therefore seeks leave to file further motions or to supplement these motions as additional discovery is produced.

1

**III.    Conclusion**

2          Mr. Lucas, through counsel, respectfully asks this Court to grant the above

3  motions to ensure that his constitutional rights to due process, equal protection,

4  effective assistance of counsel, and a fair trial are respected.

5

6                                              Respectfully submitted,

7

8   Dated:  January 30, 2020                 *s/ Chloe S. Dillon*
                                              Federal Defenders of San Diego, Inc.
9                                             Attorneys for Mr. Lucas-Hernandez

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28