# Index of Exhibits

Page

Ex. A — June 10, 2019, KFI FM Article re: Border Patrol Station Crowding.............. 1

Ex. B — July 11, 2019, Statement of Senator Feinstein re: Inhumane Conditions ...... 5

Ex. C — 2016 American Immigration Council Special Report..................................... 9

Ex. D — May 31, 2019, CNN Report re: Border Facility Conditions ........................ 26

Ex. E — May 29, 2019, NBC News Report re: Children Dying in Custody.............. 31

Ex. F — CVB Website .......................................................................................... 42

Ex. G — October 2018 CVB Calendar ................................................................. 46

Ex. H — 2018–2019 CVB Chart............................................................................ 63

Ex. I — Declaration of Lauren Cusitello................................................................ 73

Ex. J — Declarations of Federal Defender Attorneys ............................................ 78

Ex. K — TRAC Appearance Report ..................................................................... 85

Ex. L — April 6, 2018, Attorney General's Zero Tolerance Memorandum.............. 96

Ex. M — June 2018 Migration Policy Institute Report re: Numbers at Border.......... 98

Ex. N — 2016–2018 Southern District of California Case Statistics ..................... 104

Ex. O — September 4, 2018, § 922 Citation .......................................................... 106

Ex. P — Report of Investigation........................................................................... 108

A



**Don't miss out on breaking news. KFI's Stimuletter is here to help. Sign up today!** F

For the best experience on kfiam640.iheart.com, we recommend downloading an alternate browser. **More info**

LOCAL NEWS

# Border Patrol Stations in Southern California Are Maxed Out

*posted by Steve Gr egory @sevengr egory -  Jun 10, 2019*

 **930**

Facilities built to hold around 125 for a few hours are being used to house more than 170 migrants for weeks, without showers. A few days ago I was sent pictures from inside a Southern California border station, from the vantage point of surveillance camera monitors. There was an identifying code on the top of the screen that told me which station the pictures were taken. To protect the identity of the source I cropped out the identifying features.

The anonymous source, who identifies as an on-duty border agent, wrote in an email that the pictures show the crowded conditions. You see people wrapped in silver Mylar-type space blankets and are pushed up against one another - about every inch of floor space is taken. Some men are even leaned up against a wall. In one picture you see a man appearing to openly urinate in a toilet.

**2**



In these exclusive pictures you can see a man with a very long, skinny beard walking from the left. I was told by the source that fights often break out between migrants from Latin America and those from the Middle East, so the men are separated and given their own room because of ethnicity. And, because the numbers of Middle Easterners vary, as few as 4 or 5 men could be put in a large room by themselves to prevent violence.



At least 3 charter flights a week are coming from Texas to San Diego filled with illegal immigrants who are then bussed to border stations all around California for initial processing, then bussed back to a main detention center in San Diego until they are either released or appear in court.

Each charter flight costs approximately $6,000 and the flights will continue until pressure is taken off border

**3**

patrol stations in the Texas Rio Grande Valley sector. Just last month surveillance video captured around 1,000 illegal immigrants cross illegally into Texas through an opening in a fence. In May alone more than 130,000 illegal immigrants were detained at the Texas border.

You may recall months ago I interviewed 2 other unidentified agents from the San Diego sector who also described the conditions as medically dangerous. There have been cases of scabies, lice, flu and even STD's.



Those unidentified agents told me the average menu for detainees is a bean burrito for breakfast, one for lunch and one for dinner. Sometimes, as a snack they are fed crackers and juice. The agents said there are numerous cases of constipation and dehydration.

Listen to my feature for Wake Up Call:



**4**

**B**

Feinstein Speaks on Inhumane Conditions at Border Patrol Facilities - Press Releases - United States Senator for California

Case 3:19-mj-24522-LL-TWR   Document 19-2   Filed 01/30/20   PageID.77   Page 7 of 113

# Feinstein Speaks on Inhumane Conditions at Border Patrol Facilities

Jul 11 2019

*Washington*—Senate Judiciary Committee Ranking Member Dianne Feinstein (D-Calif.) today spoke about a recent Department of Homeland Security inspector general (IG) report that highlighted inhumane conditions in several Border Patrol facilities.

**"Last week, we received a report from the Department of Homeland Security IG that validates what we've heard in recent days. The IG found Border Patrol facilities packed beyond capacity. Children have nowhere to sleep, their meals are inadequate and their medical care is insufficient.**

**I know the Republican side of this committee is going tomorrow to the border and I thank you for that. I thank you for the invitation. We're going to try and put something together on our side.**

**My staff recently, though, I'm just going to use this as an example, visited a couple of Border Patrol stations in California. At one, El Centro, 304 people were crammed into space with a maximum [capacity] of 191 and there was only one outdoor shower for everyone and children and adults are packed into unsanitary cells.**

**6**

Feinstein Speaks on Inhumane Conditions at Border Patrol Facilities - Press Releases - United States Senator for California

Case 3:19-mj-24522-LL-TWR   Document 19-2   Filed 01/30/20   PageID.78   Page 8 of 113

**Yesterday, I met with the president-elect of the American Academy of Pediatrics, Dr. Sally Goza, who recently visited children in detention at the border in McAllen and Donna, Texas. What she described was horrific: children just packed in cages. It's interesting, she said instead of being loud and unruly, all she heard was silence and the crinkling of Mylar blankets. All she saw were bloodshot eyes and blank stares.**

**A ten-year old boy separated from his father was inconsolable. His father had given him a note and said, "Whatever you do, don't lose it. Here's a person and here's a number. When you get out you call that person and that number." Guess what? The child lost the note. Ten-years-old.**

**Dr. Goza gave me photos, which I showed you, that she took of sad drawings made by children. I think most of us have seen them and can figure out the starkness of the story they tell. And the story they tell really of conditions that are inhumane and should spark outrage and everyone one of us in particular. So I think we've got to ask ourselves: how can we take better care of these children?**

**The proposals being made [by the administration] do not improve the care of children at our border, I'm told. The [administration's] legislative ideas focus on dismantling the few humanitarian protections we have in place while the ultimate goal is to frighten families from fleeing to our country."**

### ###

RELATED LINKS

*Press Releases*

*Commentary*

*Official Photo*

**7**

Feinstein Speaks on Inhumane Conditions at Border Patrol Facilities - Press Releases - United States Senator for California

Case 3:19-mj-24522-LL-TWR    Document 19-2    Filed 01/30/20    PageID.79    Page 9 of 113

*Video Library*

G  Select Language | ▼  Home | Privacy Policy | Terms of Use

**8**

C

# DETAINED
# BEYOND
# THE LIMIT

## Prolonged Confinement by U.S. Customs and Border Protection along the Southwest Border





American Immigration Council

By Guillermo Cantor, Ph.D.

SPECIAL REPORT | AUGUST 2016

10

## About the Cover

The cover photo is among the video stills submitted as exhibits in litigation filed against Border Patrol by the American Immigration Council, the National Immigration Law Center, the ACLU of Arizona, the Lawyers' Committee for Civil Rights of the San Francisco Bay Area, and Morrison & Foerster LLP. It depicts individuals wrapped in Mylar sheets sleeping on a concrete floor and benches in a cell so crowded there is no room to move around. This is a sample of conditions in Border Patrol's "short-term" detention facilities in the Tucson Sector. This and the other photos were released to the public on August 18, 2016.

## About the Author

Guillermo Cantor, Ph.D., is the Deputy Director of Research at the American Immigration Council, where he leads the Council's research efforts and manages the research team. He has authored numerous publications on immigration policy and immigrant integration and regularly appears in English and Spanish-language media. He also currently teaches sociology of migration at Georgetown University. Cantor holds a Ph.D. in Sociology from the University of Maryland, College Park.

## About the American Immigration Council

The American Immigration Council's policy mission is to shape a rational conversation on immigration and immigrant integration. Through its research and analysis, the American Immigration Council provides policymakers, the media, and the general public with accurate information about the role of immigrants and immigration policy in U.S. society. We are a non-partisan organization that neither supports nor opposes any political party or candidate for office.

Visit our website at _www.AmericanImmigrationCouncil.org_ and our blog at _www. ImmigrationImpact.com_.

**CONTENTS**

**1**   Introduction

**3**   Border Patrol and CBP Standards Governing Detention

**4**   Overview of Detention Patterns in All Border Patrol Sectors in the Southwest Border Region

**10**   Conclusion

**11**   Endnotes

# INTRODUCTION

For some time now, U.S. Customs and Border Protection (CBP) has been in the spotlight for its questionable practices regarding the treatment of migrants. One such practice concerns the manner in which the Border Patrol—a component of CBP—operates its holding facilities near the U.S.' southern border. Each year, hundreds of thousands of individuals are held in these facilities, which are meant to hold individuals for a short time while they undergo initial processing and until a decision is made about the appropriate next step in their case. The holding cells, which are often referred to as "hieleras" (Spanish for "freezers" or "iceboxes"), are typically small concrete rooms with concrete benches and no beds.  They are not designed for overnight custody, and yet they are routinely used in this way. Government records analyzed in this report, which contain information on length of detention for all Border Patrol sectors along the U.S.' southwest border, reveal that individuals are frequently held for days and sometimes even months in such facilities.

As numerous reports, media accounts, and documented complaints of former detainees have previously shown, these facilities remain wholly inadequate for **any** overnight detention. Moreover, the conditions are reprehensible—as consistently reported by many who were held in them—even with respect to truly short-term detention. In addition to the fact that there are no beds in the holding cells, these facilities are extremely cold, frequently overcrowded, and routinely lack adequate food, water, and medical care.[1]

This report, which is based on never-before-released government data and documents obtained by the American Immigration Council through the Freedom of Information Act (FOIA), examines length of detention in nine Border Patrol sectors: Big Bend, Texas; Del Rio, Texas; El Centro, California; El Paso, Texas; Laredo, Texas; Rio Grande Valley, Texas; San Diego, California; Tucson, Arizona; and Yuma, Arizona. Between September 1, 2014 and August 31, 2015, 326,881[2] individuals were held in CBP facilities across the southwest border. Of the cases analyzed, which include only cases with complete data (326,728), 69,016 (21.1 percent) are women. Mexican nationals represent the largest share (57.1 percent) of those detained in CBP facilities during this period, followed by Guatemalans (16.9 percent), Salvadorans (12.7 percent), and Hondurans (9.8 percent).



Looking at all sectors combined, the data reveals that a shocking 217,485 individuals (or 67 percent of the total number detained during this period) were held in CBP facilities for 24 hours or more; 93,566 (29 percent) for 48 hours or more; and 44,202 (14 percent) for 72 hours or more.[3] The average number of hours that individuals were detained shows some variation, ranging from 65 hours at its lowest point in July 2015 to 104 hours at its peak in October 2014.

Length of detention varies considerably across border sectors. For example, lengthy detention is remarkably frequent in the Laredo, Rio Grande Valley, Tucson, Yuma, and El Centro sectors.  Laredo in particular shows the most disturbing numbers; 54 percent (19,000) of the 35,494 individuals held in detention facilities in Laredo were detained for at least 72 hours.

A recent report by the U.S. Government Accountability Office (GAO) raises questions about the possible existence of irregularities in the way Border Patrol officers capture information on length of detention. Consequently, the data presented here should be interpreted with caution.[4] However, the findings of our analysis are consistent with those reported in previous publications by the American Immigration Council. For example, according to a report released in May 2015, 58,083 individuals—or over 80 percent of people detained by the Border Patrol in its Tucson Sector between January 1, 2013 and June 30, 2013—were held for over 24 hours, and 10.9 percent (7,839 individuals) were held for 72 hours or more.[5] Another report which focused on the Rio Grande Valley Sector showed that during the months of August, September, October, and December of 2013, the share of individuals detained for over 72 hours ranged from 2.3 percent of all detainees at its lowest point to 42.5 percent at its peak.[6]

Lengthy detention is especially problematic given the inhumane conditions that characterize these holding facilities. The findings presented in this report document a troublesome reality: lengthy detention is not just a random occurrence that happens to a few individuals in one or two Border Patrol sectors; it is, instead, a systemic practice that affects, to varying degrees, all the sectors along the southwest border.



# BORDER PATROL AND CBP STANDARDS GOVERNING DETENTION

Individuals are typically taken into CBP "short-term" holding facilities[7] after being either (a) apprehended by the Border Patrol along the border and between ports of entry due to suspected criminal activity, illegal entry into the United States, or presence in the country without immigration status; or (b) interviewed by the Office of Field Operations at a port of entry to determine the individual's admissibility into the United States. After inspecting an individual for admissibility or after making an apprehension, CBP may hold individuals at short-term holding facilities. According to GAO:

> [Department of Homeland Security (DHS)] components may hold aliens at holding facilities in order to complete general processing and determine the appropriate course of action, such as transferring them to or from a court, jail, prison, other agency or other unit of the facility or agency, relocating such aliens into ICE detention facilities, removing them from the country, or releasing them, among other scenarios."[8]

Although there are no statutes or regulations specifically governing CBP short-term detention facilities, CBP and Border Patrol have issued internal guidance regarding facility standards, specifications, and operations. According to CBP guidance, holding cells are generally rectangular, made of concrete, minimally furnished, and are neither designed nor equipped for overnight sleeping.[9] Indeed, CBP policies specify that there are "no beds" in holding cells, as they are "not designed for sleeping."[10] As a Border Patrol spokesperson said, "it is what it is. We're not a long-term hold facility."[11]

Agency guidance also sets limits on the maximum length of time that an individual should be kept in a holding cell. A 2008 Border Patrol memorandum states that "a detainee should not be held for more than 12 hours," and should be moved "promptly."[12] It also recognizes that some individuals will be held for longer periods.[13] This guidance was in effect for the time period of the government data analyzed for this report, and remains in effect at this time.



In addition to guidance on the length of detention, the 2008 memorandum proscribes that detainees will be provided snacks and meals,[14] will be given access to potable drinking water,[15] will have access to bathrooms and toilet items,[16] and will be given necessary medical attention.[17]  Further, agents will make reasonable efforts to provide a shower for detainees held for more than 72 hours[18] and detention cells will be regularly cleaned and sanitized.[19]

In October 2015, CBP released the "National Standards on Transport, Escort, Detention, and Search" (TEDS)[20] policy. The new standards define short-term detention as the "temporary detention of a person at a CBP facility for the least amount of time necessary to complete processing, transfer, and/or repatriation." It also establishes that "detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities. Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible." The TEDS policy—which applies to all CBP components—does not replace the earlier 2008 memorandum that applies solely to Border Patrol facilities. As discussed below, the data demonstrates that Border Patrol was not previously—nor is it now—in compliance with its own guidance with respect to length of detention, as this detention regularly exceeded its own 12 hour limit as well as the 72 hour limit found in TEDS. This is particularly problematic considering that, as previous reports have shown, the agency is also not in compliance with other aspects of the guidance that relate to detention conditions.[21]

## OVERVIEW OF DETENTION PATTERNS IN ALL BORDER PATROL SECTORS IN THE SOUTHWEST BORDER REGION

The Southwest border region comprises nine Border Patrol sectors (Figure 1). Collectively, these sectors cover more than 2,000 miles of international border with Mexico[22] and now include 74 stations and substations.[23] In Fiscal Year (FY) 2015, the Border Patrol apprehended 331,333 individuals along the U.S.-Mexico border.[24] Of those individuals, 147,257 (44 percent) were apprehended in the Rio Grande Valley sector; 63,397 (19 percent) in the Tucson sector; 35,888 (11 percent) in the Laredo



sector; 26,290 (eight percent) in the San Diego sector; 19,013 (six percent) in the Del Rio sector; 14,495 (four percent) in the El Paso sector; 12,820 (four percent) in the El Centro sector; 7,142 (two percent) in the Yuma sector; and 5,031 (two percent) in the Big Bend sector.

**Figure 1: Map of Border Patrol Sectors Along the Southwest Border**



**Source**: U.S. Government Accountability Office, "*Secure Border Initiative Fence Construction Costs*," GAO-09-244R, January 29, 2009, http://www.gao.gov/new.items/d09244r.pdf.
*__Note:__ The Big Bend Sector was formerly known as Marfa Sector.

Between September 1, 2014 and August 31, 2015, 326,728 individuals were held in CBP facilities across the southwest border. Of them, 69,016 (21.1 percent) were women. Mexican nationals represent the largest share (57.1 percent) of those detained in CBP facilities during this period, followed by Guatemalans (16.9 percent), Salvadorans (12.7 percent), and Hondurans (9.8 percent).

A shocking 217,485 individuals (or 67 percent of the total number detained during this period) were held in CBP facilities for 24 hours or longer; 93,566 (29 percent) for 48 hours or more; and 44,202 (14 percent) for 72 hours or more (Figure 2).



**Figure 2: Distribution of Individuals Detained in CBP Facilities by Length of Detention**

Sep. 2014 - Aug. 2015



Source: Data generated by the American Immigration Council based on U.S. Border Patrol Southwest Border Apprehensions data obtained through Freedom of Information Act.

During the period analyzed, the average number of hours that individuals were detained showed some variation, ranging from 65 hours at its lowest point in July 2015 to 104 hours at its peak in October 2014 (Figure 3).

**Figure 3: Average Number of Hours in CBP Detention, by Month**



Source: Data generated by the American Immigration Council based on U.S. Border Patrol Southwest Border Apprehensions data obtained through Freedom of Information Act.



**Figure 4: Individuals Held in CBP Facilities by Southwest Border Sector and Length of Detention**

Sep. 1, 2014 - Aug. 31, 2015



- ■ Individuals detained for less than 24 hours
- ■ Individuals detained for at least 24 but less than 48 hours
- ■ Individuals detained for at least 48 but less than 72 hours
- ■ Individuals detained for 72 hours or more

**Source**: Data generated by the American Immigration Council based on U.S. Border Patrol Southwest Border Apprehensions data obtained through Freedom of Information Act.

Length of detention varies considerably across border sectors (Figure 4).[25] Notably, over 80 percent of the individuals detained between September 1, 2014 and August 31, 2015 in Laredo (29,585) and Rio Grande Valley (117,847), and over half of the individuals held in Yuma (3,664), Tucson (33,776), and El Centro (5,958), respectively, were held for 24 hours or more. Laredo has the largest share of individuals detained for 72 hours or more during this period. Specifically, 54 percent (19,000) of the 35,494 individuals held in detention facilities in Laredo were detained for at least 72 hours (Figure 5).

**Figure 5: Individuals Held in CBP Facilities by Southwest Border Sector and Length of Detention**
Sep. 1, 2014 - Aug. 31, 2015

| Sector | Less than 24 hours | At least 24 but less than 48 hours | At least 48 but less than 72 hours | 72 hours or more | Total |
|---|---|---|---|---|---|
| Laredo, Texas | 5,909 | 4,437 | 6,148 | 19,000 | 35,494 |
| | (17%) | (13%) | (17%) | (54%) | (100%) |
| Rio Grande Valley, Texas | 27,602 | 71,287 | 33,098 | 13,462 | 145,449 |
| | (19%) | (49%) | (23%) | (9%) | (100%) |
| San Diego, California | 11,592 | 10,411 | 2,351 | 2,057 | 26,411 |
| | (44%) | (39%) | (9%) | (8%) | (100%) |
| Yuma, Arizona | 2,965 | 2,132 | 329 | 1,203 | 6,629 |
| | (45%) | (32%) | (5%) | (18%) | (100%) |
| Tucson, Arizona | 29,564 | 22,290 | 4,668 | 6,818 | 63,340 |
| | (47%) | (35%) | (7%) | (11%) | (100%) |
| El Centro, California | 6,654 | 4,553 | 976 | 429 | 12,612 |
| | (53%) | (36%) | (8%) | (3%) | (100%) |
| Big Bend, Texas | 2,430 | 1,346 | 299 | 393 | 4,468 |
| | (54%) | (30%) | (7%) | (9%) | (100%) |
| El Paso, Texas | 9,700 | 3,030 | 697 | 607 | 14,034 |
| | (69%) | (22%) | (5%) | (4%) | (100%) |
| Del Rio, Texas | 12,827 | 4,433 | 798 | 233 | 18,291 |
| | (70%) | (24%) | (4%) | (1%) | (100%) |
| Total | 109,243 | 123,919 | 49,364 | 44,202 | 326,728 |
| | (33%) | (38%) | (15%) | (14%) | (100%) |

**Note**: Percentages may not sum to 100 due to rounding.
**Source**: Data generated by the American Immigration Council based on U.S. Border Patrol Southwest Border Apprehensions data obtained through Freedom of Information Act.

The average amount of time that individuals were detained was over 24 hours across all sectors (Figure 6). The sectors where individuals were detained on average for the longest periods were Laredo, Texas (166.6 hours); Yuma, Arizona (150.4 hours); and Tucson, Arizona (128.4 hours).



**Figure 6: Average Number of Hours Individuals Were Held in Detention, by Sector**



**Source**: Data generated by the American Immigration Council based on U.S. Border Patrol Southwest Border Apprehensions data obtained through Freedom of Information Act.

Because the mean is sensitive to outliers and, as we discuss below, there are extreme values in our dataset (which indicate that individuals were held for months), the median is probably a more accurate measure. Still, in six of the nine sectors analyzed, the median number of hours individuals were detained was higher than 24 (Figure 7). The sector with the greatest median was Laredo, Texas (77 hours), followed by Rio Grande Valley, Texas (39 hours) and Del Rio, Texas (27.4 hours).

**Figure 7: Median Number of Hours Individuals Were Held in Detention, by Sector**



**Source**: Data generated by the American Immigration Council based on U.S. Border Patrol Southwest Border Apprehensions data obtained through Freedom of Information Act.

Alarmingly, the data also indicate that each sector had someone detained in one of its facilities for at least seven months. It also shows that someone in Laredo was detained for 13 months, 13 days (Figure 8). DHS officials we interviewed for this report also noted that some individuals are referred for prosecution for "illegal entry" or "reentry" under 8 USC §§ 1325 and 1326 and subsequently serve jail time. These individuals may not be "booked out" of CBP custody until they are returned to CBP and repatriated after serving their sentences, making their time in CBP custody appear longer than it actually was.

**10**   *Detained Beyond the Limit: Prolonged Confinement by U.S. Customs and Border Protection along the Southwest Border*

22

**Figure 8: Maximum Number of Hours Someone Was Detained in Each Sector**

| Sector | Maximum |
|---|---|
| Laredo, Texas | 408 days, 19 hrs. |
| Rio Grande Valley, Texas | 395 days, 21 hrs. |
| El Centro, California | 395 days, 11 hrs. |
| Yuma, Arizona | 372 days, 22 hrs. |
| Tucson, Arizona | 367 days, 21 hrs. |
| Big bend, Texas | 310 days, 18 hrs. |
| El Paso, Texas | 307 days, 11 hrs. |
| Del Rio, Texas | 246 days, 8 hrs. |
| San Diego, California | 214 days, 16 hrs. |

**Source**: Data generated by the American Immigration Council based on U.S. Border Patrol Southwest Border Apprehensions data obtained through Freedom of Information Act.

During the period analyzed, it appears that 6,814 individuals were held in CBP "short-term detention" facilities for at least a month.[26] Of these, the largest share (3,214) was detained in Tucson; 1,577 in Rio Grande Valley; 1,226 in Laredo; 384 in Yuma; and the remaining 366 in the other sectors. In addition, the data suggest that 3,123 individuals were held for at least two months. Of those individuals, Tucson held the largest number (1,314); followed by Rio Grande Valley (876); Laredo (552); Yuma (202); El Paso (80); and El Centro (47).

These numbers are indeed worrisome. Although CBP released the data in response to our FOIA without a caveat, there may be a question as to the accuracy of some of it. A report by GAO found some irregularities with CBP time of custody data, due in part to "delays in agents recording of individuals' book out from holding facilities."[27]

# CONCLUSION

This newly released data shows that CBP—through its component Border Patrol—routinely forces individuals to sleep in cells that lack beds or other reasonable sleeping accommodations, often for multiple nights, in all southwest border sectors. And while lengthy detention is a frequent occurrence in all sectors, the numbers are especially alarming in many sectors—namely Laredo, Rio Grande Valley, Tucson, Yuma, and El Centro. In all of these sectors, more than 50 percent of the detainees were held for 24 hours or more. Laredo, in particular, presents the most alarming outcomes, with 54 percent of individuals held in its detention facilities for at least 72 hours. Such detention is far in excess of the 12-hour limit proscribed by Border Patrol, and is particularly troubling considering the deplorable detention conditions that previously have been reported.



# ENDNOTES

1. For more information on detention conditions, *see* Guillermo Cantor, "Hieleras (Iceboxes) in the Rio Grande Valley: Lengthy Detention, Deplorable Conditions, and Abuse in CBP Holding Cells," (Washington, DC: American Immigration Council, 2015), https://www.americanimmigrationcouncil.org/research/hieleras-iceboxes-rio-grande-valley-sector; American Immigration Council, "Way Too Long: Prolonged Detention in Border Patrol Holding Cells, Government Records Show," June 10, 2015, https://www.americanimmigrationcouncil.org/research/way-too-long-prolonged-detention-border-patrol-holding-cells-government-records-show; Americans for Immigrant Justice, "The 'Hieleras': A Report on Human and Civil Rights Abuses Committed by Customs and Border Protection Agency," August 7, 2013, http://www.aijustice.org/the-hieleras-a-report-on-human-civil-rights-abuses-committed-by-u-s-customs-border-protection-2/; No More Deaths (NMD), *Culture of Cruelty: Abuse and Impunity In Short-term U.S. Border Patrol Custody*, (Tucson, AZ: No More Deaths, 2011), 21, http://forms.nomoredeaths.org/abuse-documentation/a-culture-of-cruelty/ (noting reports of agents "turning on the air conditioning or placing fans outside the cells after receiving complaints about cold cells"); *Doe v. Johnson*, 4:15-cv-00250-DCB Doc. 1, (D. Ariz. June 8, 2015)(American Immigration Council, available at https://www.americanimmigrationcouncil.org/litigation/challenging-unconstitutional-conditions-cbp-detention-facilities).

2. Although the dataset received contained 326,881 cases, in 89 cases the book out date/time was missing and in 64 cases the book out date provided was earlier than the book in date. Given that the focus of this report is length of detention, those cases were excluded from the analysis. Thus, the total number of cases included in this analysis is 326,728.

3. U.S. Customs and Border Patrol, "USBP Southwest Border Apprehensions: September 1, 2014 through August 31, 2015," obtained by the American Immigration Council via FOIA in 2016, http://www.americanimmigrationcouncil.org/sites/default/files/usbp_southwest_border_apprehensions_090114-083115_redacted.pdf.

4. U.S. Government Accountability Office, *Immigration Detention: Additional Actions Needed to Strengthen DHS Management of Short-Term Holding Facilities*, GAO-16-514, (Washington, DC, 2016), http://www.gao.gov/assets/680/677484.pdf.

5. American Immigration Council, "Way Too Long: Prolonged Detention in Border Patrol Holding Cells, Government Records Show," June 10, 2015, https://www.americanimmigrationcouncil.org/research/way-too-long-prolonged-detention-border-patrol-holding-cells-government-records-show.

6. Guillermo Cantor, "Hieleras (Iceboxes) in the Rio Grande Valley: Lengthy Detention, Deplorable Conditions, and Abuse in CBP Holding Cells," (Washington, DC: American Immigration Council, 2015), https://www.americanimmigrationcouncil.org/research/hieleras-iceboxes-rio-grande-valley-sector.

7. *See* U.S. Border Patrol Chief David Aguilar, U.S. Border Patrol Policy, "Subject: Detention Standards," (Reference No: 08-11267), January 31, 2008, https://www.documentcloud.org/documents/818095-bp-policy-on-hold-rooms-and-short-term-custody.html; see also *Flores v. Holder*, 2:85-cv-04544-DMG Doc. 121, at *20-22 (C.D. Cal. February 27, 2015) (available at http://www.slideshare.net/amjolaw/opposition-to-enforcement-of-action) ("CBP sets and enforces clear standards for safe and sanitary conditions at the Border Patrol stations through facilities design guides and written policy guidance").

8. U.S. Government Accountability Office, *Immigration Detention: Additional Actions Needed to Strengthen DHS Management of Short-Term Holding Facilities*, GAO-16-514, (Washington, DC, 2016), 2, http://www.gao.gov/assets/680/677484.pdf.

9. *See* U.S. Customs and Border Patrol Office of Internal Affairs Security Management Division, *CBP Security Policy and Procedures Handbook*, HB1400-02B, (Washington, DC, August 13, 2009), 492-95, http://info.publicintelligence.net/CBP-SecurityHandbook.pdf.

10. Ibid., 494 ("No beds; hold rooms are not designed for sleeping.").

11. Amy Bracken, "Immigrants, Legal Groups Allege Harsh Treatment at the Border," *PRI*, August 1, 2013, http://www.pri.org/stories/2013-08-01/immigrants-legal-groups-allege-harsh-treatment-us-border.

12. "Every effort will be made to promptly process, transfer, transport, remove, or release those in custody as appropriate and as operationally feasible." U.S. Border Patrol Chief David Aguilar, U.S. Border Patrol Policy, "Subject: Detention Standards," (Reference No: 08-11267), January 31, 2008, 3 at 6.2.1, https://www.documentcloud.org/documents/818095-bp-policy-on-hold-rooms-and-short-term-custody.html.

13. Ibid., 4 at 6.2.4.1 ("In cases where the [Patrol Agent In Charge] has reason to believe that the [unaccompanied child's] detention will exceed 72 hours or exceeds 72 hours [the agent] will notify a sector staff officer immediately."). *See also* ibid. at 6.2.4.2 ("Under extenuating circumstances, the maximum time allowed for placing [unaccompanied children] in an ORR-approved facility is five days. In cases where [children] are detained longer than five days, sector staff will immediately contact the [Detention and Removal Office] liaison officer [ ].").

14. "Detainees will be provided snacks and juice every four hours. Detainees whether in a hold room or not, will be provided a meal if detained more than 8 hours or if their detention is anticipated to exceed 8 hours. Regardless of the time in custody, juveniles will be provided with meal service, and at least every six hours thereafter; two of the three meals must be hot. Juveniles, small



children, toddlers, babies, and pregnant women will have regular access to snacks, milk, or juice at all times." U.S. Border Patrol Chief David Aguilar, U.S. Border Patrol Policy, "Subject: Detention Standards," (Reference No: 08-11267), January 31, 2008, 8 at 6.8, https://www.documentcloud.org/documents/818095-bp-policy-on-hold-rooms-and-short-term-custody.html.

15. "Potable drinking water will be available to detainees. The supervisor is responsible for ensuring that drinking water is available." Ibid., at 6.9.

16. "Detainees using the restrooms will have access to toilet items, such a soap, toilet paper, and sanitary napkins. Families with small children will also have access to diapers and wipes." Ibid., at 6.10.

17. Ibid., 7 at 6.7.

18. "Agents will make reasonable efforts to provide a shower for any detainee held for more than 72 hours. Detainees that are showering will be provided a clean towel and basic toiletries. Agents will make every reasonable effort to provide unaccompanied [] children who are held more than 48 hours with access to a shower and clean towel, clean clothing, and basic hygiene articles [ ]." Ibid., 9 at 6.14.

19. "Supervisors will ensure that detention cells are regularly cleaned and sanitized." Ibid., at 6.16.

20. U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search*, October 2015, https://www.cbp.gov/sites/default/files/documents/cbp-teds-policy-20151005_1.pdf.

21. Guillermo Cantor, "Hieleras (Iceboxes) in the Rio Grande Valley: Lengthy Detention, Deplorable Conditions, and Abuse in CBP Holding Cells," (Washington, DC: American Immigration Council, 2015), https://www.americanimmigrationcouncil.org/research/hieleras-iceboxes-rio-grande-valley-sector; *Doe v. Johnson*, 4:15-cv-00250-DCB Doc. 1, (D. Ariz. June 8, 2015)(American Immigration Council, available at https://www.americanimmigrationcouncil.org/litigation/challenging-unconstitutional-conditions-cbp-detention-facilities).

22. U.S. Customs and Border Protection, "Fact Sheet: Air and Marine Southwest Border Region," September 18, 2013, http://nemo.cbp.gov/air_marine/FS_Southwest_Border_Region.pdf.

23. U.S. Customs and Border Protection, "Border Patrol Sectors," accessed August 17, 2016, https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors.

24. United States Border Patrol, "U.S. Border Patrol Fiscal Year Southwest Border Sector Apprehensions (FY 1960 - FY 2015)," accessed August 17, 2016, https://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Sector%20Apps%20FY1960%20-%20FY2015.pdf.

25. Additionally, this data set contains data from the tail end of the 2014 "surge" of unaccompanied children and families seeking refuge in the United States. According to DHS officials who we talked to for this report, this "surge" led CBP to shift resources from other sectors to the Rio Grande Valley Sector in 2014, which may have impacted resources at other sectors and potentially extended length of detention in those sectors. However, it is worth noting that, on average, length of detention in RGV was still relatively high.

26. For these calculations, we assume that each month has 30 days or 720 hours.

27. U.S. Government Accountability Office, *Immigration Detention: Additional Actions Needed to Strengthen DHS Management of Short-Term Holding Facilities*, GAO-16-514, (Washington, DC, 2016), http://www.gao.gov/assets/680/677484.pdf.



D

**LIVE**

Trump discusses manufacturing and energy before touring a Pittsburgh-area petrochemical plant

● LIVE TV

# Exclusive: Watchdog finds detainees 'standing on toilets' for breathing room at border facility holding 900 people in space meant for 125



By Priscilla Alvarez, CNN

Updated 3:03 PM ET, Fri May 31, 2019



| 03:57 | 01:43 | 02:16 | 03:12 | 0 |

Scaramucci says he     Tapper to O'Rourke: Is     Biden says he met with     CNN anchor lists the     Tapp

By using this site, you agree to our updated Privacy Policy and our Terms of Use.

**27**

**Washington (CNN) —** The Department of Homeland Security's Inspector General has found "dangerous overcrowding" and unsanitary conditions at an El Paso, Texas, Border Patrol processing facility following an unannounced inspection, according to a new report.

The IG found "standing room only conditions" at the El Paso Del Norte Processing Center, which has a maximum capacity of 125 migrants. On May 7 and 8, logs indicated that there were "approximately 750 and 900 detainees, respectively."

"We also observed detainees standing on toilets in the cells to make room and gain breathing space, thus limiting access to the toilets," the report states. The report was first obtained by CNN.

A cell with a maximum capacity of 12 held 76 detainees, another with a maximum capacity of eight held 41, and another with a maximum capacity of 35 held 155, according to the report.

"(Customs and Border Protection) was struggling to maintain hygienic conditions in the holding cells. With limited access to showers and clean clothing, detainees were wearing soiled clothing for days or weeks," the report states.

RELATED: Trump erupts over immigration, threatening Mexico with tariffs

"Corrective action is critical to the immediate health and safety needs of detainees, who cannot continue to be held in standing-room-only conditions for weeks until additional tents are constructed," the report adds.

The report comes as the number of migrants coming across the southern border continues to skyrocket. Roughly 109,000 people crossed in April, according to DHS, a number expected to increase in May.

President Donald Trump threatened on Thursday to impose tariffs against Mexico if it doesn't step up enforcement, but it's not clear such actions would stem the flow of migrants.

The White House has asked Congress for $4.5 billion in emergency funding for the border.

**28**

# Border Patrol agents worried about health, safety

The IG also said Border Patrol managers were concerned about an "immediate risk to the health and safety" of DHS agents and officers, and that employee morale is decreasing. There is a "high incidence of illness" among staff, the report states.

At the El Paso center and others, some employees eligible for retirement have accelerated their retirement dates, and others are looking for work elsewhere.

Five Border Patrol stations and two ports of entry in the El Paso area, including greater El Paso and eastern New Mexico, were part of the unannounced spot inspection visits at CBP holding facilities this month.

DHS and acting Homeland Security Secretary Kevin McAleenan have been flagging the rising number of migrants and crowded condition at border camps.

"The current situation on the border represents an acute and worsening crisis. Our immigration is not equipped to accommodate a migration pattern like the one we are experiencing now," DHS said in a written response to the IG report.

"The speed with which illegal migrants are transiting through Mexico to reach our southern border is frustrating our best efforts to respond quickly," it added.

**29**

## Recommendations

The IG recommends taking "immediate steps" to remedy the overcrowding at the El Paso Del Norte Processing Center.

DHS said that it "has implemented a multi-layered approach" that includes the construction of additional structures to house migrants, continued coordination with Immigration and Customs Enforcement and providing staff support.

The agency has constructed a soft-sided structure at El Paso Station that can hold 500 and has been operational since May 2, the response reads. The agency also plans to build additional structures, including an "800 holding capacity modular facility" at El Paso Station by July 31 and a permanent centralized processing center for approximately 1,800 people.

The estimated completion date is November 30, 2020.

**PAID CONTENT**



### The Early Signs - Research Congestive Heart Failure…

Sponsored: Yahoo! Search



### [Gallery] Audiences Today Can't Comprehend These Photos

Sponsored: History A2Z

**30**

E

Watch live: Trump delivers remarks on American energy and manufacturing in Pittsburgh



—— **From left, Felipe Gomez Alonzo, Carlos Gregorio Hernandez Vasquez and Jakelin Caal Maquin are three of the children who have died in the custody of U.S. Customs and Border Protection.** `Family photos`

`May 29, 2019, 1:44 PM PDT`

**32**

By Nicole Acevedo

At least seven children are known to have died in immigration custody since last year, after almost a decade in which no child reportedly died while in the custody of U.S. Customs and Border Protection.

The string of cases continue to raise questions around the conditions in which migrant children are being kept at a time when a growing number of migrants, many of them Central American parents with children, are presenting themselves at the border to seek asylum.

Aside from the fact that children may have underlying health conditions, most are reaching the United States after arduous journeys during which they have had little access to clean shelter and proper provisions. Many are leaving impoverished and drought-stricken regions.

But the deaths under President Donald Trump's watch have health professionals and some advocates questioning whether the administration's immigration policies — particularly keeping minors in custody for longer periods — are contributing to more minors getting sick and dying while in custody or shortly after they are released.

"Children are not like adults. They get sick more quickly and each hour of delay can be associated with serious complications, especially in cases of infectious diseases. Delays can lead to death," Dr. Julie Linton, co-chair of the immigrant health special interest group at the American Academy of Pediatrics, told NBC News.

The most recent known case is that of Carlos Gregorio Hernández Vásquez. The teenager died in CBP custody this month after being diagnosed with the flu, an infectious disease.

In December, medical examiners concluded that 7-year-old Jakelin Caal Maquin, who also died in CBP custody, succumbed to "a rapidly progressive infection" that shut down her vital organs. CBP sent Jakelin on a 90-mile bus ride to another location after she was taken into custody, even though her father had told officials she was vomiting and feeling ill before they left.

CBP officials said last year that Jakelin waited an hour and a half to receive emergency medical care after showing symptoms.

Deaths of several other migrant children were reported in just eight months following her death.

"We do not need to be talking about the prolonged detention of children. It is dangerous," Linton said.

Seven months before Jakelin's death, 1-year-old Mariee Juarez died after being released from U.S. Immigration and Customs Enforcement custody.

**33**

——— Yazmin Juarez and her daughter, Mariee, came seeking asylum from Guatemala.   Courtesy Yazmin Juarez

Mariee died from complications of a respiratory illness her mother and lawyers say she allegedly developed while detained.

CBP holding facilities are "basically concrete floors with mats and barbed wire fencing and bright lights 24/7," Linton said. "That can be a very disorienting environment to children."

**34**

**Leah Chavla**, an international human rights lawyer and policy adviser at the **Women's Refugee Commission**, has worked with families who have raised many concerns over CBP facilities being "inadequate."

"Families have come with concerns about lack of hygiene, being crammed into holding cells, being served food that has not fully cooked or nutritionally appropriate for kids ... being woken up throughout the night," Chavla told NBC News.

The CBP holding facilities are often referred to by the people held in them as "hieleras," which translates to icebox or cooler, because of their frigid temperatures. A **Human Rights Watch report about these conditions** pointed out that children were sleeping under thin Mylar blankets or foil wrappers.

**Wilmer Josué Ramírez Vásquez, a 2½-year-old,** died this month after being detained by Border Patrol in early April and spending about a month in a hospital, where he was diagnosed with pneumonia.



NEWS

16-year-old migrant boy dies in U.S. custody, 5th child to die since December

Carlos, 16, had been held in such a facility before being diagnosed with influenza A. He died May 20. The teenager had spent one week in CBP custody, even though legally he should have not been there for more than three days.

DONALD TRUMP

Cuccinelli torches famous Statue of Liberty immigrant quote

**35**

IMMIGRATION

Acting ICE chief defends Mississippi raids that left children abandoned, blames parents

U.S. laws require CBP to transfer minors into the custody of the Office of Refugee Resettlement (ORR) at the Department of Health and Human Services (HHS) within 72 hours unless there are "exceptional circumstances.

A CBP official told NBC News via email that "the standard is 72 hours or less, but with the on-going crisis that has been difficult to maintain at times."

The official stated that despite the fact that the number of migrant families and unaccompanied minors remain at peak levels, U.S. Border Patrol continues to conduct processing of unaccompanied minors in a little over a day, on average, across the southwest border.

The official added that the high number of children requiring placement with HHS-ORR exceeds their available shelter spaces so the minors spend more time in Border Patrol facilities until then.

Under ORR, children are supposed to have access to a network of state-licensed or government-funded private care providers, as well as education, health care and case management services, Linton explained.

And yet, Carlos was placed back in CBP custody after he was diagnosed with flu-like symptoms, an official from the agency previously told NBC News.

"Kids are not being processed quickly enough under CBP," Chavla said. "Filing complaints to elevate some of these concerns has been one of a couple of mechanisms used to push CBP into following the rules, but there are still some real doubts about how serious they're about this."

New calls to investigate string of migrant child deaths

MAY 23, 2019 / 05:56

**36**



Felipe Gómez Alonzo, 8, also was held in CBP custody for nearly one week before he died on Christmas Eve. Medical investigators later determined the boy had been suffering from the flu while he was under the agency's care.

"A child should never be returned to a processing center to recover from an illness," Linton said. "As a pediatrician, I would never suggest for a kid to heal in a stressful environment with concrete floors."

Even though ORR is more equipped than CBP to house minors for a longer period of time, children have also died while in ORR care or shortly after being released from immigration custody.

Darlyn Valle, 10, died in September after entering ORR custody, but her death was revealed to the public nearly eight months after it had happened.

The girl entered ORR custody on March 2018 "as a medically fragile child with a history of congenital heart defects" and remained in its custody until September, the agency told NBC News in a statement. During that time, Darlyn underwent a surgical procedure at a facility in Arizona and complications later left her in a coma.

She was then taken to Nebraska, just three days before her death, in an effort to reunite her with her mother. She died due to fever and respiratory distress, ORR said.

ORR said it provides routine and emergency medical and mental health care to all children in its care, including

**37**

an initial medical exam, follow-up care as appropriate and weekly individual and group counseling sessions with care provider clinicians.

"The government kept a sick child in its custody from March to September. That's 7 months she could've been in the arms of her mother," Al Otro Lado, a nonprofit legal services organization, wrote on Twitter.

Juan de León Gutiérrez, 16, died of health complications under ORR care on April 30 after officials at a detention facility in Texas noticed he was sick.

**38**

————  Juan de Leon Gutierrez in a March 2017 photo.  `Jimmy Cristian Gutierrez Garcia / via AP`

CBP apprehended nearly 99,000 migrants who entered the U.S. without authorization last month.

Nearly 60 percent of them were family units, according to CBP numbers. Both figures have continued to rise each month since January. Although apprehensions are still well under the historic highs of the late 1990s and early 2000s, the majority of migrants then were adult men from Mexico — not asylum-seeking families with children.

The administration has been limiting the number of people walking up to a legal port of entry on the U.S. side of the border and asking for asylum. Advocates say that has led to more people crossing the border illegally, which is contributing to Border Patrol agents ending up with overcrowded processing facilities and holding facilities.

"CBP's priority is law enforcement. They don't necessarily have the conditions to keep children for a long period of time," Linton said.

Congressional calls for oversight and investigations are always welcomed to see what to avoid and what can be done better, Chavla said, especially to look into how CBP is implementing its own guidelines that outline the conditions and resources the agency has to provide to children in their custody.

"Guidelines are not binding, so it's important to have a critical look at what's going on and how the guidelines

**39**

can be made binding," Chavla said.

Acting director of the Department of Homeland Security Kevin McAleenan said during a recent budget hearing that more than 100 certified medical practitioners have been deployed to the two busiest sectors. But when asked if every child in CBP custody had access to a pediatrician, McAleenan answered with a confident "no."

"There's a need for urgent and thoughtful engagement of pediatricians in every step where children are involved," Linton said.

Even before the latest deaths, the American Academy of Pediatrics recommended that immigration agencies should better train staff on how to respond to health-related emergencies and prioritize "the thoughtful release of children, more case management efforts and humane safe conditions," Linton said.

And yet, she said, she and other health professionals continue to ask why there seems to be a lack of urgency to improve the conditions in which migrant children are being held.

"We would love to know the answer to that question," she said.

**FOLLOW** NBC LATINO **ON** FACEBOOK, TWITTER **AND** INSTAGRAM.

---



```
Nicole Acevedo
```

☐          Nicole Acevedo is a staff reporter at NBC News Digital where she reports, writes and produces content for NBC Latino and NBCNews.com.

---

————   Daniella Silva and Suzanne Gamboa contributed.

---

ABOUT

CONTACT

CAREERS

PRIVACY POLICY

© 2019 NBC UNIVERSAL
TERMS OF
SERVICE

NBCNEWS.COM
SITE MAP

ADVERTISE

▷ ADCHOICES

**41**

F





# FREQUENTLY ASKED QUESTIONS

**What is the Central Violations Bureau?**

The Central Violations Bureau is a national center responsible for processing violation notices (tickets) issued and payments received for petty offenses charged on a federal violation notice. This includes violations that occur on federal property such as federal buildings, national parks, military installations, post offices, Veteran Affairs medical centers, national wildlife refuges, and national forests. The Central Violations Bureau processes violation notices for violations of federal law that occur outside federal property as well. For example, migratory bird offenses that occur on private property.

**How do I know if I received a federal ticket?**

This site is designed to allow on-line payments of **FEDERAL TICKETS ONLY!** Click here to see an image of a federal ticket. If the ticket you received does not say "U.S. District Court Violation Notice" across the top, then you did not receive a federal ticket. Federal tickets are issued by law enforcement personnel from agencies such as the U.S. Park Police, U.S. Fish & Wildlife, Department of Defense Police, U.S. Coast Guard, U.S. Provost Marshal, Airforce, Marines & Navy Security Forces, U.S. Postal Police, U.S. Customs, U.S. Border Police, and V.A. Police.

**How can I pay a ticket?**

You can pay on-line by clicking here. You may also make a payment by calling the Central Violations Bureau during normal business hours at (800) 827-2982 or mail a check or money order to the following address. **PLEASE DO NOT SEND CASH!**

Central Violations Bureau
P.O. Box 780549
San Antonio, TX 78278-0549

Make sure to include the location code and violation number on your payment.

**How can I check the status of a ticket?**

Contact the Central Violations Bureau by calling 800-827-2982. Use option 4 to hear an automated recording with the status of your ticket.

**I want to contest my ticket in court, but I don't have a court date written on my ticket.**

You will be notified by the Central Violations Bureau of your court date by mail. You will receive a Notice to Appear usually within 4 to 8 weeks from issuance of the ticket.

**I received a violation notice, it is marked mandatory, do I have to appear in court?**

Yes, appearance is mandatory.

**When is my payment due by?**

All payments must be received on or before the scheduled court date.

**What if I pay my ticket the day of court on-line?**

The court will be notified of your payment. You will not have to appear in court.

**What happens if I don't pay the ticket or appear in court and I have a Virginia Driver License?**

Failure to pay the collateral amount due or to appear in court on the date and time scheduled for you could result in the suspension of your driving privileges and/or vehicle registration. If your driving privileges and/or vehicle registration have been suspended by the Virginia state DMV, you must pay the violation notice in full or appear in court before the suspension will be released. If you pay your violation notice in full through this website, the suspension will be released automatically within 48 business hours. If you are attempting to reinstate your driving privileges sooner, you must contact the CVB. Additional fees will apply for expediting the release. Please note: if your driving privilege is suspended, a reinstatement fee will also be assessed by the Virginia Department of Motor Vehicles.

NOTICE: If you received a similar copy of this suspension letter from the Virginia Department of Motor Vehicles, you must pay the total amount due on the violation notice to have your drivers license reinstated. Once the balance due is received in full at the CVB, notification will be electronically transmitted to the Virginia Department of Motor Vehicles automatically. You will be required to pay a reinstatement fee to the Virginia Department of Motor Vehicles to obtain a release. The reinstatement fee is in addition to the amount owed for the ticket and should be paid directly to the state.

**What happens if I don't pay the ticket or appear in court?**

If you fail to pay the amount due or to appear in court on the date and time scheduled, the United States District Court may issue a summons ordering you to appear or issue a warrant for your arrest. If you are charged with a motor-vehicle violation, the court may also report your failure to pay or appear to your state's motor-vehicle or driver-licensing agency, which may affect your driving privileges, or your vehicle registration, or both.

**I received a notice to appear, but I mailed my payment three weeks ago, did you receive my payment?**

Contact the Central Violations Bureau by calling 800-827-2982.  Use option 4 to hear an automated recording with the status of your ticket.

**I received a ticket, but I have moved.  How can I change my address?**

Address change requests must be submitted in writing to the Central Violations Bureau.   You may send a fax to 210-301-6401, email to info@cvb.uscourts.gov or mail to:

Central Violations Bureau
P.O. Box 780549
San Antonio, TX 78278-0549

Please include your name, location code, violation number and current contact information (phone and email) in your request.   Simply filing a change of address with the U.S. Postal Service is not sufficient.

**Can I take drivers course/traffic school/defensive driving?**

Please appear on your scheduled court date for any special requests.

**What if I can't afford to pay the Total Collateral Due amount on my ticket prior to court?**

Please appear on your scheduled court date for any special requests.

**Can I request community service, probation, or deferred prosecution?**

Please appear on your scheduled court date for any special requests.

**Where can I find directions to the court?**

Use the Court Links on this website for all court information.

**If I submit correspondence regarding my violation, do I still have to appear in court?**

Yes, unless you receive guidance from the court instructing you otherwise.

**I received a moving violation (i.e. a speeding ticket.) How many points will be assessed against my drivers license?**

You will have to contact your state's Department of Motor Vehicles or Licensing to determine the point value of the offense. The Central Violations Bureau does not maintain this information.

**Where does the money go when I pay a ticket?**

Funds collected from the payment of petty offense cases are deposited into the Crime Victims Fund.   The Crime Victims Fund was established by the Victims of Crime Act of 1984 and is a major funding source for victim services throughout the country.   For more information about the Crime Victims Fund and how the funds are disbursed, visit the Office for Victims of Crime website at http://www.ojp.usdoj.gov/ovc/.   The $30 processing fee is used to offset court costs.

**Will I be charged a fee if my check or electronic payment is returned from my bank for lack of funds?**

Yes, there is a $53 fee for payments returned to the court for non-payment.   See the District Court Fee Schedule for a detailed list of fees. Additional bank fees may apply depending on your financial institution.

**How do I obtain a release for my driver license or vehicle's registration?**

All releases are processed automatically once a fine is paid in full or the case is dismissed. They are processed in accordance with the policies of the Department of Motor Vehicles of your state and may require several weeks to become effective . There is no additional fee assessed by the Central Violations Bureau to issue a release.

**How may I obtain a copy of the complete statement of the charge(s) against me?**

You may obtain a copy of the statement by calling 800-827-2982 or submitting a written request to the Central Violations Bureau through email, fax or mail. The request must contain the CVB Location Code, Violation Number, defendant name and contact phone number. Any information missing will delay the request. Please allow 30 days from the date of issuance for the CVB to receive a copy of the ticket from the law enforcement agency.

|  |  |
|---|---|
| The email address is: | info@cvb.uscourts.gov |
| The fax number is: | (210) 301-6401 |
| | Central Violations Bureau |
| The mailing address is: | P.O. Box 780549 |
| | San Antonio, TX 78278-0549 |

**How do I get a refund for an over payment?**

Defendants must submit a letter of request along with a Refund Form to receive a refund for payments made to the Central Violations Bureau.   The request can not be processed without both a letter of request and form.   Click here for a copy of the Refund Form.   For information regarding the purpose of the refund form please see the United States Treasury website.   Please allow 4-6 weeks for payment processing. In most cases refunds will be issued via electronic funds transfer. The refund will appear as a credit to your checking or savings account.

**NOTE:** The document listed above is in Adobe's Portable Document Format (pdf). In order to view pdf documents, you must have Adobe's Acrobat Reader. This reader is available free at the Adobe web site.

**44**

This site is maintained by the Administrative Office of the U.S. Courts on behalf of the Federal Judiciary.

The purpose of this site is to provide information about the U.S. District Court Violation Notice process.

G

Case 3:19-mj-24522-LL-TWR   Document 19-2   Filed 01/30/20   PageID.118   Page 48 of 113

**U.S. District Court**
**Southern District of California**
**Petty Offense Docket Sheet and Judgment Order**
**For 10/10/2018 08:30 AM Hearing Site: crtrm1F**
**Magistrate Judge: Bernard G. Skomal**

Date Oct 04, 2018

| Defendant Information | Citation | Hrg Type | Offense Information | Disposition | Proc. Fee | Special Assess. | Fine | Total Due |
|---|---|---|---|---|---|---|---|---|
| 3:17-po-02936-BGS USA vs Alejandromeza Uriel Alejandromeza | CVC 16028(a) | statcnf | CVC 16028(a) Fail to display evidence of financial responsibility when requested by peace off Violation Number 6939429 Violation Location CS81 | | 0.0 | 0.0 | 180.0 | 180.0 |
| 3:17-po-02936-BGS USA vs Alejandromeza Uriel Alejandromeza | CVC 12500(a) | statcnf | CVC 12500(a) Unlawful to drive unless licensed Violation Number 6939428 Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:17-po-02936-BGS USA vs Alejandromeza Uriel Alejandromeza | CVC 4000(a) | statcnf | CVC 4000(a) Registration required. Violation Number 6939426 Violation Location CS81 | | | 0.0 | 180.0 | 180.0 |
| 3:17-po-02936-BGS USA vs Alejandromeza Uriel Alejandromeza | CVC 4462.5 | statcnf | CVC 4462.5 Unlawful display of evidence of registration Violation Number 6939430 Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01713-BGS USA vs Bors Timmothy S Bors | 36 CFR 2.31 | zzia | 36 CFR 2.31 Trespassing, Tampering and Vandalism Violation Number 7520675 Violation Location CS60 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01326-BGS USA vs Bouton Brianna L Bouton | 21 USC 844 | statcnf | 21 USC 844 Possession of Controlled Substance / Marijuana (CVB Citation) Violation Number FS205168 Violation Location CS31 | Class A | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01642-BGS USA vs Brooks Jesse J Brooks | CVC 23152(a) | statcnf | CVC 23152(a) Driving under the influence of alcohol and/or drugs Violation Number 7777937 Violation Location CS2 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:17-po-03022-BGS USA v. Cammarata Samantha M Cammarata | PC 459.5 | statcnf | PC 459.5 Shoplifting Violation Number 6816071 Violation Location CS2 | Class A | 0.0 | 0.0 | 0.0 | 0.0 |

EXHIBIT B

47

| Case / Name | Code | Type | Violation | Date | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-01715-BGS<br>USA vs Cardenas<br>Mark A Cardenas | 36 CFR 1.5 | ia | 36 CFR 1.5<br>Closure of Public Use Limits<br>Violation Number 7520652<br>Violation Location CS60 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01715-BGS<br>USA vs Cardenas<br>Mark A Cardenas | 36 CFR 2.14 | ia | 36 CFR 2.14<br>Sanitation and Refuse<br>Violation Number 7520656<br>Violation Location CS60 | Class B | 0.0 | 0.0 | 230.0 | 230.0 |
| 3:18-po-01521-BGS<br>USA vs Cheatham<br>Joshua Cheatham | CVC 12500(a) | statcnf | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6398767<br>Violation Location CS2 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01555-BGS<br>USA vs Chen<br>Zhao Chen | 36 CFR 1.5 | statcnf | 36 CFR 1.5<br>Closure of Public Use Limits<br>Violation Number 6516198<br>Violation Location CS60 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01826-BGS<br>USA vs Chen<br>Qingfa Chen | 36 CFR 2.2 | ia | 36 CFR 2.2<br>Wildlife Protection<br>Violation Number 6516230<br>Violation Location CS60 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-00347-BGS<br>USA v. Farias<br>Ramiro Farias | CVC 14601.2(a) | statcnf | CVC 14601.2(a)<br>Driving while drivers license suspended or revoked for driving under influence<br>Violation Number 6938091<br>Violation Location CS81 | Class B | 25.0 | 0.0 | 0.0 | 25.0 |
| 3:18-po-00347-BGS<br>USA v. Farias<br>Ramiro Farias | CVC 16028(a) | statcnf | CVC 16028(a)<br>Fail to display evidence of financial responsibility when requested by peace off<br>Violation Number 6938093<br>Violation Location CS81 | NM<br>2018-03-08 | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-00347-BGS<br>USA v. Farias<br>Ramiro Farias | CVC 4000(a) | statcnf | CVC 4000(a)<br>Registration required.<br>Violation Number 6938092<br>Violation Location CS81 | NM<br>2018-03-08 | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-02031-BGS<br>USA vs Garcia<br>Emanuel Garcia | CVC 12500(b), (d) | statcnf | CVC 12500(b), (d)<br>Drivers license - out of classification<br>Violation Number 7472273<br>Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:17-po-02750-BGS<br>USA v. Garduno<br>Jasmine Garduno | CVC 4000(a) | statcnf | CVC 4000(a)<br>Registration required.<br>Violation Number 6937577<br>Violation Location CS81 | NM<br>2017-10-31 | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:17-po-02750-BGS<br>USA v. Garduno<br>Jasmine Garduno | CVC 12500(a) | statcnf | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6937576<br>Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |

EXHIBIT B

**48**

Document Activity Report - Hearing Date 10/11/18
Magistrate Judge: Bernard G. Skomal

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-01524-BGS<br>USA vs Gaytan<br>Michelle R Gaytan | CVC 12500(a) | statcnf | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7079729<br>Violation Location CS2 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01730-BGS<br>USA vs Granillo<br>Karina I Granillo | 50 CFR 27.84 | statcnf | 50 CFR 27.84<br>Disturbing, molesting, or interfering with person<br>engaged in official business<br>Violation Number 6372186<br>Violation Location CS51 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:17-po-02068-BGS<br>USA v. Gutierrezzuniga<br>Beatriz Gutierrezzuniga | CVC 12500(a) | zzia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6937267<br>Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:17-po-02068-BGS<br>USA v. Gutierrezzuniga<br>Beatriz Gutierrezzuniga | CVC 4000(a) | zzia | CVC 4000(a)<br>Registration required.<br>Violation Number 6937268<br>Violation Location CS81 | FC<br>2017-08-26 | 30.0 | | 150.0 | 180.0 |
| 3:17-po-02068-BGS<br>USA v. Gutierrezzuniga<br>Beatriz Gutierrezzuniga | CVC 12500(a) | zzia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6937267<br>Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:17-po-02068-BGS<br>USA v. Gutierrezzuniga<br>Beatriz Gutierrezzuniga | CVC 4000(a) | zzia | CVC 4000(a)<br>Registration required.<br>Violation Number 6937268<br>Violation Location CS81 | FC<br>2017-08-26 | 30.0 | | 150.0 | 180.0 |
| 3:18-po-02002-BGS<br>USA vs Herbert<br>Yahmyra M Herbert | 18 USC 113 | statcnf | 18 USC 113<br>Assault (CVB Citation)<br>Violation Number 7080378<br>Violation Location CS2 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01744-BGS<br>USA vs Lee<br>Benjamin Y Lee | 36 CFR 4.12 | ia | 36 CFR 4.12<br>Traffic Control Devices<br>Violation Number 6516050<br>Violation Location CS60 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01609-BGS<br>USA vs Lux<br>David W Lux | 36 CFR 261.5 | statcnf | 36 CFR 261.5<br>Fire<br>Violation Number FBGF000R<br>Violation Location CS31 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01945-BGS<br>USA vs Lwung<br>Erik C Lwung | CVC 23152(b) | ia | CVC 23152(b)<br>Driving with blood alcohol level of .08 or higher<br>Violation Number 6842202<br>Violation Location CS1 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01945-BGS<br>USA vs Lwung<br>Erik C Lwung | CVC 23222(b) | ia | CVC 23222(b)<br>Possession of marijuana by driver<br>Violation Number 6842204<br>Violation Location CS1 | | 0.0 | 0.0 | 0.0 | 0.0 |

EXHIBIT B

**49**

Case 10/04/2018 08:30 AM Hearing Site: 107BF
Magistrate Judge: Bernard G. Skomai

Page 4 of 6                                                                                   Date Oct 04, 2018

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-01751-BGS<br>USA vs Morales<br>Jessica Morales | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or revoked for offenses<br>Violation Number 7471674<br>Violation Location CS81 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:16-po-01964-BGS<br>USA v. Murray<br>Abel J Murray | 21 USC 841 | statcnf | 21 USC 841<br>Possession of Controlled Substance / Spice (CVB Citation)<br>Violation Number F4857401<br>Violation Location CS31 | Class A | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-02056-BGS<br>USA vs Nunez<br>Gabriel A Nunez | HSC 11350 | zzia | HSC 11350<br>Possession of a Controlled Substance<br>Violation Number 6371965<br>Violation Location CS51 | Class A | 0.0 | 0.0 | 280.0 | 280.0 |
| 3:18-po-01531-BGS<br>USA vs Pangborn<br>Christopher A Pangborn | CVC 14601.2(a) | statcnf | CVC 14601.2(a)<br>Driving while drivers license suspended or revoked for driving under influence<br>Violation Number 6399385<br>Violation Location CS2 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01532-BGS<br>USA vs Perez<br>Roemi L Perez | CVC 22350 | statcnf | CVC 22350<br>Violation of basic speed law<br>Violation Number 7079528<br>Violation Location CS2 | FC<br>2018-07-09 | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-01828-BGS<br>USA vs Prishker<br>Gisela J Prishker | 36 CFR 2.15 | ia | 36 CFR 2.15<br>Pets<br>Violation Number 7520634<br>Violation Location CS60 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01314-BGS<br>USA vs Ramos Jr<br>Roberto R Ramos Jr | CVC 12500(a) | statcnf | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7079563<br>Violation Location CS2 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-00312-BGS<br>USA vs Rivers<br>Gregory H Rivers | CVC 14601.1(a) | statcnf | CVC 14601.1(a)<br>Driving while drivers license suspended or revoked for offenses<br>Violation Number 7077626<br>Violation Location CS2 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-02073-BGS<br>USA vs Sanchez<br>Ivana A Sanchez | 50 CFR 25.21 | statcnf | 50 CFR 25.21<br>Violation of refuge closure order<br>Violation Number 6372225<br>Violation Location CS51 | Class B | 0.0 | 0.0 | 130.0 | 130.0 |
| 3:18-po-01380-BGS<br>USA vs Shumate<br>David S Shumate | 21 USC 844 | statcnf | 21 USC 844<br>Possession of Controlled Substance / Marijuana (CVB Citation)<br>Violation Number F5205167<br>Violation Location CS31 | Class A | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-02080-BGS<br>USA vs Torres<br>Carmen Torres | CVC 12951(a) | ia | CVC 12951(a)<br>Drivers License, to be in possession<br>Violation Number 7471354<br>Violation Location CS81 | | 0.0 | 0.0 | 130.0 | 130.0 |

EXHIBIT B

**50**

Magistrate Judge: Bernard G. Skomal

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-01144-BGS<br>USA vs Valenzuela Jr<br>Carlos Valenzuela Jr | CVC 4464 | statcnf | CVC 4464<br>Displaying altered license plates<br>Violation Number 6939155<br>Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01144-BGS<br>USA vs Valenzuela Jr<br>Carlos Valenzuela Jr | CVC 12500(a) | statcnf | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6939154<br>Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01144-BGS<br>USA vs Valenzuela Jr<br>Carlos Valenzuela Jr | CVC 4462(a) | statcnf | CVC 4462(a)<br>Showing of registration upon demand<br>Violation Number 6939156<br>Violation Location CS81 | FC<br>2018-05-01 | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-01984-BGS<br>USA vs Varney<br>Christina T Varney | 21 USC 863 | statcnf | 21 USC 863<br>Drug Paraphernalia (CVB Citation)<br>Violation Number 7164422<br>Violation Location CS5 | Felony | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01984-BGS<br>USA vs Varney<br>Christina T Varney | 21 USC 844 | statcnf | 21 USC 844<br>Controlled Substance/Marijuana/Narcotics -<br>Possession (CVB Citation)<br>Violation Number 7164421<br>Violation Location CS5 | Class A | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01984-BGS<br>USA vs Varney<br>Christina T Varney | CVC 23152(e) | statcnf | CVC 23152(e)<br>Driving Under the Influence of Drugs<br>Violation Number 7164420<br>Violation Location CS5 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01984-BGS<br>USA vs Varney<br>Christina T Varney | CVC 12500(a) | statcnf | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7164419<br>Violation Location CS5 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01399-BGS<br>USA vs Vazquez<br>Concepcion Vazquez | CVC 22500.1 | statcnf | CVC 22500.1<br>Stopping in designated fire lane<br>Violation Number 7471449<br>Violation Location CS81 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01702-BGS<br>USA vs Velasquez<br>Paul R Velasquez | CVC 24252(a)-<br>(c) | statcnf | CVC 24252(a)- (c)<br>Maintenance of lamps and devices required<br>Violation Number 6816363<br>Violation Location CS2 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01702-BGS<br>USA vs Velasquez<br>Paul R Velasquez | CVC 23152(a) | statcnf | CVC 23152(a)<br>Driving under the influence of alcohol and/or<br>drugs<br>Violation Number 6816362<br>Violation Location CS2 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01702-BGS<br>USA vs Velasquez<br>Paul R Velasquez | CVC 23612 | statcnf | CVC 23612<br>Implied Consent to Chemical Testing<br>Violation Number 6816361<br>Violation Location CS2 | | 0.0 | 0.0 | 0.0 | 0.0 |

EXHIBIT B

Case 3:18-mj-20098-KSC-AHB   Document 8-1   Filed 10/10/18   PageID.737   Page 10 of 20
Magistrate Judge: Bernard G. Skomal

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-01708-BGS<br>USA vs Works<br>Benjamin M Works | CVC 23612 | statcnf | CVC 23612<br>Implied Consent to Chemical Testing<br>Violation Number 7080210<br>Violation Location CS2 | | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01708-BGS<br>USA vs Works<br>Benjamin M Works | CVC 23152(a) | statcnf | CVC 23152(a)<br>Driving under the influence of alcohol and/or drugs<br>Violation Number 7080209<br>Violation Location CS2 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |
| 3:18-po-01708-BGS<br>USA vs Works<br>Benjamin M Works | CVC 20002(a) | statcnf | CVC 20002(a)<br>Hit and run, property damage including vehicles<br>Violation Number 7080211<br>Violation Location CS2 | Class B | 0.0 | 0.0 | 0.0 | 0.0 |

EXHIBIT B

**52**

Page 1 of 2

**U.S. District Court**
**Southern District of California**
**Petty Offense Docket Sheet and Judgment Order**
**For 10/10/2018 08:30 AM Hearing Site: SD00**
**Magistrate Judge: Bernard G. Skomal**

Date Oct 04, 2018

| Defendant Information | Citation | Hrg Type | Offense Information | Disposition | Proc. Fee | Special Assess. | Fine | Total Due |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02267-BGS USA vs Andrade Dustin K Andrade | CVC 14601.1(a) | ia | CVC 14601.1(a) Driving while drivers license suspended or revoked for offenses Violation Number 6397605 Violation Location CS2 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02268-BGS USA vs Biddles Malcolm E Biddles | CVC 14601.2(a) | ia | CVC 14601.2(a) Driving while drivers license suspended or revoked for driving under influence Violation Number 7080071 Violation Location CS2 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02269-BGS USA vs Brown Carl L Brown | CVC 4000(a) | ia | CVC 4000(a) Registration required. Violation Number 7080426 Violation Location CS2 | | 30.0 | 0.0 | 80.0 | 110.0 |
| 3:18-po-02270-BGS USA vs Burton Elijah A Burton | CVC 4000(a) | ia | CVC 4000(a) Registration required. Violation Number 6816035 Violation Location CS2 | | 30.0 | 0.0 | 200.0 | 230.0 |
| 3:18-po-02270-BGS USA vs Burton Elijah A Burton | CVC 12500(a) | ia | CVC 12500(a) Unlawful to drive unless licensed Violation Number 6816037 Violation Location CS2 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02270-BGS USA vs Burton Elijah A Burton | CVC 16020(a) | ia | CVC 16020(a) Maintain financial responsibility and carry evidence in vehicle Violation Number 6816036 Violation Location CS2 | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02271-BGS USA vs Caraballopietri Omar A Caraballopietri | CVC 22350 | ia | CVC 22350 Violation of basic speed law Violation Number 7780644 Violation Location CS2 | | 30.0 | 0.0 | 270.0 | 300.0 |
| 3:18-po-02273-BGS USA vs Huckleberry Ii Walter C Huckleberry Ii | CVC 12500(a) | ia | CVC 12500(a) Unlawful to drive unless licensed Violation Number 7077465 Violation Location CS2 | | 30.0 | 0.0 | 0.0 | 30.0 |

53

EXHIBIT B

Case 3:18-mj-20098-KSC-AJB   Document 26   Filed 10/10/18   PageID.739   Page 12 of 20

For 10/10/2018 08:30 AM Hearing Site: SD00
Magistrate Judge: Bernard G. Skomal

**Date Oct 04, 2018**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02274-BGS<br>USA vs Keisker<br>Noelle F Keisker | 21 USC 844 | ia | 21 USC 844<br>Controlled Substance/Marijuana/Narcotics -<br>Possession (CVB Citation)<br>Violation Number 7778953<br>Violation Location CS2 | Class A | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02275-BGS<br>USA vs Quintin<br>Vanesa Quintin | 21 USC 844 | ia | 21 USC 844<br>Controlled Substance/Marijuana/Narcotics -<br>Possession (CVB Citation)<br>Violation Number 7778954<br>Violation Location CS2 | Class A | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02276-BGS<br>USA vs Sanchez<br>Jasmine Sanchez | PC 270 | ia | PC 270<br>Failure to provide for a minor child<br>Violation Number 7078806<br>Violation Location CS2 | Class A | 30.0 | 0.0 | 0.0 | 30.0 |

EXHIBIT B

**U.S. District Court**
**Southern District of California**
**Petty Offense Docket Sheet and Judgment Order**
**For 10/10/2018 08:30 AM Hearing Site: SD02**
**Magistrate Judge: Bernard G. Skomal**

| Defendant Information | Citation | Hrg Type | Offense Information | Disposition | Proc. Fee | Special Assess. | Fine | Total Due |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02277-BGS<br>USA vs Alcantara<br>Raul Alcantara | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471265<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02348-BGS<br>USA vs Arechiga<br>Jacqueline P Arechiga | 36 CFR 4.22 | ia | 36 CFR 4.22<br>Unsafe Operation<br>Violation Number 6516236<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 400.0 | 430.0 |
| 3:18-po-02278-BGS<br>USA vs Amenta<br>Benjamin A Armenta | CVC 16028(a) | ia | CVC 16028(a)<br>Fail to display evidence of financial<br>responsibility when requested by peace off<br>Violation Number 7471915<br>Violation Location CS81 | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02278-BGS<br>USA vs Amenta<br>Benjamin A Armenta | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required,<br>Violation Number 7471914<br>Violation Location CS81 | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02279-BGS<br>USA vs Avendano<br>Daniel Avendano | CVC 27360(a), (b) | ia | CVC 27360(a), (b)<br>Mandatory use of child passenger restraints<br>Violation Number 7471268<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 300.0 | 330.0 |
| 3:18-po-02280-BGS<br>USA vs Bajko<br>Michael J Bajko | 43 CFR 8365.1-4(a) | ia | 43 CFR 8365.1-4(a)<br>Failure to comply with officer, creating a<br>hazard, or nuisance<br>Violation Number 6497581<br>Violation Location CS41 | Class A | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02281-BGS<br>USA vs Ball<br>Brueanne C Ball | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number 7471520<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02282-BGS<br>USA vs Barraza<br>Patrica Barraza | 36 CFR 261.53 | ia | 36 CFR 261.53<br>Special Closures<br>Violation Number F4857184<br>Violation Location CS31 | Class B | 30.0 | 0.0 | 50.0 | 80.0 |

55

EXHIBIT B

Filed 10/10/2018 08:30 AM Hearing Site: SD02
Magistrate Judge: Bernard G. Skomal

Page 2 of 8                                                                                                    Date Oct 04, 2018

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02283-BGS<br>USA vs Beeckman<br>Christopher A Beeckman | 36 CFR 261.5 | ia | 36 CFR 261.5<br>Fire<br>Violation Number F4857892<br>Violation Location CS31 | Class B | | 30.0 | 0.0 | 350.0 | 380.0 |
| 3:18-po-02284-BGS<br>USA vs Beltrannoriega<br>Gerardo Beltrannoriega | CVC 16028(a) | ia | CVC 16028(a)<br>Fail to display evidence of financial<br>responsibility when requested by peace off<br>Violation Number 7471907<br>Violation Location CS81 | | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02285-BGS<br>USA vs Camachogudino<br>Christian U Camachogudino | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471921<br>Violation Location CS81 | | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02286-BGS<br>USA vs Camachogudino<br>Christian U Camachogudino | CVC 16028(a) | ia | CVC 16028(a)<br>Fail to display evidence of financial<br>responsibility when requested by peace off<br>Violation Number 7471922<br>Violation Location CS81 | | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02287-BGS<br>USA vs Camberos<br>Kevin J Camberos | 36 CFR 1.5 | ia | 36 CFR 1.5<br>Closure of Public Use Limits<br>Violation Number 7520653<br>Violation Location CS60 | Class B | | 30.0 | 0.0 | 75.0 | 105.0 |
| 3:18-po-02288-BGS<br>USA vs Canora<br>Susan J Canora | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471923<br>Violation Location CS81 | | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02289-BGS<br>USA vs Chavezruiz<br>Jesus Chavezruiz | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 6939328<br>Violation Location CS81 | | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02289-BGS<br>USA vs Chavezruiz<br>Jesus Chavezruiz | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6939327<br>Violation Location CS81 | | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02290-BGS<br>USA vs Clark<br>Artesha Q Clark | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number 7471899<br>Violation Location CS81 | Class B | | 30.0 | 0.0 | 500.0 | 530.0 |
| 3:18-po-02291-BGS<br>USA vs Cordovaquezada<br>Jose L Cordovaquezada | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471271<br>Violation Location CS81 | | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02291-BGS<br>USA vs Cordovaquezada<br>Jose L Cordovaquezada | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471270<br>Violation Location CS81 | | | 30.0 | 0.0 | 0.0 | 30.0 |

EXHIBIT B

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02292-BGS<br>USA vs Cortez<br>Richard Cortez | 36 CFR 2.31 | ia | 36 CFR 2.31<br>Trespassing, Tampering and Vandalism<br>Violation Number 7520739<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02293-BGS<br>USA vs Diaz<br>Edwardo Diaz | 21 USC 844 | ia | 21 USC 844<br>Controlled Substance/Marijuana/Narcotics -<br>Possession (CVB Citation)<br>Violation Number F5463708<br>Violation Location CS31 | Class A | 30.0 | 0.0 | 220.0 | 250.0 |
| 3:18-po-02294-BGS<br>USA vs Diazbarraza<br>Axel A Diazbarraza | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471917<br>Violation Location CS81 | | 30.0 | 0.0 | 250.0 | 280.0 |
| 3:18-po-02295-BGS<br>USA vs Dreyer<br>Harry R Dreyer | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471260<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02296-BGS<br>USA vs Duarte Jr<br>Cesar Duarte Jr | 21 USC 844 | ia | 21 USC 844<br>Controlled Substance/Marijuana/Narcotics -<br>Possession (CVB Citation)<br>Violation Number F5463705<br>Violation Location CS31 | Class A | 30.0 | 0.0 | 220.0 | 250.0 |
| 3:18-po-02297-BGS<br>USA vs Ferreira<br>Jose C Ferreira | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number 7471269<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02299-BGS<br>USA vs Floresrobles<br>Jose A Floresrobles | CVC 38020 | ia | CVC 38020<br>Off-highway vehicles identification required<br>Violation Number FBDK00ET<br>Violation Location CS31 | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02300-BGS<br>USA vs Games<br>Sergio G Games | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number 6939498<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02301-BGS<br>USA vs Gamez<br>Edgar J Gamez | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number 7471522<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02302-BGS<br>USA vs Garcia<br>Juan L Garcia | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number 6939330<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02303-BGS<br>USA vs Gomez<br>Issac Gomez | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471275<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |

EXHIBIT B                                                                                                     **57**

Case 3:18-mj-20098-KSC-AJB   Document 8-26 AM Filed 10/10/18   PageID.743   Page 16 of 20

Magistrate Judge: Bernard G. Skomal

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02304-BGS<br>USA vs Gonzalez<br>Justin P Gonzalez | 36 CFR 2.31 | ia | 36 CFR 2.31<br>Trespassing, Tampering and Vandalism<br>Violation Number 6516128<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02305-BGS<br>USA vs Gonzalez<br>Linda E Gonzalez | CVC 16028(a) | ia | CVC 16028(a)<br>Fail to display evidence of financial<br>responsibility when requested by peace off<br>Violation Number 6939500<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02305-BGS<br>USA vs Gonzalez<br>Linda E Gonzalez | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6939499<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02306-BGS<br>USA vs Gonzalez<br>Sergio D Gonzalez | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471521<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02307-BGS<br>USA vs Guttmann<br>Jared L Guttmann | 36 CFR 261.17 | ia | 36 CFR 261.17<br>Recreation Fees<br>Violation Number F4856654<br>Violation Location CS31 | | 30.0 | 0.0 | 30.0 | 60.0 |
| 3:18-po-02308-BGS<br>USA vs Hernandez<br>Sarah Hernandez | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471274<br>Violation Location CS81 | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02308-BGS<br>USA vs Hernandez<br>Sarah Hernandez | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471273<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02309-BGS<br>USA vs Lai<br>Maggie Lai | 36 CFR 2.31 | ia | 36 CFR 2.31<br>Trespassing, Tampering and Vandalism<br>Violation Number 7520741<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02310-BGS<br>USA vs Lopez<br>Jovanni Lopez | CVC 26302(a)-<br>(d) | ia | CVC 26302(a)- (d)<br>Brakes- trailer requirements specified<br>Violation Number 6497590<br>Violation Location CS41 | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02311-BGS<br>USA vs Macias<br>Samuel R Macias | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471491<br>Violation Location CS81 | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02312-BGS<br>USA vs Martinezvazquez<br>Juan A Martinezvazquez | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 6939494<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02313-BGS<br>USA vs Mccoy Ii<br>Kenneth R Mccoy Ii | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 6939333<br>Violation Location CS81 | | 30.0 | 0.0 | 100.0 | 130.0 |

EXHIBIT B

For 10/10/2018 08:30 AM Hearing Sito SD82
Magistrate Judge: Bernard G. Skomal

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02313-BGS<br>USA vs Mccoy Ii<br>Kenneth R Mccoy Ii | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6939332<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02315-BGS<br>USA vs Meza<br>Jair Meza | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471908<br>Violation Location CS81 | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02328-BGS *SEALED*<br>USA vs Minor Child<br>Minor Child | 36 CFR 261.53 | ia | 36 CFR 261.53<br>Special Closures<br>Violation Number F5205300<br>Violation Location CS31 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02316-BGS<br>USA vs Mirandaduarte<br>Oskarcesar Mirandaduarte | CVC 12500(b), (d) | ia | CVC 12500(b), (d)<br>Drivers license - out of classification<br>Violation Number 7472492<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02317-BGS<br>USA vs Morris<br>Nathaniel I Morris | 36 CFR 2.31 | ia | 36 CFR 2.31<br>Trespassing, Tampering and Vandalism<br>Violation Number 6516243<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02318-BGS<br>USA vs Munozmoreno<br>Joel Munozmoreno | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471924<br>Violation Location CS81 | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02320-BGS<br>USA vs Murillo<br>Jorge A Murillo | CVC 16028(a) | ia | CVC 16028(a)<br>Fail to display evidence of financial responsibility when requested by peace off<br>Violation Number 6939495<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02321-BGS<br>USA vs Nunez<br>Esteban Nunez | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471523<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02319-BGS<br>USA vs Ortiz<br>Ranulfo C Ortiz | 41 CFR 102-74.430 | ia | 41 CFR 102-74.430<br>Conduct on Federal Property - Vehicular and Pedestrian Traffic<br>Violation Number 6938201<br>Violation Location CS81 | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02322-BGS<br>USA vs Padillapuerto<br>Estefania Padillapuerto | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471264<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02323-BGS<br>USA vs Peinado<br>Esequiel Peinado | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or revoked for offenses<br>Violation Number 7471896<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 500.0 | 530.0 |

EXHIBIT B

For 10/10/2018 08:30 AM Hearing Set for 5903
Magistrate Judge: Bernard G. Skomal

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02324-BGS<br>USA vs Perez<br>Gustavo A Perez | CVC 26302(a)-(d) | ia | CVC 26302(a)- (d)<br>Brakes- trailer requirements specified<br>Violation Number 6497591<br>Violation Location CS41 | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02325-BGS<br>USA vs Perez<br>Jaime E Perez | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or revoked for offenses<br>Violation Number 6938300<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02326-BGS<br>USA vs Pinnick<br>Samantha A Pinnick | CVC 16028(a) | ia | CVC 16028(a)<br>Fail to display evidence of financial responsibility when requested by peace off<br>Violation Number 7471898<br>Violation Location CS81 | | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02327-BGS<br>USA vs Ponce Jr<br>Sergio Ponce Jr | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471272<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02329-BGS<br>USA vs Ramirezflores<br>Jorge Ramirezflores | CVC 12500(b), (d) | ia | CVC 12500(b), (d)<br>Drivers license - out of classification<br>Violation Number 6939336<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02330-BGS<br>USA vs Rangeljimenez<br>Karina Rangeljimenez | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 6939497<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02330-BGS<br>USA vs Rangeljimenez<br>Karina Rangeljimenez | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 6939496<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02331-BGS<br>USA vs Rios<br>Oscar J Rios | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or revoked for offenses<br>Violation Number 7471916<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 200.0 | 230.0 |
| 3:18-po-02332-BGS<br>USA vs Rodriguez<br>Anthony Rodriguez | 36 CFR 261.53 | ia | 36 CFR 261.53<br>Special Closures<br>Violation Number F4857185<br>Violation Location CS31 | Class B | 30.0 | 0.0 | 50.0 | 80.0 |
| 3:18-po-02333-BGS<br>USA vs Rodriguez<br>Manuel Rodriguez | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or revoked for offenses<br>Violation Number 7471259<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02334-BGS<br>USA vs Rodriguez<br>Yvette Rodriguez | 36 CFR 2.31 | ia | 36 CFR 2.31<br>Trespassing, Tampering and Vandalism<br>Violation Number 6516099<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 150.0 | 180.0 |

EXHIBIT B

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02335-BGS<br>USA vs Romero<br>Alejandra Y Romero | 21 USC 844 | ia | 21 USC 844<br>Controlled Substance/Marijuana/Narcotics -<br>Possession (CVB Citation)<br>Violation Number F5463707<br>Violation Location CS31 | Class A | 30.0 | 0.0 | 220.0 | 250.0 |
| 3:18-po-02336-BGS<br>USA vs Rosas<br>Lauro J Rosas | CVC 14601.2(a) | ia | CVC 14601.2(a)<br>Driving while drivers license suspended or<br>revoked for driving under influence<br>Violation Number 7471266<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02336-BGS<br>USA vs Rosas<br>Lauro J Rosas | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471267<br>Violation Location CS81 | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02337-BGS<br>USA vs Sauceda<br>Leslie Sauceda | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number 6939326<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02338-BGS<br>USA vs Seggal<br>Ryan M Seggal | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number F4857554<br>Violation Location CS31 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02339-BGS<br>USA vs Serrano<br>Angelina Serrano | CVC 12500(a) | ia | CVC 12500(a)<br>Unlawful to drive unless licensed<br>Violation Number 7471262<br>Violation Location CS81 | | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02340-BGS<br>USA vs Soto<br>Ruben Soto | 36 CFR 2.31 | ia | 36 CFR 2.31<br>Trespassing, Tampering and Vandalism<br>Violation Number 6516240<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02341-BGS<br>USA vs Tabali<br>Brian L Tabali | CVC 14601.1(a) | ia | CVC 14601.1(a)<br>Driving while drivers license suspended or<br>revoked for offenses<br>Violation Number 6939331<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |
| 3:18-po-02342-BGS<br>USA vs Valerio<br>Amy Valerio | CVC 27360(a),<br>(b) | ia | CVC 27360(a), (b)<br>Mandatory use of child passenger restraints<br>Violation Number 6939256<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02342-BGS<br>USA vs Valerio<br>Amy Valerio | CVC 14601(a) | ia | CVC 14601(a)<br>Driving while drivers license suspended or<br>revoked for reckless or negligent<br>Violation Number 6939255<br>Violation Location CS81 | Class B | 30.0 | 0.0 | 0.0 | 30.0 |

EXHIBIT B

For 10/18/2018 08:30 AM Hearing for 18003
Magistrate Judge: Bernard G. Skomal

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3:18-po-02343-BGS<br>USA vs Varela<br>Analia U Varela | CVC 38505 | ia | CVC 38505<br>Operation of all-terrain vehicle without safety helmet prohibited<br>Violation Number F5458343<br>Violation Location CS31 | | 30.0 | 0.0 | 25.0 | 55.0 |
| 3:18-po-02344-BGS<br>USA vs Vargas<br>Manuel Vargas | 36 CFR 2.31 | ia | 36 CFR 2.31<br>Trespassing, Tampering and Vandalism<br>Violation Number 6516098<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02345-BGS<br>USA vs Vega<br>Anthony Vega | 36 CFR 2.31 | ia | 36 CFR 2.31<br>Trespassing, Tampering and Vandalism<br>Violation Number 6516242<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 150.0 | 180.0 |
| 3:18-po-02346-BGS<br>USA vs Villafana Jr<br>Felipe Villafana Jr | CVC 4000(a) | ia | CVC 4000(a)<br>Registration required.<br>Violation Number 7471910<br>Violation Location CS81 | | 30.0 | 0.0 | 100.0 | 130.0 |
| 3:18-po-02347-BGS<br>USA vs Zehner<br>Audrey Zehner | 36 CFR 4.12 | ia | 36 CFR 4.12<br>Traffic Control Devices<br>Violation Number 6516176<br>Violation Location CS60 | Class B | 30.0 | 0.0 | 100.0 | 130.0 |

EXHIBIT B

H

CVB offenses under Title 18
July 9, 2018-July 9, 2019

| Disposition | Number | Percentage of Total |
|---|---|---|
| Dismissed | 152 | 39.7% |
| FTA (Failure to Appear) | 88 | 23% |
| FTA* (Failure to Appear but case dismissed anyway) | 46 | 12% |
| Forfeiture of collateral | 5 | 1.3% |
| Pending | 92 | 24% |
| **Total** | **383** | **100%** |

## CVB failure to appear rate: 35%

| CASE NAME | CASE NO. | STATUTE | OFFENSE | Class | DISPO |
|---|---|---|---|---|---|
| U.S. v. Newberry | 19-po-1032 | 18 USC 73 | Obstruction of justice | A | Pending |
| U.S. v. Burton | 18-po-1644 | 18 USC 111 | Assault on an officer | A | FTA |
| U.S. v. Burton | 18-po-1644 | 18 USC 111 | Assault on an officer | A | FTA |
| U.S. v. Crawford | 18-po-1793 | 18 USC 111 | Assault on an officer | A | FTA |
| U.S. v. Fant | 18-po-1799 | 18 USC 111 | Assault on an officer | A | Dismissed |
| U.S. v. McKinney | 18-po-1807 | 18 USC 111 | Assault on an officer | A | Dismissed |
| U.S. v. Williams | 18-po-1989 | 18 USC 111 | Assault on an officer | A | Dismissed |
| U.S. v. Reed | 18-po-2155 | 18 USC 111 | Assault on an officer | A | FTA |
| U.S. v. Sherman | 19-po-6 | 18 USC 111 | Assault on an officer | A | FTA |
| U.S. v. Oakes | 19-po-68 | 18 USC 111 | Assault on an officer | A | Pending |
| U.S. v. Leichtfuss | 19-po-280 | 18 USC 111 | Assault on an officer | A | Pending |
| U.S. v. Smith | 19-po-1143 | 18 USC 111 | Assault on an officer | A | FTA* |
| U.S. v. Foster | 19-po-1463 | 18 USC 111 | Assault on an officer | A | Pending |
| U.S. v. Adonivahu | 19-po-111 | 18 USC 111 | Assault on an officer | A | FTA |
| U.S. v. Arevalo | 18-po-1639 | 18 USC 113 | Assault in maritime juris. | B | FTA* |
| U.S. v. Coleman | 18-po-1648 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |
| U.S. v. Kline | 18-po-1844 | 18 USC 113 | Assault in maritime juris. | B | FTA |
| U.S. v. Milano | 18-po-1870 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |
| U.S. v. Lopez | 18-po-1903 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |
| U.S. v. Drinan | 18-po-2147 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |
| U.S. v. Herbert | 18-po-2002 | 18 USC 113 | Assault in maritime juris. | B | FTA* |
| U.S. v. Smith-Jarvis | 18-po-2006 | 18 USC 113 | Assault in maritime juris. | B | FTA |
| U.S. v. Bell | 18-po-2107 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |
| U.S. v. Mullins | 18-po-2168 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |
| U.S. v. Schilling | 18-po-2169 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |
| U.S. v. Garza | 18-po-2349 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |
| U.S. v. Watts | 18-po-2373 | 18 USC 113 | Assault in maritime juris. | B | Dismissed |

**64**

| U.S. v. Almeida | 18-po-2378 | 18 USC 113 | Assault in maritime juris. | B | FTA |
|---|---|---|---|---|---|
| U.S. v. Echevarria | 18-po-2388 | 18 USC 113 | Assault in maritime juris. | B | FTA |
| U.S. v. Leveille | 18-po-2462 | 18 USC 113 | Assault in maritime juris. | B | FTA |
| U.S. v. Noe | 19-po-848 | 18 USC 113 | Assault in maritime juris. | B | FTA |
| U.S. v. Johnson | 19-po-1335 | 18 USC 113 | Assault in maritime juris. | B | Pending |
| U.S. v. Klassen | 19-po-1530 | 18 USC 113 | Assault in maritime juris. | B | Pending |
| U.S. v. Beller | 18-po-1835 | 18 USC 113 | Assault in maritime juris. | B | Pending |
| U.S. v. Barquin | 18-po-1789 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Berry | 18-po-1790 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Chambers | 18-po-1792 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Del Valle | 18-po-1795 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Gillian | 18-po-1801 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Liu | 18-po-1805 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Mika | 18-po-1809 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Reyno | 18-po-1812 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Ruffier | 18-po-1814 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Valentine | 18-po-1817 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Plewa | 18-po-1877 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Thomas | 18-po-1885 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Zamora | 18-po-1892 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Edano | 18-po-2113 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Everett | 18-po-2114 | 18 USC 651 | Theft of govt property | A | FTA |
| U.S. v. Gutierrez | 18-po-2119 | 18 USC 641 | Conspiracy to commit theft of govt property | A | Dismissed |
| U.S. v. Hopper | 18-po-2122 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Odinga | 18-po-2129 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Pierson | 18-po-2132 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Plasencia | 18-po-2133 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Romero | 18-po-2135 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Secasiu | 18-po-2136 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Tolentino | 18-po-2139 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Adejado | 18-po-2350 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Byrd | 18-po-2354 | 18 USC 641 | Theft of govt property | A | FTA* |
| U.S. v. Cordening | 18-po-2356 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Macpherson | 18-po-2362 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Nisperos | 18-po-2366 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Zielinski | 18-po-2374 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Burba | 18-po-2630 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Mulligan | 18-po-2636 | 18 USC 641 | Theft of govt property | A | FTA* |
| U.S. v. Belais | 18-po-2858 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Baysa | 18-po-2859 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Billen | 18-po-2862 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Gamban | 18-po-2869 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Gilland | 18-po-2871 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Gray | 18-po-2874 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Hunter | 18-po-2877 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Lopez | 18-po-2884 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Mathena | 18-po-2891 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Ray | 18-po-2901 | 18 USC 641 | Theft of govt property | A | Dismissed |

**65**

| | | | | | |
|---|---|---|---|---|---|
| U.S. v. Tran | 18-po-2916 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Williams | 18-po-2919 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Stogsdill | 18-po-3098 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Lopez | 18-po-3096 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Layne | 19-po-232 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Berger | 19-po-250 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Enciso | 19-po-255 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Taylor | 19-po-267 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Giron | 19-po-287 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Rothhardt | 19-po-381 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Balagtas | 19-po-665 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. De Jesus | 19-po-674 | 18 USC 641 | Theft of govt property | A | FTA* |
| U.S. v. Delgadillo | 19-po-675 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Goodman | 19-po-678 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Medine | 19-po-687 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Ortiz | 19-po-693 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Rosenberg | 19-po-700 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Villalva | 19-po-712 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Garcia | 19-po-720 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Casteneda | 19-po-738 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Maloney | 19-po-1026 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Spinoza | 19-po-1030 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Reyna | 19-po-1258 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Belgrove | 19-po-1344 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Cayabyab | 19-po-1348 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Cervantes | 19-po-1349 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Coleman | 19-po-1350 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Coerces | 19-po-1352 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Gutierrez | 19-po-1359 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Meneses | 19-po-1383 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Rivera | 19-po-1392 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Rodriguez | 19-po-1393 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Smith | 19-po-1397 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Trevizo | 19-po-1399 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Uribe | 19-po-1401 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Brown | 19-po-1411 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Sandoval | 19-po-1417 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Garcia | 19-po-1629 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Huang | 19-po-1635 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Llorico | 19-po-1641 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Martinez | 19-po-1644 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Norsworthy | 19-po-1651 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Roberts | 19-po-1659 | 18 USC 641 | Theft of govt property | A | Dismissed |
| U.S. v. Schweitzer | 19-po-1663 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Shaw | 19-po-1664 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Bultman | 19-po-1702 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Burns | 19-po-1703 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Linder | 19-po-1706 | 18 USC 641 | Theft of govt property | A | FTA |
| U.S. v. Todd | 19-po-1732 | 18 USC 641 | Theft of govt property | A | FTA |

| U.S. v. Cavazos | 19-po-1838 | 18 USC 641 | Theft of govt property | A | Pending |
|---|---|---|---|---|---|
| U.S. v. Dang | 19-po-1839 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Lang | 19-po-1849 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Manzano | 19-po-1851 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Paris | 19-po-1857 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Ramos | 19-po-1858 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Reese | 19-po-1860 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Robinson | 19-po-1861 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Sanchez | 19-po-1862 | 18 USC 641 | Theft of govt property | A | Pending |
| U.S. v. Contreras | 18-po-1837 | 18 USC 661 | Theft in maritime juris. | A | Dismissed |
| U.S. v. Dyer | 18-po-1838 | 18 USC 661 | Theft in maritime juris. | A | Dismissed |
| U.S. v. Silva | 18-po-2252 | 18 USC 661 | Theft in maritime juris. | A | Dismissed |
| U.S. v. Remsnyder | 18-po-2625 | 18 USC 661 | Theft in maritime juris. | A | FTA |
| U.S. v. Cibelli | 18-po-2641 | 18 USC 661 | Theft in maritime juris. | A | FTA |
| U.S. v. Clark | 18-po-1919 | 18 USC 701 | Unlawful use of govt ID | B | Dismissed |
| U.S. v. Reed | 18-po-2155 | 18 USC 752 | Escape | A | FTA |
| U.S. v. Williams | 18-po-2521 | 18 USC 873 | Blackmail | A | Dismissed |
| U.S. v. De la Rosa | 18-po-2948 | 18 USC 922 | Prohibited poss.-firearm | Felony | Dismissed |
| U.S. v. Neal | 18-po-1872 | 18 USC 930 | Poss. weapon fed. facility | A | Dismissed |
| U.S. v. Smith | 18-po-2920 | 18 USC 930 | Poss. weapon fed. facility | A | Pending |
| U.S. v. Lawton | 19-po-2 | 18 USC 930 | Poss. weapon fed. facility | A | Dismissed |
| U.S. v. Cabanilla | 18-po-1835 | 18 USC 1028 | Identity theft | Felony | Dismissed |
| U.S. v. Contreras | 18-po-1837 | 18 USC 1028 | Identity theft | Felony | Dismissed |
| U.S. v. Echavarria | 18-po-1929 | 18 USC 1028 | Identity theft | Felony | Dismissed |
| U.S. v. Lopez | 18-po-3096 | 18 USC 1028 | Identity theft | Felony | Dismissed |
| U.S. v. Contreras | 18-po-1837 | 18 USC 1029 | ID Fraud | Felony | Dismissed |
| U.S. v. Gillian | 18-po-1801 | 18 USC 1114 | Protection of officers | Felony | Dismissed |
| U.S. v. Obeso | 18-po-2525 | 18 USC 1361 | Damage to govt property | A | Dismissed |
| U.S. v. Ramos | 19-po-369 | 18 USC 1361 | Damage to govt property | A | Dismissed |
| U.S. v. Lindsey | 18-po-1669 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Mckinley | 18-po-1673 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Banuelos | 18-po-1831 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Cabanilla | 18-po-1835 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v Carney | 18-po-1836 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Bickel | 18-po-1855 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Escalera | 18-po-1858 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Guevara | 18-po-1863 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Santos | 18-po-1881 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Taylor | 18-po-1884 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Woodcock | 18-po-1891 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Eichelberger | 18-po-1930 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Gerber | 18-po-1934 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Larose | 18-po-1943 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Cibelli | 18-po-2000 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Bartlett | 18-po-2106 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Cedillo | 18-po-2109 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Burqueno | 18-po-2352 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v Perez | 18-po-2369 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Rau | 18-po-2375 | 18 USC 1382 | Entering federal property | B | FTA* |

**67**

| | | | | | |
|---|---|---|---|---|---|
| U.S. v. Burhani | 18-po-2383 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Zahr | 18-po-2415 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Anderson | 18-po-2522 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Couvillon | 18-po-2524 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Gomez | 18-po-2615 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Remsnyder | 18-po-2625 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Bernoski | 18-po-2628 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Cibelli | 18-po-2641 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Ruiz | 18-po-2664 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Sandoval | 18-po-2665 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Mada | 18-po-2886 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Markovich | 18-po-2890 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Lockery | 18-po-3041 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Chandler | 18-po-3060 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Hernandez | 18-po-3069 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Linares | 18-po-3076 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Luburic | 18-po-3077 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Wiedle | 18-po-3092 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Reid | 19-po-5 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Baucer | 19-po-135 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Mehrvar | 19-po-234 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Renteria | 19-po-238 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Lozano | 19-po-259 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Robinson | 19-po-264 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Amirhossgin | 19-po-273 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Shivers | 19-po-284 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Spinoza | 19-po-291 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Maombi | 19-po-344 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Blomker | 19-po-630 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Iii | 19-po-649 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Treadwell | 19-po-657 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Howard | 19-po-679 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Moss | 19-po-690 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Salyer | 19-po-703 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Zhang | 19-po-716 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Gonzalez | 19-po-726 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Amanpoor | 19-po-736 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Colgin | 19-po-739 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Edwards | 19-po-740 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Parker | 19-po-749 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Pinkston | 19-po-750 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Varner | 19-po-755 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Martin | 19-po-773 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Reyla | 19-po-779 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Sullins | 19-po-868 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Rivera | 19-po-1012 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Renfroe | 19-po-1029 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Apoadi | 19-po-1036 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Lazarof | 19-po-1161 | 18 USC 1382 | Entering federal property | B | Pending |

| | | | | | |
|---|---|---|---|---|---|
| U.S. v. Pacheco | 19-po-1387 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Alper | 19-po-1410 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Nolan | 19-po-1414 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Penaloza | 19-po-1415 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Huddleston | 19-po-1429 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Roberts | 19-po-1435 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Castro-bran | 19-po-1450 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Doty | 19-po-1459 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Alale | 19-po-1617 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Prince | 19-po-1655 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Castro-bran | 19-po-1674 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Mohareb | 19-po-1678 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Dent | 19-po-1684 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Haney | 19-po-1685 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Merriwether | 19-po-1692 | 18 USC 1382 | Entering federal property | B | FTA* |
| U.S. v. Tew | 19-po-1701 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Garcia | 19-po-1704 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Valasek | 19-po-1709 | 18 USC 1382 | Entering federal property | B | Pending |
| U.S. v. Trussell | 19-po-1815 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Davis | 19-po-1840 | 18 USC 1382 | Entering federal property | B | Dismissed |
| U.S. v. Glaser | 19-po-1843 | 18 USC 1382 | Entering federal property | B | FTA |
| U.S. v. Lindsey | 18-po-1669 | 18 USC 2112 | Robbery of U.S. property | Felony | FTA |
| U.S. v. Reed | 18-po-1850 | 18 USC 2261 | Interstate domestic | Felony | FTA |
| U.S. v. Jones | 18-po-2093 | 18 USC 2261 | Interstate domestic violence | Felony | Dismissed |
| U.S. v. Posey | 18-po-2154 | 18 USC 2261 | Interstate domestic | Felony | Dismissed |
| U.S. v. Leslie | 18-po-2396 | 18 USC 2261 | Interstate domestic | Felony | Dismissed |
| U.S. v. Linzy | 18-po-2398 | 18 USC 2261 | Interstate domestic | Felony | Dismissed |
| U.S. v. Failma | 18-po-2646 | 18 USC 2261 | Interstate domestic | Felony | Dismissed |
| U.S. v. Santos | 18-po-2666 | 18 USC 2261 | Interstate domestic | Felony | Pending |
| U.S. v. German | 18-po-3066 | 18 USC 2261 | Interstate domestic | Felony | FTA* |
| U.S. v. Jimenez | 19-po-1825 | 18 USC 2261 | Interstate domestic | Felony | Pending |
| U.S. v. Parsons | 18-po-2148 | 18 USC 2262 | Viol. of protection order | Felony | FTA |
| U.S. v. Croton | 18-po-1992 | 21 USC 841 | Poss. of narcotics-distrib. | Felony | Dismissed |
| U.S. v. Lozano | 19-po-259 | 21 USC 841 | Possession of cont. sub. | Felony | FTA* |
| U.S. v. Williams | 18-po-2260 | 21 USC 842 | Possession of marijuana | A | FTA* |
| U.S. v. Coleman | 18-po-1648 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Guzman | 18-po-1735 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Fayemiwo | 18-po-1800 | 21 USC 844 | Possession of marijuana | A | Forfeiture |
| U.S. v. Miller | 18-po-1810 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Carroll | 18-po-1856 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Figueroa | 18-po-1860 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Nguyen | 18-po-1874 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Perez | 18-po-1876 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Taylor | 18-po-1884 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Waller | 18-po-1887 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Wilson | 18-po-1890 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Alamad | 18-po-1904 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Coffey | 18-po-1920 | 21 USC 844 | Possession of marijuana | A | Dismissed |

**69**

| U.S. v. Dipietro | 18-po-1926 | 21 USC 844 | Possession of marijuana | A | Dismissed |
|---|---|---|---|---|---|
| U.S. v. Echavarria | 18-po-1929 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Morgan | 18-po-1956 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Reynoso | 18-po-1966 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Varney | 18-po-1984 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Glasberg | 18-po-2036 | 21 USC 844 | Possession of marijuana | A | Forfeiture |
| U.S. v. Goebel | 18-po-2090 | 21 USC 844 | Possession of heroin | A | Dismissed |
| U.S. v. Hunter | 18-po-2092 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Spencer | 18-po-2101 | 21 USC 844 | Possession of narcotics | A | Dismissed |
| U.S. v. Heredia | 18-po-2120 | 21 USC 844 | Possession of narcotics | A | FTA |
| U.S. v. Sedano | 18-po-2137 | 21 USC 844 | Possession of cont.. sub. | A | FTA |
| U.S. v. Villasenor | 18-po-2143 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Reed | 18-po-2155 | 21 USC 844 | Possession of cocaine | A | FTA |
| U.S. v. Vicks | 18-po-2157 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Barnette | 18-po-2159 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Masip | 18-po-2224 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Pena | 18-po-2233 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Reinsch | 18-po-2240 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Vandersluis | 18-po-2255 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Keisker | 18-po-2274 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Quintin | 18-po-2275 | 21 USC 844 | Possession of cocaine | A | FTA |
| U.S. v. Diaz | 18-po-2293 | 21 USC 844 | Possession of control sub. | A | FTA |
| U.S. v. Duarte | 18-po-2296 | 21 USC 844 | Possession of marijuana | A | Forfeiture |
| U.S. v. Romero | 18-po-2335 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Allen | 18-po-2351 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Juarez | 18-po-2361 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Clark | 18-po-2386 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Salinas | 18-po-2410 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Lynn | 18-po-2465 | 21 USC 844 | Possession of narcotics | A | Dismissed |
| U.S. v. Montanez | 18-po-2470 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Osawa | 18-po-2478 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Ruiz | 18-po-2490 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Russell | 18-po-2491 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Suazo | 18-po-2500 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Torres | 18-po-2504 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Toure | 18-po-2505 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Dutton | 18-po-2551 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Flores | 18-po-2611 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Guzman | 18-po-2616 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Chapman | 18-po-2631 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Judge | 18-po-2655 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Krause | 18-po-2712 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Nguyen | 18-po-2728 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Roybal | 18-po-2745 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Low | 18-po-2885 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Coe | 18-po-2939 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Ajamu | 18-po-3033 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. McMahan | 18-po-3045 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Reynoso | 18-po-3049 | 21 USC 844 | Possession of marijuana | A | FTA* |

| | | | | | |
|---|---|---|---|---|---|
| U.S. v. St. Gelais | 18-po-3087 | 21 USC 844 | Possession of cont. sub. | A | Dismissed |
| U.S. v. Reid | 19-po-4 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Breidinger | 19-po-10 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Dinh | 19-po-32 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Villegas | 19-po-102 | 21 USC 844 | Possession of cont. sub. | A | Dismissed |
| U.S. v. Amedee | 18-po-223 | 21 USC 844 | Possession of cont. sub. | A | Pending |
| U.S. v. Layne | 19-po-232 | 21 USC 844 | Possession of cont. sub. | A | Dismissed |
| U.S. v. Dominguez | 19-po-254 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Green | 19-po-325 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Larda | 19-po-337 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Damato | 19-po-636 | 21 USC 844 | Possession of cont. sub. | A | Pending |
| U.S. v. Newberry | 19-po-648 | 21 USC 844 | Possession of cont. sub. | A | Dismissed |
| U.S. v. Sanchez | 19-po-656 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Marinelli | 19-po-683 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Mejia | 19-po-688 | 21 USC 844 | Possession of marijuana | A | FTA |
| U.S. v. Mouton | 19-po-691 | 21 USC 844 | Possession of cont. sub. | A | Pending |
| U.S. v. Ruiz | 19-po-701 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Watkins | 19-po-734 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Hodge | 19-po-744 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Strickland | 19-po-754 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Estrada | 19-po-811 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Weaver | 19-po-879 | 21 USC 844 | Poss. of amphetamine | A | Pending |
| U.S. v. Dooley | 19-po-937 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Niupulusu | 19-po-1009 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Passman | 19-po-1010 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Underwood | 19-po-1016 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Bynum | 19-po-1023 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Dooley | 19-po-1034 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Benevides | 19-po-1059 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Navarro | 19-po-1123 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Potter | 19-po-1131 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Da Silva | 19-po-1354 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Hodges | 19-po-1365 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Trevizo | 19-po-1399 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Anglovich | 19-po-1441 | 21 USC 844 | Possession of marijuana | A | Forfeiture |
| U.S. v. Herring | 19-po-1469 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Holm | 19-po-1470 | 21 USC 844 | Poss. of hydrocodone | A | Pending |
| U.S. v. Holm | 19-po-1470 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Romaniuk | 19-po-1503 | 21 USC 844 | Possession of marijuana | A | FTA* |
| U.S. v. Mainroy | 19-po-1643 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Norsworthy | 19-po-1651 | 21 USC 844 | Possession of cont. sub. | A | FTA |
| U.S. v. Bacchas | 19-po-1717 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Fults | 19-po-1720 | 21 USC 844 | Possession of marijuana | A | Pending |
| U.S. v. Carter | 19-po-1837 | 21 USC 844 | Possession of cont. sub. | A | FTA* |
| U.S. v. Jackson | 19-po-1846 | 21 USC 844 | Possession of cont. sub. | A | Pending |
| U.S. v. Malveaux | 19-po-1850 | 21 USC 844 | Possession of marijuana | A | Dismissed |
| U.S. v. Ransom | 19-po-1859 | 21 USC 844 | Possession of cont. sub. | A | Pending |
| U.S. v. Fayemiwo | 18-po-1800 | 21 USC 863 | Poss. of paraphernalia | Felony | Forfeiture |
| U.S. v. Varney | 18-po-1984 | 21 USC 863 | Poss. of paraphernalia | Felony | Pending |

**71**

| U.S. v. Sedano | 18-po-2137 | 21 USC 863 | Poss. of paraphernalia | Felony | FTA |
|---|---|---|---|---|---|
| U.S. v. Reyes | 18-po-2626 | 21 USC 863 | Poss. of paraphernalia | Felony | FTA |
| U.S. v. Cibelli | 18-po-2641 | 21 USC 863 | Poss. of paraphernalia | Felony | FTA* |
| U.S. v. McMahan | 18-po-3045 | 21 USC 863 | Poss. of paraphernalia | Felony | Dismissed |
| U.S. v. Amedee | 19-po-223 | 21 USC 863 | Poss. of paraphernalia | Felony | Pending |
| U.S. v. Nickerson | 19-po-356 | 21 USC 863 | Poss. of paraphernalia | Felony | Dismissed |
| U.S. v. Niupulusu | 19-po-1009 | 21 USC 863 | Poss. of paraphernalia | Felony | FTA* |
| U.S. v. Mosquetti | 19-po-1119 | 21 USC 863 | Poss. of paraphernalia | Felony | FTA* |
| U.S. v. Potter | 19-po-1131 | 21 USC 863 | Poss. of paraphernalia | Felony | Pending |
| U.S. v. Da Silva | 18-po-1354 | 21 USC 863 | Poss. of paraphernalia | Felony | Pending |
| U.S. v. Hodges | 19-po-1365 | 21 USC 863 | Poss. of paraphernalia | Felony | Pending |
| U.S. v. Martinez | 19-po-1378 | 21 USC 863 | Poss. of paraphernalia | Felony | Dismissed |
| U.S. v. Naisher | 19-po-1615 | 21 USC 863 | Poss. of paraphernalia | Felony | Pending |
| U.S. v. Abualshayeb | 19-po-1820 | 21 USC 863 | Poss. of paraphernalia | Felony | Pending |
| U.S. v. Malveaux | 19-po-1850 | 21 USC 863 | Poss. of paraphernalia | Felony | Dismissed |

I

I, Lauren Cusitello, hereby state under penalty of perjury that the following facts are true and correct to the best of my knowledge:

1.     I am a licensed attorney and a member of the State Bar of California since 2008. Over the last ten years, I have practiced primarily in the fields of criminal defense and immigration law in San Diego, California.

2.     In May 2016, I was selected to serve on a panel of defense attorneys that provides representation to defendants charged with federal misdemeanors in the Southern District of California—the Central Violations Bureau (CVB) Panel. As part of this panel, I attend court once a week on Wednesday mornings at the federal courthouse in San Diego.

3.     At this court, I represent defendants who have been charged with Class A, B, and C federal misdemeanors, as defined by 18 U.S.C. § 3559(a). These crimes have a potential term of imprisonment of one year or less and include such offenses as DUI, unlawful possession of a weapon, domestic assault, hit and run, marijuana possession, obstruction, and theft of government property. Some of these individuals have criminal histories, including significant criminal histories.

4.     In my experience, when a person is apprehended in the Southern District of California for a federal misdemeanor (other than illegal entry under 8 U.S.C. § 1325), the defendant is almost never held in criminal custody. Generally, the individual is released with a ticket.  In the rare case, the individual may be

1

temporarily handcuffed or held by law enforcement for several hours for questioning. In these rare cases, the individual is still generally released the same day.

5.      Approximately six to eight weeks after the offense, a person charged with a federal misdemeanor will receive a notice to appear at court on a future Wednesday morning in the mail. This is true regardless of the charged offense. This federal misdemeanor court is not held in an actual courtroom. Rather, it is held in one of the jury rooms on the first floor of the James M. Carter and Judith N. Keep United States Courthouse.

6.      At the federal misdemeanor court, there is no judge and no formal proceedings. Instead, each defense attorney meets with their client briefly and then attempts to resolve the case with the prosecuting attorney.

7.      During this Wednesday morning court, the court makes a Spanish interpreter available for attorneys who do not speak Spanish to allow them to communicate with their clients. I have also seen the court provide interpreters for other defendants who do not speak English or Spanish.

8.      There are generally five ways that a misdemeanor case may resolve. The most common way is for a defendant to enter into a deferred prosecution agreement in which the case will be dismissed in exchange for the defendant's compliance with certain conditions. Many cases are also dismissed outright. A

2

**75**

defendant also may agree to resolve the case by forfeiting collateral (in effect, a fine), which may not count as a "conviction." A defendant may plead guilty, although this disposition would usually only be required in DUI cases.  And finally, a person may proceed to trial.

9.     If the defense attorney and the prosecutor work out a resolution, this agreement is memorialized on a form. When the resolution involves a guilty plea, there is an additional form, which states that no jail time will be imposed for the offense. The form or forms are then left with the clerks at the misdemeanor court, after which a magistrate judge reviews any plea agreements and the cases resolve pursuant to the parties' agreements.

10.    After the offense, defendants in the federal misdemeanor court system are not held in custody prior to their first court proceeding. Every defendant who is appearing for the first time will walk in and out of Wednesday morning court with no restrictions on their liberty.

11.    A first-time illegal entry under 8 U.S.C. § 1325 is a Class B misdemeanor, punishable by no more than six months in jail. But even though § 1325 is a federal misdemeanor, I have never seen a § 1325 case adjudicated in the federal misdemeanor court on Wednesday morning.

I hereby state that these facts are true and correct to the best of my

knowledge.

_____7/19/2010_____
Date

Lauren Cusitello
California Bar #257570
Executive Director
Crossroads Justice Center of
San Diego
1102 Cesar E. Chavez Pkwy.
San Diego, CA 92113

4

**77**

J

# DECLARATION OF DAVID MENNINGER

I, David Menninger, declare as follows:

1.    I am an attorney with the Office of the Federal Public Defender for the Central District of California. I am over the age of 18 and have personal knowledge of the following facts.

2.    To the best of my knowledge, in the following recent cases in the Central District of California defendants charged with immigration-related offenses were released on bond, remained released throughout the pendency of the criminal proceeding, and appeared for sentencing:

     a.    *United States v. Olga Cervantes*, CR 09-469-DSF,CR 16-469-DSF

     b.    *United States v. Jose Rodriguez-Bolanos*, CR 17-298-PA

     c.    *United States v. Juan Carlos Valadez-Munoz*, CR 17-702-RGK

     d.    *United States v. Raul Rodriguez-Vera*, CR 15-555-FMO

     e.    *United States v. Jorge Maya-Flores*, CR 16-187-ODW

     f.    *United States v. Eduardo Hernandez*, CR 15-26-JGB

     g.    *United States v. Juan Manuel Martinez-Gonzalez*, CR 14-739-RGK

     h.    *United States v. Karina Sevilla*, CR 14-72-PA

     i.    *United States v. Julian Martinez-Ibarra*, CR 17-93-JFW

     j.    *United States v. Juan Manuel Escobar*, CR 15-300-RGK

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 20, 2018, at Los Angeles, California.

DAVID MENNINGER

1

**79**

## DECLARATION OF MILES POPE

I, Miles Pope, hereby state under penalty of perjury that the following facts are true and correct to the best of my knowledge:

1.      I am a licensed attorney and an active member of the State Bar of Alaska. I currently work as an assistant federal defender in Spokane, Washington.

2.      In my work as an assistant federal defender, I have represented many noncitizens charged with illegal reentry under 8 U.S.C. § 1326.

3.      In the Eastern District of Washington, where I currently practice, it is my experience that noncitizens charged with immigration-related crimes are generally released from criminal custody while their case is pending. When this occurs, Immigration and Customs Enforcement ("ICE") does not immediately take them into custody and deport them. Rather, the noncitizen is permitted to remain at large in the community, without an ankle monitor or any other form of electronic monitoring, until the criminal case is completed. Once the criminal case is completed, ICE will then take the noncitizen into custody and initiate removal proceedings.

4.      In my experience practicing in the Eastern District of Washington, noncitizens charged with immigration-related crimes are treated exactly like anybody else charged with a federal crime. If the court concludes that they are

1

**80**

entitled to pretrial release under the Bail Reform Act, then they are released and permitted to remain in the community on conditions.

5.     I am only aware of one case where ICE immediately deported a noncitizen who had been released pending his prosecution for an immigration-related crime.

6.     By contrast, I am aware of at least 7 defendants represented by my office who were released into the community without any form of ankle or electronic monitoring, and who all either fully complied—or are currently in compliance—with their conditions of release.

7.     I personally represent three of these noncitizens during their criminal proceedings. These three were released on their own recognizance without posting a cash or property bond. They are still living in the community, attending their court proceedings, and are in regular touch with me.

I hereby state that these facts are true and correct to the best of my knowledge.

_9 - 26 - 18_____
Date

_Miles Pope_____
Miles Pope
Alaska Bar #1508066
Federal Public Defender
Eastern District of Washington
10 North Post Street
Suite 700
Spokane, WA 99201

2

**81**

## DECLARATION OF SARA BRIN

I, Sara Brin, hereby state under penalty of perjury that the following facts are true and correct to the best of my knowledge:

1.      I am a licensed attorney and an active member of the State Bar of Washington. I previously worked as an assistant federal defender in San Diego, California, and currently work as an assistant federal defender in Seattle, Washington.

2.      In my work as an assistant federal defender, I have represented many noncitizens charged with illegal entry under 8 U.S.C. § 1325 and illegal reentry under 8 U.S.C. § 1326.

3.      In the Western District of Washington where I currently practice, it is my experience that defendants with ICE detainers can be released from criminal custody while their case is pending. When this occurs, Immigration and Customs Enforcement ("ICE") does not immediately take them into custody and deport them. Rather, the defendant is permitted to remain at large in the community on an ankle monitor until the criminal case is completed. In my experience, once the criminal case is completed, ICE will then take the defendant into custody and initiate removal proceedings.

4.      I am aware of at least six defendants represented by my office in which this occurred. All six were released into the community on ankle monitors.

1

**82**

To the best of my knowledge, all six fully complied with or remain in compliance with their conditions of release as of the date this declaration was signed.

5.      I personally represented or represent four of these defendants during their criminal proceedings. All four were released on their own recognizance without posting a cash or property bond. Three of these individuals are still living in the community and are being supervised by Pre-Trial Services. The fourth individual had his case dismissed, and ICE took him into administrative custody the following day.

I hereby state that these facts are true and correct to the best of my knowledge.

9 | 19 | 2018
Date

Sara Brin
Washington Bar # 52476
Assistant Federal Public Defender
Western District of Washington
1601 Fifth Ave., Suite 700
Seattle, WA 98101

2

**83**

## DECLARATION OF RACHEL NATHANSON

I, Rachel Nathanson, hereby state under penalty of perjury that the following facts
are true and correct to the best of my knowledge:

1.     I am a licensed attorney and an active member of the State Bar of New
Mexico. I currently work as an Assistant Federal Public Defender in Las Cruces, New
Mexico.

2.     In my work as an Assistant Federal Public Defender, I have represented
many noncitizens charged with illegal entry under 8 U.S.C. § 1325 and illegal reentry
under 8 U.S.C. § 1326.

3.     In the District of New Mexico, where I currently practice, I recently
represented a noncitizen charged with an immigration-related offense. Although he was
released on a criminal bond, Immigration and Customs Enforcement ("ICE") did not take
him into custody and deport him. Rather, he lived with his family during the pendency of
his criminal case and eventually pleaded guilty to a lesser offense. During this client's
criminal proceedings, he attended all court hearings and fully complied with the
conditions of his release.

I hereby state that these facts are true and correct.

_9/19/2018_
Date

Rachel Nathanson
New Mexico Bar #145713
Federal Public Defender
506 S. Main
Suite 400
Las Cruces, NM 88001

**84**

K

**TRAC**Immigration

# What Happens When Individuals Are Released On Bond in Immigration Court Proceedings?

Court records show that at least half - and in some years upwards of two-thirds - of individuals are held in ICE custody at the time the Department of Homeland Security (DHS) starts Immigration Court proceedings seeking to deport them. As the backlog in the Immigration Court continues to grow and wait times increase,[1] the issue of whether individuals should remain locked up while their Immigration Court case is pending has garnered increased attention.

Even though detained individuals receive priority in scheduling court hearings, some individuals remain locked up for many months and even years before their cases are finally concluded.[2] A growing number of lawsuits in federal courts are challenging the constitutionality of locking up individuals during this period when their detention is "prolonged."[3]

The government argues that continued detention is needed to ensure that these individuals will not abscond and will show up for their hearing. For a smaller subset, there also may be public safety concerns. However, detention imposes real costs. There are to begin with the costs to taxpayers who foot the substantial bill to keep individuals locked up even though there has been no finding that the individual is actually deportable. But there are also real and significant costs to the individuals who are being detained, and frequently also to their family members.

It is unquestioned that the loss of freedom and all that this implies often imposes substantial hardships. Further, it is widely acknowledged that it is more difficult to carry out activities necessary to mount a successful defense in the deportation proceeding itself when individuals remain locked up.

Some individuals, but historically only a minority, have been able to challenge the necessity of their continued detention in a hearing before an immigration judge. However, due in part to court rulings, the right to a hearing before an immigration judge to challenge ICE's decision to keep individuals detained has been extended to a wider group of individuals. Unfortunately, very little information has been published by the Immigration Court on these custody hearings, leaving many questions unanswered. These questions include:

- What proportion of detained individuals in Immigration Court hearings actually receive a custody hearing before a judge?

- Once they receive a hearing, how often do immigration judges grant bond or release persons on personal recognizance?

- Do individuals who are released as a result of these decisions then abscond or do they show up for their subsequent court hearings?

- And finally what ultimately happens in their removal cases, does the court find they are actually deportable?

This report for the first time seeks to address these fundamental questions. It uses the court's own case-by-case records on each custody hearing, matched with parallel case-by-case records on what ultimately happens in their subsequent removal proceeding. The underlying court records were obtained by the Transactional Records Access Clearinghouse (TRAC) at Syracuse University from the Executive Office for Immigration Review (EOIR) under the Freedom of Information Act (FOIA).

Results presented are based upon a detailed analysis of these records by TRAC. The analysis spanned the last twenty years. In brief, TRAC's findings are as follows:

- First, the proportion of detained individuals in Immigration Court proceedings receiving custody hearings before an immigration judge has risen from one in five, to about half over the last twenty years.

- Second, the bond request was frequently turned down -- sometimes more, and sometimes a bit less than half the time. For those granted bond, about one in five remained detained until the end of their case, presumably because they were unable to post the bond amount set.

⟳ Third, for those who posted bond and were then released, relatively few individuals currently abscond. During FY 2015, for example, only 14 percent failed to turn up at their subsequent court hearing.

⟳ Fourth most individuals who were released prevailed in their court proceedings. Last year fully two out of every three (68%) won their case and were found not to be deportable.

Details on these findings are presented below. This report expands the topics covered in TRAC's extensive publication series on Immigration Court matters, and was made possible through the support of Syracuse University and a recent grant from the Carnegie Corporation of New York.

**How Many Individuals Receive Immigration Court Custody Hearings?**

During FY 2015, immigration court records show that a total of 50,654 individuals received custody hearings before a judge, up from 14,169 twenty years earlier. Much of this increase reflects the growing number of detained individuals in Immigration Court. As shown in Figure 1 and Appendix Table 1, individuals detained at the start of their immigration proceedings generally grew from 66,000 in FY 1995 to nearly 164,000 in FY 2011, and then declined back to roughly 98,000 last year as overall court filings declined.[4]



Figure 1. Immigration Court Filings by Detention Status, FY 1995 - FY 2015

For many years about one in four initially detained individuals received custody hearings before an immigration judge. Although this percentage has varied a bit from year to year, during the fifteen-year period between FY 1995 and FY 2010 it rarely was as low as 20 percent, or higher than 30 percent.

As shown in Figure 2, since FY 2010 the picture has changed. There are a growing proportion of detainees receiving bond hearings. During FY 2015 custody hearings were held for half of those detained. While hearing numbers jumped to over 66,000 in FY 2011 and FY 2012, since then the number of individuals with custody hearings has been falling. What has happened is that the number of individuals in detained proceedings has fallen faster, so that the proportion with custody hearings still increased. See Figure 2 and Appendix Table 1.



*first 10 months*

Figure 2. Percent of Initially Detained Individuals Afforded Custody Hearing

### How Often Do Immigration Judges Grant Bond or Release on Personal Recognizance?

On average over this twenty-year period, slightly more than half (54%) of bond hearings resulted in the immigration judge denying the bond motion. In the remaining 46 percent, the bond motion was granted.[5] There has been considerable year-to-year variation in these rates. In general, judges are no more likely to grant bond today than they were twenty years ago.

Figure 3 displays this release rate from a slightly different angle - those released as compared with the total number of individuals in detained immigration proceedings. Historically, only one in ten detained individuals had a favorable judge ruling at a bond hearing. Last year three out of every ten detained individuals had a bond motion granted by an immigration judge. This increase reflects the growing proportion of detained individuals who had hearings. See Figure 3 and Appendix Table 1.

**88**



* first 10 months

Figure 3. Percent of Detained with Custody Hearings and Granted Bond

The character of bond hearings has also changed over the past two decades. Twenty years ago court records indicate in three out four cases an initial bond had been set by the immigration enforcement officials and the hearing was over whether the bond amount should be reduced -- not whether the individual should be released at all. However, the number of these cases has steadily dwindled. By FY 2015, in 94 percent of the cases ICE was apparently insisting that the individual must be kept locked up since court records indicated enforcement officials had not set any bond amount. Accordingly, the judge was being asked to set a bond to allow the individual to be released.

When the bond motion was granted, bond amounts naturally varied. A few were granted release on personal recognizance, or the bond amount was simply set at $0. At the other extreme, occasionally bond amounts of a million dollars or more were set by the judge. The median bond amount set twenty years ago was $3,000. By FY 2002 it rose to $5,000 where it remained until FY 2014 when it increased to $6,000. In FY 2015 the median bond amount was $6,500. See Appendix Table 2.

Figure 4 shows, where bond was granted, the distribution of the amount of bond set by the judge in each of the past five years. In FY 2015 fully half of all bonds set were between $4,000 and $10,000. A total of four percent did not have to post any bond, while according to court records, seven individuals had bonds set of over a million dollars.



Figure 4. Bond Amounts Set by Immigration Judge

For those granted bond, having a bond set still was not synonymous with being released. While figures varied from year to year, according to court records about one in five remained detained at the conclusion of their case, presumably because they were unable to post that bond amount. For cases concluded during FY 2015, 13 percent remained detained even after the judge granted bond, down from 28 percent who had still been detained at the conclusion of their case in FY 2011 after bond was granted. See Appendix Table 3.

The remaining sections of this report focus on those individuals who secured their release from detention. That is, they had a bond hearing before a judge, were then successful in having their motion granted, and finally were as a result released from ICE custody.

**Did Released Individuals Turn Up at Their Subsequent Court Hearings?**

The vast majority of individuals who in recent years were released on bond as a result of their custody hearing before an immigration judge turned up for their court case. During FY 2015, for example, court records indicate that 86 percent of individuals that were released from detention turned up for their court hearing when it was finally held. The remaining 14 percent were recorded "*in absentia.*" That is, they failed to appear and the immigration judge - in their absence -- granted the government's request for a removal order to deport them.[6]

The appearance rate of those released as a result of a custody hearing before an immigration judge is generally better - that is, higher -- than for individuals that immigration enforcement officials have themselves released from custody. The "*in absentia*" rate overall for released individuals during FY 2015, for example, was 23.4 percent[7], as compared to only 14.0 percent for the subset of those released after an immigration judge had set bond. This is noteworthy since the cases immigration judges were reviewing were almost always those where the government had refused to release the individual. Such cases, if the system operated logically, would be thought to present a higher, not lower, flight risk.

In general, *in absentia* rates for individuals released as a result of bond decisions made by immigration judges also were down from levels of ten or more years ago. *In absentia* rates for individuals released after their custody hearings peaked at 47 percent during FY 2002 and have generally fallen since then despite the increasing percentage of detained individuals being released on bond by judges[8]. See Figure 5 and Appendix Table 3.



Figure 5. Whether Individuals Released from Detention After Bond Granted by Immigration Judge Abscond

**Immigration Judge Decisions on Deportation and Removal Proceedings**

Individuals who gain their release in a bond hearing also have a very high success rate in establishing that they should not be deported in the first place, and can therefore remain in the U.S. During FY 2015, for example, two out of every three individuals (68%) released after the judge granted bond ultimately prevailed in their Immigration Court proceeding.

The remaining proportion ordered deported - that is, one out of three - was significantly lower than those ordered deported overall in Immigration Court proceeding completed last year. As TRAC has previously reported, in FY 2015 the overall proportion of individuals ordered deported in Immigration Court proceedings was just under half, or 46 percent.

Outcomes in deportation and removal proceedings over the past two decades for individuals released after a judge granted bond in their custody hearing are shown in Figure 6 and Appendix Table 4. As can be seen, these individuals who have been released from detention have over time increasingly prevailed in their Immigration Court cases.



Figure 6. Outcome in Immigration Deportation Proceedings Where Individual Released After Judge Granted Bond

## Conclusion

Court records so far demonstrate that the practical result of the release of increasing numbers of individuals on bond has not resulted in any significant increase in those who abscond and fail to show up for their immigration hearings. Trends, if anything, show declines. At the same time, it has allowed thousands of individuals who ultimately were found not to be deportable to avoid being held during their lengthy court proceedings. The number of those judged not deportable who escaped unnecessary detention grew over the last decade from 1,697 individuals in FY 1995 to 9,158 individuals in FY 2015.

## Footnotes

[1] See, for example, _July 2016 TRAC report_ on increasing backlogs, and _September 2015 report_ on ballooning wait times.

[2] See, for example, _recent EOIR statistics_. Also see _TRAC report_ that found legal noncitizens had received the longest ICE detention times simply because of the lengthy procedures required to prove they had the legal right to remain in the U.S.

[3] The U.S. Supreme Court, for example, recently granted certiorari to review _the Ninth Circuit's Rodriguez opinion_ in a class action involving prolonged detention in Immigration Court proceedings holding that those individuals had a right to a bond hearing before an Immigration judge. See also, Denmore v. Kim, 538 U.S. 510 (2003).

[4] These recent declines reflect the decrease in the overall number of court filings after FY 2011 in large part because of DHS's increasing reliance on administrative deportation procedures that bypass the Immigration Court. The larger number in FY 2014 reflects cases from the surge of unaccompanied children and women with children that arrived that year seeking refuge in this country

[5] For individuals who had multiple bond hearings, figures are based upon the outcome of the last hearing. Grant rates are lower if counts include all hearings since unsuccessful candidates account for most requests for repeat hearings.

[6] Given the Court's backlog, there was typically a long delay between the date of their bond hearing and the hearing that concluded removal proceedings. For example, the median bond hearing date for FY 2015 dispositions was back in April 2012.

[7] This rate, using the same methodology, compares the total number of in absentia decisions in cases in which the individuals had been released from custody to the total cases involving released individuals concluded that year. These results are also shown in Appendix Table 3. Where there have been multiple proceedings for the same individual, the outcome for the last - that is, final -- proceeding is used. TRAC's result differs from what EOIR publishes as its "in absentia" rate for the following two reasons. First, EOIR's rate is based upon the initial, rather than the last proceeding. If this rate is being used as an indicator of individuals absconding, rather than simply failing to

appear, then using the first proceeding and ignoring subsequent ones is quite inappropriate. Where, for example, the individual never received notice of the hearing, the case may be reopened and a later hearing take place. Use of the last proceeding, rather than the first, is thus a more accurate measure in this context. In fact, using the last proceeding instead of the first significantly impacts and reduces the calculated rates. Second, EOIR unlike TRAC does not include all individuals with hearings that conclude their case, choosing to exclude some because of the particular type of decision the court ultimately made. While anyone who absconded would not be qualified to receive the type of decision that EOIR labels as "other completions", the agency excludes these from its total case completion count when computing in absentia rates. Although formerly insignificant in number, these "other completions" have grown in recent years. They have the same practical effect of closing the case and allowing the individual to remain in the U.S. In FY 2015, these "other completions" made up around a quarter of the cases the court decided. EOIR appears to continue to exclude them for what appears to be largely historical reasons when its case counting methodology was quite different. No rationale now for their current exclusion remains. Indeed, continuing to exclude them results in publishing misleading and greatly inflated in absentia rates.

[8] Supplemental Note (October 6, 2016). TRAC just completed a supplemental analysis of the subset of cases that EOIR recently began identifying as "individuals released from custody as a result of a bond hearing conducted pursuant to the decision in Rodriguez v. Robbins, 804 F.3rd 1060 (9th Cir. 2015)." TRAC found there are a relatively small number that EOIR has identified thus far as applicable Rodriguez cases. In addition, only a very few of these Rodriguez cases have reached a conclusion on their merits. As a result it is much too early to even attempt to determine what proportion ultimately will be decided "in absentia." To place these very preliminary numbers into context, TRAC reported in Appendix Table 3 that during the first 10 months of FY 2016 there were 12,022 cases of all types that had been concluded in which the individual earlier had been released from custody as a result of immigration judges granting them bond. TRAC found only two out of the 12,022 were identified as Rodriguez cases and, according to Immigration Court records, both of these released individuals showed up for their immigration hearings.

## Appendix

### Appendix Table 1. Immigration Court Detained Cases with Custody Hearings

| Fiscal Year | New Court Filings | | Custody Hearings* | | Percentage of Detained | |
|---|---|---|---|---|---|---|
| | Total | Individual Detained | All | Bond Granted** | With Custody Hearings | With Bond Granted |
| 1995 | 159,135 | 66,017 | 14,169 | 9,056 | 21.46% | 13.7% |
| 1996 | 190,170 | 80,423 | 15,595 | 9,005 | 19.4% | 11.2% |
| 1997 | 200,316 | 98,094 | 19,637 | 11,462 | 20.0% | 11.7% |
| 1998 | 189,070 | 98,160 | 27,636 | 15,559 | 28.2% | 15.9% |
| 1999 | 164,186 | 80,129 | 21,515 | 8,499 | 26.9% | 10.6% |
| 2000 | 160,852 | 89,875 | 23,116 | 10,328 | 25.7% | 11.5% |
| 2001 | 176,230 | 100,980 | 27,451 | 13,540 | 27.2% | 13.4% |
| 2002 | 180,249 | 98,475 | 29,955 | 14,469 | 30.4% | 14.7% |
| 2003 | 196,905 | 104,467 | 30,040 | 12,415 | 28.8% | 11.9% |
| 2004 | 205,818 | 98,907 | 26,685 | 9,614 | 27.0% | 9.7% |
| 2005 | 287,240 | 105,838 | 23,408 | 8,164 | 22.1% | 7.7% |
| 2006 | 233,269 | 114,113 | 27,117 | 10,658 | 23.8% | 9.3% |
| 2007 | 217,088 | 136,200 | 38,793 | 15,870 | 28.5% | 11.7% |
| 2008 | 231,504 | 153,531 | 42,232 | 16,089 | 27.5% | 10.5% |
| 2009 | 258,036 | 165,500 | 46,707 | 18,563 | 28.2% | 11.2% |
| 2010 | 249,452 | 156,999 | 46,819 | 18,549 | 29.8% | 11.8% |
| 2011 | 242,932 | 163,716 | 66,913 | 30,398 | 40.9% | 18.6% |
| 2012 | 218,483 | 145,785 | 68,014 | 31,688 | 46.7% | 21.7% |
| 2013 | 205,142 | 127,573 | 48,722 | 20,587 | 38.2% | 16.1% |
| 2014 | 268,095 | 135,434 | 52,138 | 25,644 | 38.5% | 18.9% |
| 2015 | 194,798 | 97,927 | 50,654 | 28,637 | 51.7% | 29.2% |
| 2016*** | 157,664 | 80,482 | 43,317 | 23,996 | 53.8% | 29.8% |

* The number of individuals with custody hearings.
** Where an individual had their custody reviewed more than once, the outcome at the last custody hearing is used.
***Covers the first 10 months of FY 2016 (through the end of July).

Appendix Table 2. Bond Decisions* to Grant Bond or Release on Personal Recognizance

| Fiscal Year | Number | Median Amount | Percentage by Bond Amount | | | | | | | | | |
| | | | $0 | $1-$2,500 | $2,500<$5,000 | $5,000<$7,500 | $7,500<$10,000 | $10,000<$12,500 | $12,500<$17,500 | $17,500<$25,000 | $25,000+ | Total |
| 1995 | 9,056 | $3,000 | 7.1% | 32.6% | 19.2% | 16.2% | 7.5% | 8.2% | 3.4% | 3.1% | 2.6% | 100.0% |
| 1996 | 9,005 | $2,500 | 5.9% | 40.7% | 23.3% | 13.3% | 5.2% | 5.7% | 2.5% | 1.9% | 1.6% | 100.0% |
| 1997 | 11,462 | $3,000 | 5.9% | 29.9% | 26.9% | 15.7% | 4.3% | 8.1% | 3.6% | 2.8% | 2.8% | 100.0% |
| 1998 | 15,559 | $3,500 | 5.0% | 19.6% | 37.7% | 17.6% | 5.1% | 7.3% | 2.8% | 2.6% | 2.2% | 100.0% |
| 1999 | 8,499 | $3,000 | 8.1% | 28.3% | 39.5% | 13.9% | 3.3% | 3.6% | 1.4% | 0.9% | 0.9% | 100.0% |
| 2000 | 10,328 | $3,000 | 5.7% | 25.7% | 35.4% | 20.1% | 3.3% | 4.1% | 2.5% | 0.9% | 2.3% | 100.0% |
| 2001 | 13,540 | $3,500 | 7.9% | 17.6% | 37.7% | 23.1% | 4.2% | 4.2% | 2.8% | 0.6% | 1.9% | 100.0% |
| 2002 | 14,469 | $5,000 | 5.7% | 14.1% | 28.0% | 23.5% | 7.1% | 8.6% | 4.9% | 2.5% | 5.5% | 100.0% |
| 2003 | 12,415 | $5,000 | 5.5% | 15.2% | 24.2% | 24.6% | 7.9% | 8.8% | 4.9% | 2.9% | 6.0% | 100.0% |
| 2004 | 9,614 | $5,000 | 4.6% | 13.0% | 21.0% | 29.3% | 10.4% | 9.5% | 3.9% | 3.4% | 4.9% | 100.0% |
| 2005 | 8,164 | $5,000 | 4.6% | 12.8% | 18.8% | 31.2% | 9.2% | 10.7% | 4.3% | 2.6% | 5.9% | 100.0% |
| 2006 | 10,658 | $5,000 | 3.4% | 14.5% | 22.3% | 27.4% | 10.1% | 10.2% | 4.7% | 2.8% | 4.6% | 100.0% |
| 2007 | 15,870 | $5,000 | 3.2% | 12.6% | 22.5% | 26.1% | 11.3% | 11.9% | 5.4% | 3.3% | 3.7% | 100.0% |
| 2008 | 16,089 | $5,000 | 1.8% | 10.4% | 26.2% | 28.0% | 11.0% | 11.9% | 4.9% | 2.7% | 3.2% | 100.0% |
| 2009 | 18,563 | $5,000 | 1.4% | 10.3% | 25.4% | 27.7% | 12.3% | 11.6% | 5.3% | 2.7% | 3.4% | 100.0% |
| 2010 | 18,549 | $5,000 | 1.1% | 12.5% | 30.6% | 27.6% | 12.2% | 8.7% | 4.0% | 1.8% | 1.6% | 100.0% |
| 2011 | 30,398 | $5,000 | 0.5% | 10.9% | 28.8% | 27.6% | 12.7% | 9.7% | 4.3% | 2.5% | 3.0% | 100.0% |
| 2012 | 31,688 | $5,000 | 0.5% | 10.0% | 30.2% | 29.9% | 14.5% | 8.6% | 3.7% | 1.3% | 1.4% | 100.0% |
| 2013 | 20,587 | $5,000 | 0.8% | 7.4% | 25.2% | 31.4% | 16.8% | 10.1% | 5.0% | 1.6% | 1.8% | 100.0% |
| 2014 | 25,644 | $6,000 | 0.8% | 7.1% | 24.4% | 28.2% | 16.4% | 13.0% | 5.9% | 1.9% | 2.2% | 100.0% |
| 2015 | 28,637 | $6,500 | 4.4% | 6.3% | 19.6% | 23.7% | 19.1% | 13.1% | 7.3% | 3.7% | 2.7% | 100.0% |
| 2016** | 23,996 | $8,000 | 0.7% | 4.1% | 12.5% | 19.9% | 22.6% | 18.0% | 9.2% | 6.5% | 6.5% | 100.0% |

*Where an individual had their custody reviewed more than once, the outcome at the last custody hearing is used.*
** Covers the first 10 months of FY 2016 (through the end of July).*

Appendix Table 3. Completed Immigration Court Cases Where Initially Detained Individual Had Been Released

| Fiscal Year Case Completed | Immigration Judge Granted Bond* | | | | | | All Completions Where Released | | |
| | Total | Remained Detained | Gained Release | Attended Court Hearing | Did Not Attend** | Percent "In Absentia" | Total Released | Did Not Attend** | Percent "In Absentia" |
| 1995 | 6,820 | 2,381 | 4,439 | 3,038 | 1,401 | 31.6% | 11,898 | 4,249 | 35.7% |
| 1996 | 8,227 | 2,546 | 5,681 | 4,001 | 1,680 | 29.6% | 12,484 | 4,328 | 34.7% |
| 1997 | 9,228 | 2,977 | 6,251 | 4,455 | 1,796 | 28.7% | 12,767 | 4,145 | 32.5% |
| 1998 | 12,297 | 3,841 | 8,456 | 5,731 | 2,725 | 32.2% | 16,308 | 5,775 | 35.4% |
| 1999 | 10,214 | 2,146 | 8,068 | 5,260 | 2,808 | 34.8% | 16,226 | 6,050 | 37.3% |
| 2000 | 8,967 | 2,006 | 6,961 | 4,101 | 2,860 | 41.1% | 17,251 | 7,641 | 44.3% |
| 2001 | 9,781 | 2,302 | 7,479 | 4,082 | 3,397 | 45.4% | 22,986 | 11,098 | 48.3% |
| 2002 | 12,574 | 2,855 | 9,719 | 5,187 | 4,532 | 46.6% | 27,646 | 13,058 | 47.2% |
| 2003 | 13,310 | 3,153 | 10,157 | 6,303 | 3,854 | 37.9% | 27,258 | 11,008 | 40.4% |
| 2004 | 9,818 | 2,509 | 7,309 | 4,648 | 2,661 | 36.4% | 20,074 | 7,362 | 36.7% |
| 2005 | 7,765 | 1,969 | 5,796 | 4,142 | 1,654 | 28.5% | 17,287 | 5,951 | 34.4% |
| 2006 | 7,783 | 2,113 | 5,670 | 4,235 | 1,435 | 25.3% | 18,387 | 5,899 | 32.1% |
| 2007 | 9,858 | 2,697 | 7,161 | 5,368 | 1,793 | 25.0% | 19,082 | 5,243 | 27.5% |
| 2008 | 10,656 | 2,635 | 8,021 | 6,671 | 1,350 | 16.8% | 19,111 | 4,137 | 21.6% |
| 2009 | 11,353 | 3,000 | 8,353 | 7,140 | 1,213 | 14.5% | 18,336 | 3,764 | 20.5% |
| 2010 | 12,184 | 2,735 | 9,449 | 8,322 | 1,127 | 11.9% | 20,583 | 3,845 | 18.7% |
| 2011 | 14,211 | 3,985 | 10,226 | 8,537 | 1,689 | 16.5% | 24,587 | 5,778 | 23.5% |
| 2012 | 17,023 | 4,109 | 12,914 | 10,480 | 2,434 | 18.8% | 29,573 | 6,821 | 23.1% |
| 2013 | 18,504 | 2,876 | 15,628 | 13,370 | 2,258 | 14.4% | 36,307 | 8,260 | 22.8% |
| 2014 | 17,221 | 2,951 | 14,270 | 12,448 | 1,822 | 12.8% | 38,685 | 9,547 | 24.7% |

**94**

| Fiscal Year Case Completed | Immigration Judge Granted Bond* | | | | | | All Completions Where Released | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Remained Detained | Gained Release | Attended Court Hearing | Did Not Attend** | Percent "In Absentia" | Total Released | Did Not Attend** | Percent "In Absentia" |
| 2015 | 15,269 | 2,028 | 13,241 | 11,391 | 1,850 | 14.0% | 44,280 | 10,379 | 23.4% |
| 2016*** | 13,485 | 1,463 | 12,022 | 10,009 | 2,010 | 16.7% | 38,770 | 7,912 | 20.4% |

* This table covers only those cases where Immigration Court proceedings were completed. Thus, the outcome is known and whether the decision was made "in absentia" can be determined. Individuals granted bond by Immigration Judge where cases are still pending are not included.

** Based on court records that decision was made "in absentia" when individual failed to appear for their court hearing.

*** Covers the first 10 months of FY 2016 (through the end of July).

Appendix Table 4. Outcome in Immigration Deportation Proceedings
Where Individual Released After Judge Granted Bond

| Fiscal Year Case Completed | Total* | Stay in U.S. | Ordered Deported | Percent Stay in U.S. |
|---|---|---|---|---|
| 1995 | 4,439 | 1,272 | 3,167 | 28.7% |
| 1996 | 5,680 | 1,457 | 4,223 | 25.7% |
| 1997 | 6,249 | 1,142 | 5,107 | 18.3% |
| 1998 | 8,456 | 1,734 | 6,722 | 20.5% |
| 1999 | 8,068 | 1,862 | 6,206 | 23.1% |
| 2000 | 6,961 | 1,528 | 5,433 | 22.0% |
| 2001 | 7,479 | 1,959 | 5,520 | 26.2% |
| 2002 | 9,719 | 1,965 | 7,754 | 20.2% |
| 2003 | 10,156 | 2,355 | 7,801 | 23.2% |
| 2004 | 7,308 | 1,848 | 5,460 | 25.3% |
| 2005 | 5,796 | 1,697 | 4,099 | 29.3% |
| 2006 | 5,670 | 2,106 | 3,564 | 37.1% |
| 2007 | 7,160 | 2,363 | 4,797 | 33.0% |
| 2008 | 8,021 | 2,703 | 5,318 | 33.7% |
| 2009 | 8,351 | 3,156 | 5,195 | 37.8% |
| 2010 | 9,449 | 4,415 | 5,034 | 46.7% |
| 2011 | 10,226 | 4,437 | 5,789 | 43.4% |
| 2012 | 12,914 | 6,135 | 6,779 | 47.5% |
| 2013 | 15,627 | 8,814 | 6,813 | 56.4% |
| 2014 | 14,268 | 9,158 | 5,110 | 64.2% |
| 2015 | 13,225 | 9,031 | 4,194 | 68.3% |
| 2016** | 12,012 | 8,040 | 3,972 | 66.9% |

* Covers deportation and removal proceedings. Slight difference between the totals in Appendix Tables 3 and 4 are because a small number of non-deportation/removal case types handled by the Immigration Court are not included in this table.

** Covers the first 10 months of FY 2016 (through the end of July).

Report date: September 14, 2016



Copyright 2016, TRAC Reports, Inc.

L



**Office of the Attorney General**
**Washington, D. C. 20530**

APRIL 6, 2018

MEMORANDUM FOR FEDERAL PROSECUTORS ALONG THE SOUTHWEST BORDER

FROM:          THE ATTORNEY GENERAL          4/6/18

SUBJECT:       Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)

On April 11, 2017, I issued a memorandum to all federal prosecutors entitled "Renewed Commitment to Criminal Immigration Enforcement," in which I directed the prioritization of the prosecution of certain criminal immigration offenses. I further directed each United States Attorney's Office along the Southwest Border to work with the Department of Homeland Security to develop guidelines for prosecuting offenses under 8 U.S.C. § 1325(a).

Those seeking to further an illegal goal constantly alter their tactics to take advantage of weak points. That means we must effectively respond with smart changes also. The recent increase in aliens illegally crossing our Southwest Border requires an updated approach. Past prosecution initiatives in certain districts—such as Operation Streamline—led to a decrease in illegal activities in those districts. We must continue to execute effective policies to meet new challenges.

Accordingly, I direct each United States Attorney's Office along the Southwest Border— to the extent practicable, and in consultation with DHS— to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a). This zero-tolerance policy shall supersede any existing policies. If adopting such a policy requires additional resources, each office shall identify and request such additional resources.

You are on the front lines of this battle. I respect you and your team. Your dedication and insight into border reality is invaluable. Keep us informed, and don't hesitate to give us suggestions for improvement. Remember, our goal is not simply more cases. It is to end the illegality in our immigration system.

This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**97**

M

Crisis at the Border? Not by the Numbers | migrationpolicy.org

All MPI ▸

AA Adjust Font
🖶 Print
🔊 RSS
☐ Copyright & Reuse

SUBSCRIBE FOR UPDATES ›

## Authors



Jessica Bolter is an Associate Policy Analyst at MPI, where she researches migration patterns at the U.S.-Mexico border, U.S. immigration enforcement, and asylum and refugee

Naturalization Service, directs MPI's U.S. immigration policy work. Full Bio >

## Related Research

• Advances in U.S.-Mexico Border

Home » Newsroom

COMMENTARIES │ JUNE 2018

# Crisis at the Border? Not by the Numbers

By Jessica Bolter and Doris Meissner

Border Security  Border Enforcement  Technology & Infrastructure  Illegal Immigration & Interior Enforcement



Monthly numbers of migrant apprehensions at the U.S.-Mexico border have become a major preoccupation of the Trump administration. The President reportedly treats the numbers as a gauge of his administration's effectiveness at securing the border. Any rise in the numbers undercuts for him a central promise of his presidency.

U.S. Customs and Border Protection (CBP) data issued June 6 show that for the third straight month, apprehensions in May—that is, the

We use cookies to broadly understand traffic to this website. Continue browsing if this is acceptable. Learn more

I understand

contend that these increases represent a crisis at the border that demands toughened border policies and major additional resource infusions, especially construction of a border wall.

What has been lost in the discussion is that the 2017 apprehensions are the outliers, and so measuring current activity at the border against that atypically low period ignores the fact that the current apprehensions picture largely mirrors earlier years.

What made 2017 unusual? There were significant reductions in attempted illegal entries after the November 2016 general election and in the early months of the new administration as would-be migrants seemingly held back in wait-and-see mode, given the

https://www.migrationpolicy.org/news/crisis-border-not-numbers[8/13/2019 3:25:01 PM]

99

Crisis at the Border? Not by the Numbers | migrationpolicy.org

Case 3:19-mj-24522-LL-TWR   Document 19-2   Filed 01/30/20   PageID.171   Page 101 of 113

Trump campaign's muscular focus on immigration enforcement. What became dubbed the "Trump effect" has predictably waned, however, given the deeper push-pull forces that propel illegal migration.

As a result, this year's apprehension numbers for March, April, and May are largely comparable to the same months in 2013, 2014, and 2016. (In 2015, apprehensions dropped, partly due to stepped-up enforcement against Central American migrants by Mexican authorities.) The 40,344 apprehensions recorded in May 2018 are continuing the downward trend that has emerged over the past 18 years. And that monthly total is more than 100,000 apprehensions less than the level recorded in May 2000—the peak year of apprehensions, at more than 1.6 million. (See Figure 1.)



Figure 1. Border Patrol Southwest Border Apprehensions, FY 2000-18

*Note*: 2018 Year to Date includes apprehensions for the first eight months of FY 2018 (October 2017 to May 2018).

*Sources*: U.S. Border Patrol, "U.S. Border Patrol Monthly Apprehensions (FY 2000 - FY 2017)," accessed June 4, 2018, www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20Apps%20by%20Sector%20and%20Area%2C%20FY2000-FY2017.pdf; U.S. Customs and Border Protection (CBP), "Southwest Border Migration FY2018," updated June 6, 2018, https://www.cbp.gov/newsroom/stats/sw-border-migration.

What is different about apprehensions in recent years, but particularly in 2017 and 2018, is the proportion of migrants that are

Enforcement: A Review of the Consequence Delivery System
- Trump's First Year on Immigration Policy: Rhetoric vs. Reality
- A Revolving Door No More? A Statistical Profile of Mexican Adults Repatriated from the United States
- Border Metrics: How to Effectively Measure Border Security and Immigration Control

**MULTIMEDIA**



## Recognizing Changing Enforcement and Crossing Trends at the U.S.-Mexico Border

MAY 4, 2017 | Migration Policy Institute

## U.S. Immigration Policy Program

MPI's U.S. Immigration Policy Program analyzes U.S. policies and their impacts, as well as the complex demographic, economic, political, foreign policy, and other forces that shape immigration to the country.

More Info >

## Contact Us

202-266-1940

**100**

Crisis at the Border? Not by the Numbers | migrationpolicy.org

Case 3:19-mj-24522-LL-TWR   Document 19-2   Filed 01/30/20   PageID.172   Page 102 of 113

info@migrationpolicy.org

either traveling as unaccompanied children or as families consisting of both adults and children. In fiscal year (FY) 2017, 29 percent of migrants apprehended were individuals traveling as families, compared to 3 percent in FY 2012. Overall, 39 percent of those apprehended in FY 2017 and 36 percent of those apprehended thus far in FY 2018 have been either families or unaccompanied children, compared to 10 percent in FY 2012 (See Figure 2).



**Figure 2. Family and Unaccompanied Minor Apprehensions as Share of Total Apprehensions, FY 2012-18**

*Note*: 2018 Year to Date includes apprehensions for the first eight months of FY 2018 (October 2017 to May 2018).

*Sources*: CBP, "United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016," updated October 18, 2016, www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016; CBP, "Southwest Border Migration FY2017;" CBP, "Southwest Border Migration FY2018."

It is particularly notable that overall migration flows remain at such lows now, while the U.S. economy is strong. The unemployment rate has fallen to 3.8 percent, the lowest since 2000, while jobs have been continually added to the economy for a record 92 months. Yet border apprehension numbers remain low, indicating that illegal immigration, in particular from Mexico which has historically been largely driven by demand from U.S. employers, has lessened. Instead, the flows we are seeing are dominated by those seeking humanitarian protection.

In addition to migrants apprehended seeking to cross illegally between ports of entry, many of those traveling to the U.S. border—especially families—are turning themselves in at designated ports of entry (POEs) and often asking for asylum. These numbers

Crisis at the Border? Not by the Numbers | migrationpolicy.org

Case 3:19-mj-24522-LL-TWR   Document 19-2   Filed 01/30/20   PageID.173   Page 103 of 113

are separate from apprehension numbers but have in recent years become another important indicator of changing flows at the border. In FY 2017, 28 percent of all families attempting to enter the United States did so by presenting themselves at POEs. In the first eight months of FY 2018, that share has risen to 37 percent. In comparison, 29 percent of adult individual migrants presented at POEs in FY 2017, and 23 percent have done so thus far in FY 2018.

Meanwhile, the number of Border Patrol agents at the Southwest border is almost double the number in 2000, and the Trump administration continues to press for the hiring of 5,000 additional agents, even as total apprehensions in recent years have been at lows comparable to those of the mid-1970s, when there were about 1,400 agents at the Southwest border (see Figure 3).



**Figure 3. Southwest Border Apprehension and Border Patrol Staffing Levels, FY 1975-2017**

*Sources*: Transactional Records Access Clearinghouse, "Border Patrol Expands But Growth Rate After 9/11 Much Less Than Before, Division Between North/South Border Little Changed," updated April 4, 2006, http://trac.syr.edu/immigration/reports/143/; U.S. Border Patrol, "Border Patrol Agent Nationwide Staffing by Fiscal Year," accessed June 4, 2018, www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Staffing%20FY1992-FY2017.pdf.

In recent months, amid the Trump administration's relentless narrative of a border in crisis, the National Guard has been deployed to the border and Interior Secretary Ryan Zinke dispatched a contingent of National Park Service and U.S. Park Police officers to assist enforcement efforts. The President continues to demand a border wall and additional Border Patrol agents. And Attorney General Jeff Sessions has announced a zero-tolerance policy mandating federal prosecution of all first-time crossers, which has

Crisis at the Border? Not by the Numbers | migrationpolicy.org

had the result of forcing family separation, as children cannot be held in criminal incarceration.

This willful misreading of the trends at the border is belied by the most recent apprehension statistics, which call into question whether an expenditure of billions of dollars on barriers and more enforcement personnel would be an effective use of taxpayer resources. The statistics provide the latest evidence of near-historic lows in illegal border crossings and a change in the flows that call for deciding asylum cases in a timely, fair fashion, not policies such as the family separation ones that have sparked outrage and concern.

## Links

MPI's U.S. immigration policy research

RESEARCH & INITIATIVES | PUBLICATIONS | EVENTS | NEWS | ABOUT          CONTACT US | SITE MAP | PRIVACY POLICY | EXPERTS | EMAIL SIGN





1400 16th St NW, Suite 300, Washington, DC 20036 | ph. 202-266-1940 | fax. 202-266-1900

Copyright © 2001-2019 Migration Policy Institute. All rights reserved.

**103**

N

## CRIMINAL AND CIVIL CASES FILED

### CALENDAR YEAR 2016 THROUGH 2018

**CRIMINAL (CASES)**  ...  **MAGISTRATE (CASES)**

| MONTH | 2016 TOTAL | 2017 TOTAL | 2018 TOTAL | % CHANGE 2017-2018 | (+/-) TOTAL | 2018 TOTAL COMPLAINTS | 1325 |
|-------|-----|-----|-----|-----|-----|-----|-----|
| JAN | 159 | 221 | 499 | 126% | 278 | 584 | 1 |
| FEB | 216 | 266 | 530 | 99% | 264 | 583 | 3 |
| MAR | 297 | 299 | 613 | 105% | 314 | 575 | 4 |
| APR | 250 | 270 | 491 | 82% | 221 | 566 | 4 |
| MAY | 305 | 298 | 550 | 85% | 252 | 895 | 475 |
| JUN | 284 | 389 | 322 | -17% | -67 | 1030 | 810 |
| JULY | 186 | 296 | 301 | 2% | 5 | 1231 | 345 |
| AUG | 219 | 491 | 451 | -8% | -40 | 1633 | 1152 |
| SEP | 271 | 481 | | | | | |
| OCT | 260 | 494 | | | | | |
| NOV | 257 | 428 | | | | | |
| DEC | 282 | 474 | | | | | |
| TOTAL | 2986 | 4407 | 3757 | | 1227 | 7102 | 2397 |

**CRIMINAL (DFTS)**

| MONTH | 2016 TOTAL | 2017 TOTAL | 2018 TOTAL | % CHANGE 2017-2018 | (+/-) TOTAL | Note |
|-------|-----|-----|-----|-----|-----|-----|
| JAN | 201 | 269 | 555 | 106% | 286 | |
| FEB | 336 | 370 | 596 | 61% | 226 | |
| MAR | 341 | 340 | 710 | 109% | 370 | |
| APR | 302 | 357 | 514 | 44% | 157 | |
| MAY | 349 | 354 | 592 | 67% | 238 | |
| JUN | 333 | 451 | 373 | -19% | -88 | |
| JULY | 214 | 330 | 332 | 1% | -3 | |
| AUG | 252 | 581 | 479 | -18% | -102 | |
| SEP | 297 | 552 | | | | |
| OCT | 285 | 547 | | | | |
| NOV | 284 | 454 | | | | |
| DEC | 316 | 504 | | | | |
| TOTAL | 3415 | 5113 | 4151 | | 1885 | |

**CIVIL**

| MONTH | 2016 TOTAL | 2017 TOTAL | 2018 TOTAL | % CHANGE 2017-2018 | (+/-) TOTAL | Note |
|-------|-----|-----|-----|-----|-----|-----|
| JAN | 251 | 193 | 234 | 21% | 41 | |
| FEB | 273 | 229 | 214 | -7% | -15 | |
| MAR | 246 | 242 | 206 | -15% | -36 | |
| APR | 282 | 206 | 175 | -15% | -31 | |
| MAY | 253 | 241 | 277 | 15% | 36 | |
| JUN | 399 | 229 | 386 | 69% | 157 | |
| JULY | 216 | 202 | 266 | 32% | 64 | |
| AUG | 291 | 218 | 276 | 27% | 58 | |
| SEP | 254 | 249 | | | | |
| OCT | 235 | 203 | | | | |
| NOV | 211 | 189 | | | | |
| DEC | 216 | 193 | | | | |
| TOTAL | 3127 | 2614 | 2634 | | 274 | |

**Distribution:**

| | |
|---|---|
| Chief Judge Benitez | John Morrill |
| Mag Judge Adler | Ted Lewis |
| Dave Sulzbaugh | Jamie Forcelo |
| Lori Gandolic | Jennilyn Brown |

* The projections for both Criminal and Civil are based on the trend over the previous 24 months. Does not include reopened cases.

EXHIBIT A

O

Case 3:19-mj-02948-MSB   Document 3   Filed 12/19/18   PageID.4   Page 1 of 1
(For issuance of an arrest warrant or summons)

I state that on Sept 4, 20 18 while exercising my duties as a
law enforcement officer in the Southern District of California
See attached statement

The foregoing statement is based upon:

☐ my personal observation   ☐ my personal investigation

☐ information supplied to me from my fellow officer's observation

☐ other (explain above)

I declare under penalty of perjury that the information which I have set forth above and on the face of this violation notice is true and correct to the best of my knowledge.

Executed on: 09/04/2018   Officer's Signature
            Date (mm/dd/yyyy)

Probable cause has been stated for the issuance of a warrant.

Executed on: _____   _____
            Date (mm/dd/yyyy)   U.S. Magistrate Judge

HAZMAT = Hazardous material involved in incident;   PASS = 9 or more passenger vehicle
CDL = Commercial drivers license;   CMV = Commercial vehicle involved in incident

CVB SCAN 09/26/2018 13:26

---

**United States District Court**
**Violation Notice**

Violation Number: 7472655   Officer Name (Print): None K   Officer No.: 903   CS81

YOU ARE CHARGED WITH THE FOLLOWING VIOLATION

Date and Time of Offense (mm/dd/yyyy): 09/04/2018   19:02
Offense Charged: ☒USC ☐CFR ☐State Code   18 USC 922 G   49 CFR

Place of Offense: San Ysidro Vehicle Secondary (West pedestrian entry)

Offense Description: Possession of a firearm by prohibited person "dishonorably discharged" veteran

7472655

DEFENDANT INFORMATION

Last Name: De La Rosa Gonzalez   First Name: Antonio   M.I.

Tag No.: DNJ667   State: OK   Year: 16   Make/Model: Hyundai   PASS ☐   Color: White

A ☒ IF BOX A IS CHECKED, YOU MUST APPEAR IN COURT. SEE INSTRUCTIONS (on back of yellow copy).

B ☐ IF BOX B IS CHECKED, YOU MUST PAY AMOUNT INDICATED BELOW OR APPEAR IN COURT. SEE INSTRUCTIONS (on back of yellow copy).

Forfeiture Amount: $
+ $30 Processing Fee
PAY THIS AMOUNT → Total Collateral Due: $

YOUR COURT DATE
(If no court appearance date is shown, you will be notified of your appearance date by mail.)

Court Address: 221 West Broadway   San Diego, CA, 92101
Date (mm/dd/yyyy): TBD   Time (hh:mm): TBD

My signature signifies that I have received a copy of this violation notice. It is not an admission of guilt. I promise to appear for the hearing at the time and place instructed or pay the total collateral due.

Defendant Signature: X refused to sign

(Rev 04/2015)   Original - CVB Copy

CVB SCAN 09/26/2018 13:26

P

| U.S. Department of Homeland Security | | Subject ID:367321708 | | Record of Deportable/Inadmissible Alien |

| Family Name (CAPS) | First | Middle | | | Sex | Hair | Eyes | Cmplxn |
|---|---|---|---|---|---|---|---|---|
| LUCAS-HERNANDEZ, ULISES ROMEO | | | | | M | BLK | BRO | MED |

| Country of Citizenship | Passport Number and Country of Issue | File Number | Height | Weight | Occupation |
|---|---|---|---|---|---|
| MEXICO | | CASE No:CAO2011000121 A209 947 526 | 64 | 132 | LABORER |

**U.S. Address**
IN DHS CUSTODY

Scars and Marks
None Visible

| Date, Place, Time, and Manner of Last Entry | Passenger Boarded at | F.B.I. Number |
|---|---|---|
| 11/30/2019, 0600, 18 mile(s) E of TEC, PWA (AFOOT) | | EEH9XELNE |

☒ Single
☐ Divorced ☐ Married
☐ Widower ☐ Separated

Number, Street, City, Province, State and Country of Permanent Residence
PRIVADA LAS PIEDRAS 30 COL DE LA PRESA TIJUANA, BAJA CALIFORNIA, MEXICO

Method of Location/Apprehension
PB

| Date of Birth | | Date of Action | Location Code | At/Near | Date/Hour |
|---|---|---|---|---|---|
| 10/22/1997 | Age:22 | 11/30/2019 | SDC/CAO | San Diego, CA | 11/30/2019 1410 |

| City, Province (State) and Country of Birth | | By |
|---|---|---|
| SAN JUAN ATEPEC, OAXACA, MEXICO | AR ☒   Form: (Type and No.) Lifted ☐ Not Lifted ☐ | BRIAN MAULER |

| NIV Issuing Post and NIV Number | Social Security Account Name | Status at Entry | Status When Found |
|---|---|---|---|
| | | PWA Mexico | TRAVEL/SEEKIN G |

| Date Visa Issued | Social Security Number | Length of Time Illegally in U.S. |
|---|---|---|
| | | AT ENTRY |

| Immigration Record | Criminal Record |
|---|---|
| POSITIVE - See Narrative | |

Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate)

Number and Nationality of Minor Children

| Father's Name, Nationality, and Address, if Known | Mother's Present and Maiden Names, Nationality, and Address, if Known |
|---|---|
| See Narrative | See Narrative |

| Monies Due/Property in U.S. Not in Immediate Possession | Fingerprinted? ☒ Yes ☐ No | Systems Checks | Charge Code Word(s) |
|---|---|---|---|
| None Claimed | | See Narrative | I6A |

| Name and Address of (Last/Current) U.S. Employer | Type of Employment | Salary | Employed from/to |
|---|---|---|---|
| | | Hr | |

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

FINS #:1234807072          I77 #:6783751



Left Index Print

Right Index Print

ARREST COORDINATES:
--------------------
Latitude:  32.64899
Longitude: -116.35606

CONSEQUENCE DELIVERY SYSTEM:
---------------------------
Classification: PERA

11/30/19 FF (Date/Initials)

RUBEN ROBLES
Border Patrol Agent
(Signature and Title of Immigration Officer)

Alien has been advised of communication privileges

| Distribution | Received: (Subject and Documents)  (Report of Interview) |
|---|---|
| Original to "A" File Copy to SDC/PROS Copy to SDC/CAO Intel | Officer  RUBEN ROBLES on  November 30, 2019 at 2132  (time) Disposition  REINSTATEMENT OF DEPORT ORDER I-871 Examining Officer  NOEL J. MENDEZ |

Form I-213 (Rev. 08/01/07) Y

U.S. Department of Homeland Security                          Continuation Page for Form ____ I213

| Alien's Name | File Number | Date |
|---|---|---|
| LUCAS-HERNANDEZ, ULISES ROMEO | A209 947 526<br>Event No:CAO2011000121 | 11/30/2019 |

FATHER NAME AND ADDRESS:
------------------------
Nationality:MEXICO LUCAS, ROMEO
PRIVADA LAS PIEDRAS 30 COL DE LA PRESA
TIJUANA, BAJA CALIFORNIA, MEXICO

MOTHER NAME AND ADDRESS:
------------------------
Nationality:MEXICO HERNADEZ, IRMA
PRIVADA LAS PIEDRAS 30 COL DE LA PRESA
TIJUANA, BAJA CALIFORNIA, MEXICO

FUNDS IN POSSESSION:
--------------------
Mexican Peso 600.00        URLH

RECORDS CHECKED:
----------------
ABIS Positive
EARM Positive
IAFIS Positive
NCIC Positive
TECS Positive

NARRATIVE:
----------
On November 30, 2019, Ulises Romeo LUCAS-Hernandez, was encountered by Border Patrol Agent
Brian Mauler, and taken into custody. LUCAS was transported to the Campo Station for
further processing.

Border Patrol Agent Brian Mauler's statement is documented in the attached G-166C.

At the station, as a routine step in processing, LUCAS' biographical and biometric
information were entered into the Department of Homeland Security processing systems. The
following numbers are associated with LUCAS:

A#:    209 947 526

FINS#:  1234807072

FBI#:  EEH9XELNE

No wants or warrants were found.

| Signature | Title |
|---|---|
| RUBEN ROBLES | Border Patrol Agent |

2 of 3 Pages

U.S. Department of Homeland Security                    Continuation Page for Form _____ I213

| Alien's Name | File Number | Date |
|---|---|---|
| LUCAS-HERNANDEZ, ULISES ROMEO | A209 947 526 | 11/30/2019 |
| | Event No:CAO2011000121 | |

On November 30, 2019, Border Patrol Agent Richard Ledesma advised LUCAS of his consulate communication rights. LUCAS elected to exercise his rights at that time and telephonic call was made. LUCAS was able to speak to a consulate representative.

LUCAS claimed no fear of torture or persecution if returned to Mexico.

LUCAS was served with DHS forms I-871, I-294, and I-215B.

LUCAS is being held in the custody of the Department of Homeland Security pending reinstatement of a prior order of removal/8 USC 1325.

*******************************************

8 USC 1325 Defendant Statement:

Name: Lucas-Hernandez, Ulises Romeo

Location: Campo Border Patrol Station, Pine Valley, CA

Time: 4:21 PM/11/30/2019

Taken By: BPA Richard Ledesma

Witnessed By: BPA R. Moore

On November 30, 2019, at approximately 3:33 PM, I Border Patrol Agent (BPA) Richard Ledesma conducted a videotaped interview with defendant Lucas-Hernandez, Ulises Romeo. BPA R. Moore served as a witness.
At approximately 3:36 PM, I advised Lucas-Hernandez, Ulises Romeo of his Consulate Rights. Lucas-Hernandez, Ulises Romeo stated that he did not wish to speak to his consulate office. BPA agent R. Moore witnessed this advisement.
At approximately 3:39 PM, I advised Lucas-Hernandez, Ulises Romeo of his Miranda Rights as per DHS Form I-214. Lucas-Hernandez, Ulises Romeo stated he understood his rights and initialed DHS form I-214. Lucas-Hernandez, Ulises Romeo invoked his Miranda Rights and stated that he was not willing to answer my questions without having an attorney present and sign DHS form I-214 acknowledging his responses.

The interview was concluded at approximately 3:39PM.

| Signature | | Title |
|---|---|---|
| RUBEN ROBLES | | Border Patrol Agent |

Form I-831 Continuation Page (Rev. 08/01/07)

Event No:CAO2011000121

U.S. Department of Homeland Security          MEMORANDUM OF INVESTIGATION

| File Number | Title: | Control Office |
|---|---|---|
| A209 947 526 | LUCAS-HERNADEZ, ULISES ROMEO | SDC/CAO |

Memorandum of Investigation
---------------------------
On November 30, 2019, I, Border Patrol Agent Brian Mauler was on duty in the Campo, California Border Patrol Station's area of responsibility.

At approximately 2:00 p.m., I was patrolling on a dirt road that is known to Border Patrol Agents as "The 3030 Road" near Boulevard, California, when I discovered shoeprints heading north. I began following the shoeprints, and followed them for approximately five minutes until I encountered three individuals attempting to hide in a deep sand wash. This area is located approximately 16 miles east of the Tecate, California Port of Entry and approximately 3.5 miles north of the United States/Mexico international boundary.

I identified myself as a United States Border Patrol Agent and questioned each of the three individuals, later identified as Abel CRUZ-Hernandez, Luis HERNANDEZ-Lopez, and Ulises Romeo LUCAS-Hernandez, in regards to their citizenship. CRUZ, HERNANDEZ, and LUCAS each stated that they were citizens of Mexico. CRUZ, HERNANDEZ, and LUCAS also each admitted that they had illegally crossed the border and that they did not have any immigration documents that would allow them to be in the United States legally.

At approximately 2:10 p.m., I placed CRUZ, HERNANDEZ, and LUCAS under arrest for being illegally present in the United States and transported them to the Campo Border Patrol Station for further processing.

I, Border Patrol Agent Brian Mauler, placed my initials next to the photos of CRUZ, HERNANDEZ, and LUCAS, the individuals on DHS form G-166C. My initials indicate that these photographs depict the individuals that I encountered and apprehended on November 30, 2019.



LUCAS-HERNANDEZ



CRUZ-HERNANDEZ



HERNANDEZ-LOPE.

| Investigator | | Date |
|---|---|---|
| Border Patrol Agent | BRIAN MAULER | November 30, 2019 |

Form G-166C (08/01/07)                                    Page  1  of 1